ROB BONTA
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General
MACKLIN THORNTON
Deputy Attorney General
State Bar No. 327927
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  Telephone:  (619) 321-5166
  Fax:  (916) 732-7920
  E-mail:  Macklin.Thornton@doj.ca.gov
*Attorneys for Defendants*
*E. Heidler and E. Kranz*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **ROBERT ANTHONY GOINS,**<br><br>Plaintiff,<br><br>v.<br><br>**E. KRANZ, et al.,**<br><br>Defendants. | 2:25-cv-02168-SB-ACCV<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[*Per Dkt. No. 39, no hearing date will be set*]<br><br>Judge:　　Hon. Angela Catherine Claire Viramontes<br>Action Filed: 3/10/2025 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

UNCONTROVERTED MATERIAL FACTS ........................................................... 1

   I.    The Parties........................................................................................... 1

   II.   CDCR's Mental Health Services ......................................................... 2

       A.    The Mental Health Services Delivery System (MHSDS) .......... 2

       B.    The Crisis Intervention Team (CIT) ......................................... 3

   III.  Plaintiff's Mental health and Attempts to Avoid His Restricted Housing Unit (RHU) Placement Before the Incident ......................... 4

   IV.  Defendants' Interactions with Plaintiff Before the March 26, 2023 Incident. ........................................................................ 6

   V.   The March 26, 2023 Incident. .............................................................. 6

   VI.  Plaintiff's Staged Suicide Attempt...................................................... 7

   VII. Defendants' Interactions with Plaintiff After the March 26, 2023 Incident............................................................................................... 8

   VIII. Dr. Heidler's Supervision of Dr. Kranz........................................... 9

   IX.  Plaintiff's Grievances........................................................................ 9

       A.    The Health Care Grievance Process. ....................................... 9

       B.    Plaintiff's Relevant Health Care Grievances........................... 10

LEGAL STANDARD ............................................................................................. 11

ARGUMENT........................................................................................................... 12

   I.    Plaintiff Failed to Exhaust His Claim Against Heidler. .................... 12

       A.    A Grievance Must Include Sufficient Factual Information....... 12

       B.    Plaintiff Failed to Exhaust Administrative Remedies Against Heidler ........................................................................ 13

   II.   Defendants Did Not Violate Plaintiff's Eighth Amendment Rights Because Plaintiff's Claim of Suicidal Ideation Was Not Credible, Defendants Were Not Deliberately Indifferent, and Plaintiff Lacks Evidence to Support Supervisory Liability................ 14

       A.    Deliberate Indifference Is a High Legal Standard.................... 14

       B.    Plaintiff Did Not Face an Objectively Serious Risk of Harm. ....................................................................................... 16

       C.    Kranz Did Not Know of Nor Consciously Disregard an Excessive Risk of Harm to Plaintiff's Health or Safety Because Plaintiff's Self-Report Was Insincere and Unsupported by His Health Record. ........................................ 16

       D.    Heidler Cannot Be Liable for Supervisory Liability Because Plaintiff Has No Evidence of Her Personal Involvement or A Sufficient Causal Connection ................... 18

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

III.    Defendants are Entitled to Qualified Immunity.................................19

    A.    Qualified Immunity Shields All Except Those Who Are Plainly Incompetent or Who Knowingly Violate the Law.......20

    B.    Qualified Immunity Shields Defendants from Liability...........21

CONCLUSION.................................................................................22

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alston v. Read*
663 F.3d 1094 (9th Cir. 2011) ..................................................................21

*Anderson v. Creighton*
483 U.S. 635 (1987) ..................................................................................21

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ............................................................................11, 12

*Arellano v. Calderon*
No. 22-cv-441 TWR (LR), 2024 WL 1163177 (S.D. Cal. Mar. 18, 2024)..........................................................................................................17

*Ashcroft v. al-Kidd*
563 U.S. 731 (2011) ..................................................................................20

*Barren v. Harrington*
152 F.3d 1193 (9th Cir. 1998)..................................................................15

*Brown v. Valoff*
422 F.3d 926 (9th Cir. 2005)......................................................................9

*Cano v. Taylor*
739 F.3d 1214 (9th Cir. 2014)......................................................12, 13, 18

*Carmen v. San Francisco Unified Sch. Dist.*
237 F.3d 1026 (9th Cir. 2001)..................................................................19

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986) ..................................................................................11

*Colburn v. Upper Darby Twp.*
946 F.2d 1017 (3d Cir. 1991)....................................................................16

*Devereaux v. Abbey*
263 F.3d 1070 (9th Cir. 2001) (en banc)..................................................11

**TABLE OF AUTHORITIES**
(continued)

Page

*Estelle v. Gamble*
    429 U.S. 97 (1976) ................................................................... 14, 15, 17

*Farias v. Lopez*
    No. 21-cv-04167-BLF, 2023 WL 6466395 (N.D. Cal. Oct. 3, 2023)................ 13

*Farmer v. Brennan*
    511 U.S. 825 (1984) ................................................................... 14, 15, 17

*First Nat. Bank of Ariz. v. Cities Serv. Co.*
    391 U.S. 253 (1968) ...................................................................... 11

*Foster v. Runnels*
    554 F.3d 807 (9th Cir. 2009) .............................................................. 14

*Griffin v. Arpaio*
    557 F.3d 1117 (9th Cir. 2009) ............................................................ 12

*Hallett v. Morgan*
    296 F.3d 732 (9th Cir. 2002) ............................................................. 15

*Hamby v. Hammond*
    821 F.3d 1085 (9th Cir. 2016) ............................................................ 20

*Hansen v. Black*
    885 F.2d 642 (9th Cir. 1989) .......................................................... 15, 19

*Harrison v. Kernan*
    971 F.3d 1069 (9th Cir. 2020) ............................................................. 9

*Hearns v. Terhune*
    413 F.3d 1036 (9th Cir. 2005) ............................................................ 14

*Hutchinson v. United States*
    838 F.2d 390 (9th Cir. 1988) ............................................................. 15

*Jones v. Bock*
    549 U.S. 199 (2007) ...................................................................... 13

*Leer v. Murphy*
    844 F.2d 628 (9th Cir. 1988)............................................................... 19

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lemire v. California Dep't of Corr. & Rehab.*
726 F.3d 1062 (9th Cir. 2013).......................................................................14, 15

*Lovett v. Cnty. of Los Angeles*
No. 2:22-cv-07394-KK-PD, 2024 WL 4766205 (C.D. Cal. Aug. 1, 2024).........................................................................................................19

*Malley v. Briggs*
475 U.S. 335 (1986)...........................................................................................20

*Mangiaracina v. Penzone*
849 F.3d 1191 (9th Cir. 2017)..............................................................................9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986) ..........................................................................................11

*May v. Enomoto*
633 F.2d 164 (9th Cir. 1980)..............................................................................15

*Moore v. Dunlap*
No. 24-2704, 2026 WL 184223 (9th Cir. Jan. 23, 2026) ...................................17

*Mullenix v. Luna*
577 U.S. 7 (2015) ..............................................................................................20

*Navajo Nation v. Dep't of the Interior*
876 F.3d 1144 (9th Cir. 2017)..............................................................................9

*Pearson v. Callahan*
555 U.S. 223 (2009) ..........................................................................................20

*Plumhoff v. Rickard*
572 U.S. 765 (2014) ..........................................................................................21

*Porter v. Nussle*
534 U.S. 516 (2002) .....................................................................................12, 13

*Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*
479 F.3d 1175 (9th Cir. 2007).............................................................................15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Sanchez v. Vild*
891 F.2d 240 (9th Cir. 1989) ................................................................. 15

*Sapp v. Kimbrell*
623 F.3d 813 (9th Cir. 2010) ................................................................. 12

*Scott v. Cnty. of Kern*
No. 1:24-cv-00423-CDB, 2025 WL 3035176 (E.D. Cal. Oct. 30,
2025) ....................................................................................................... 22

*Sjurset v. Button*
810 F.3d 609 (9th Cir. 2015) ................................................................. 20

*Toguchi v. Chung*
391 F.3d 1051 (9th Cir. 2004) ............................................................... 14

*Vasquez v. Cnty. of Santa Clara*
803 F. App'x 100 (9th Cir. 2020) .......................................................... 18

*Vazquez v. Cnty. of Kern*
949 F.3d 1153 (9th Cir. 2020) ............................................................... 15

*Villiarimo v. Aloha Island Air, Inc.*
281 F.3d 1054 (9th Cir. 2002) ............................................................... 12

*Vivanco v. California Dep't of Corr. & Rehab.*
No. 1:17-cv-00434-BAM, 2019 WL 2764397 (E.D. Cal. July 2,
2019) ....................................................................................................... 16

*White v. Pauly*
580 U.S. 73 (2017) ................................................................................. 21

*Woodford v. Ngo*
548 U.S. 81 (2006) ..................................................................... 12, 13, 14

**STATUTES**

42 United States Code
§ 1983 ....................................................................................................... 1
§ 1997e(a) ............................................................................................... 12

## TABLE OF AUTHORITIES
### (continued)

**Page**

**COURT RULES**

Federal Rule of Civil Procedure
    56 ...................................................................................................................... 11, 19

**OTHER AUTHORITIES**

California Code of Regulations, Title 15
    § 3999.227 ...................................................................................... 12, 13, 14

**INTRODUCTION**

Plaintiff Robert Anthony Goins, an incarcerated person proceeding *pro se*, brings this action against Defendants E. Kranz and E. Heidler pursuant to 42 U.S.C. § 1983.  Dkt. Nos. 1, 32.[1]  Plaintiff's only remaining cause of action is his Eighth Amendment claim for medical indifference.  Dkt. Nos. 25, 32.

Plaintiff alleges Defendants were deliberately indifferent to his medical needs when Dr. Kranz declined to change Plaintiff's level of care when Plaintiff self-reported suicidal ideations.  Plaintiff claims he then attempted to commit suicide after Kranz failed to adequately treat Plaintiff.  In addition to Kranz's purported missteps, Plaintiff asserts a supervisory liability claim against Dr. Heidler.

The contemporaneous, undisputed evidence refutes Plaintiff's baseless claims.  Plaintiff did not want to be transferred or have a cell mate, so he feigned suicidal ideation.  Dr. Kranz assessed Plaintiff and determined the reality of Plaintiff's mental health did not align with Plaintiff's representation.  Plaintiff did not warrant a higher level of care.  When Kranz shared his findings, Plaintiff demanded Kranz's name, threatened to stage a suicide, and threatened to then file a claim for deliberate indifference.  Plaintiff cannot satisfy the objective or subjective components of his Eighth Amendment claim where his self-reported mental health crisis was insincere and designed to manipulate staff.

Accordingly, Defendants move for summary judgment.

**UNCONTROVERTED MATERIAL FACTS**

**I.     THE PARTIES.**

Plaintiff Goins is in the custody of the California Department of Corrections and Rehabilitation (CDCR).  Defendants' Statement of Uncontroverted Facts (DSUF) No. 1.  Plaintiff has preexisting neck injuries.  DSUF No. 2.

---

[1] Page references to *docket entries* refer to the pagination assigned by CM/ECF.  Page references to *exhibits* attached to supporting declarations to this motion refer to the stamped, chronological pages at the bottom of each page following exhibit cover sheets.  References to any *deposition transcript* refer to the page numbers on the transcript itself.

1

Dr. Kranz was a Clinical Psychologist at California Men's Colony (CMC) during the relevant time.  DSUF No. 3.  In this role, Kranz's duties included providing mental health treatment to inmates.  DSUF No. 4.  Licensed psychologists do not have prescriptive authority in California.  DSUF No. 5.  Kranz served on the Crisis Intervention Team (CIT), which responds inmates' mental health emergencies.  DSUF No. 6.  In February 2026, Kranz promoted to Senior Psychologist Supervisor.  DSUF No. 7.

Dr. Heidler was a Senior Psychologist Supervisor at CMC during the relevant time.  DSUF No. 8.  In this role, Heidler supervised and trained Clinical Psychologists.  DSUF No. 9.

## II.  CDCR'S MENTAL HEALTH SERVICES

### A.  The Mental Health Services Delivery System (MHSDS)

The MHSDS Program Guide delineates care guidelines for patients at all levels of custody in CDCR.  DSUF No. 10.  Mental health services are based on "levels of care" assigned through screening and evaluation by mental health clinicians.  DSUF No. 11.  Levels of care denote the acuity of a patient's mental health needs and ability to function in a correctional environment.  DSUF No. 12.  The lowest (*i.e.*, least acute) level of care is the Correctional Clinical Case Management System (CCCMS).  DSUF No. 13.

For patients with chronic mental health problems or those suffering from acute mental health crises, the Enhanced Outpatient Program (EOP) level of care provides more intensive individual and group treatment.  DSUF No. 14.  The EOP provides the most intensive level of *outpatient* mental health care within the MHSDS.  DSUF No. 15.

Short-term and longer-term inpatient facilities are available.  DSUF No. 16.  The goal of the Mental Health Crisis Bed (MHCB) program is to treat conditions requiring an *inpatient* setting to ameliorate mental health symptoms in the least restrictive environment.  DSUF No. 17.  A patient admitted to the MHCB may have

acute symptoms of a serious mental disorder or may be suffering from a significant or life-threatening disability. DSUF No. 18. Where twenty-four-hour care is needed, an incarcerated patient is placed in a MHCB for continuous nursing care. DSUF No. 19.

A patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, is referred to a MHCB. DSUF No. 20. A patient must meet specific criteria to receive treatment at the MHCB level of care. DSUF No. 21. Not all crises require admission to the MHCB. DSUF No. 22. Crisis episodes for some patients may be handled on an outpatient basis. DSUF No. 23.

**B.   The Crisis Intervention Team (CIT)**

The CIT is part of CMC's crisis mental health response. DSUF No. 24. It is an interdisciplinary team that includes a mental health clinician, nursing staff, and custody supervisory staff. DSUF No. 25. The CIT sees each patient in-person, in a confidential setting, together as a team, and as close to the patient's housing unit as possible. DSUF No. 26. The CIT provides responsive crisis intervention strategies directed toward resolving patient crises. DSUF No. 27. Prompt attention to potential crisis issues allows staff to work with the patient to address concerns that could lead to self-harm or suicidal behavior. DSUF No. 28. The interdisciplinary model of the CIT improves the collaboration and partnership of the disciplines to meet patients' needs. DSUF No. 29.

A crisis is a sudden or rapid onset or exacerbation of symptoms of mental illness, which may include suicidality or other aberrant behavior, and requires immediate intervention. DSUF No. 30. Situations involving mental health crisis may follow trajectories that include intense feelings of personal distress (*e.g.*, anxiety, depression, anger, panic, hopelessness), obvious changes in functioning (*e.g.*, neglect of personal hygiene, unusual behavior), and may be precipitated by catastrophic life events (*e.g.*, disruptions in personal relationships,

3

support systems or living arrangements; loss of autonomy or parental rights; victimization or natural disasters).  DSUF No. 31.

When a patient reports or staff observe an emergent mental health need, staff notify CIT members.  DSUF No. 32.  The CIT members will complete a record review prior to meeting the patient.  DSUF No. 33.

The CIT convenes within thirty minutes and will initiate intervention in collaboration with all team members.  DSUF No. 34.  The CIT interviews the patient to identify the type of crisis, takes appropriate action regarding treatment planning, assesses the patient's ability to understand and communicate, assesses the problem using de-escalation and motivational interviewing techniques, and assesses whether a referral to the psychiatrist is clinically indicated.  DSUF No. 35.  As part of the interview, the mental health clinician determines whether the patient needs a referral to the MHCB.  DSUF No. 36.

### III. PLAINTIFF'S MENTAL HEALTH AND ATTEMPTS TO AVOID HIS RESTRICTED HOUSING UNIT (RHU) PLACEMENT BEFORE THE INCIDENT

Between January 7, 2023 and January 13, 2023, Plaintiff was housed in MHCB after reporting he would kill himself if he were placed in the RHU[2] as a result of his visitor attempting to bring illicit substances into CMC.  DSUF No. 38.  Plaintiff said "if I go up to [RHU] I am going to kill myself, I know what I am going to do.  I don't deserve to be up there."  DSUF No. 39.

On January 10, 2023, Dr. Heidler saw Plaintiff while he was housed in MHCB.  DSUF No. 40.  Plaintiff expressed concern about being housed in RHU without his property and the investigation into the illicit substance allegations.  DSUF No. 41.  Heidler reported Plaintiff was "able to see the more optimistic side of things" and was "future oriented and finds comfort in family visits."  DSUF No. 42.  Heidler saw that Plaintiff "has no documented suicide attempts on record."

_____

[2] The Administrative Segregation Unit (ASU) (sometimes referred to as "Ad Seg") has been reorganized as part of the RHU.  DSUF No. 37.

4

DSUF No. 43.  Heidler's medical report noted Plaintiff would "remain in the MHCB for the next few days."  DSUF No. 44.

After discharged from MHCB, Plaintiff was housed in CMC's RHU EOP program and was not experiencing suicidal ideations.  DSUF No. 45.  Over the following five days, Plaintiff exhibited no suicidal ideation and decreased distress.  DSUF No. 46.  Between his MHCB discharge on January 13, 2023, and evaluation by Dr. Kranz on March 26, 2023, Plaintiff attended recreation therapy groups and saw his mental health clinician and assigned psychiatrist regularly.  DSUF No. 47.

As Plaintiff approached two months in RHU, Plaintiff complained to clinicians about the stress and uncertainty of his situation, including worrying of being transferred away from CMC.  DSUF No. 48.  On March 9, 2023, Plaintiff was compliant with his medications and denied having suicidal ideations.  DSUF No. 49.  On March 14, 2023, Plaintiff expressed being tired of being housed in RHU but denied having problems with his medication or having suicidal ideations.  DSUF No. 50.  On March 18, 2023, Plaintiff expressed being depressed because he wanted out of RHU.  DSUF No. 51.  On March 21, 2023, Plaintiff explained he was "worried and concerned they will transfer me" and "[didn't] want to cell with others; I've been dreading it."  DSUF No. 52.  During the March 21 appointment, Plaintiff denied problems with his medication, identified coping skills, and denied having suicidal ideation.  DSUF No. 53.  On March 24, 2023, Plaintiff was anxious because of a possible transfer but denied having suicidal ideations.  DSUF No. 54.

Psychiatric technician reports from March 2023 report intermittent suicidal thoughts *without* plan or intent to act.  DSUF No. 55.  Clinicians reported Plaintiff was coping well with the stress and was compliant with his psychotropic medications.  DSUF No. 56.

5

**IV.  DEFENDANTS' INTERACTIONS WITH PLAINTIFF BEFORE THE MARCH 26, 2023 INCIDENT.**

Kranz's first interaction with Plaintiff was on March 26, 2023.  DSUF No. 57.  Heidler's only interaction with Plaintiff was on January 10, 2023.  DSUF No. 58.  Heidler did not treat or interact with Plaintiff on March 26, 2023.  DSUF No. 59.  Before March 26, 2023, Plaintiff did not complain to Heidler regarding Kranz's provision of mental health treatment.  DSUF No. 60.

**V.  THE MARCH 26, 2023 INCIDENT.**

On March 26, 2023, around 5:50 P.M., Kranz received a CIT alert that Plaintiff required a mental health assessment.  DSUF No. 61.

The CIT, including Kranz, responded to Plaintiff and interviewed him.  DSUF No. 62.  Plaintiff said "I heard bad news about my son today . . . but also I've been here for two and half months and I'm mentally exhausted . . . .  I'm thinking about wrapping a sheet around my neck."  DSUF No. 63.  Plaintiff reported he felt this way for "[a] week" but didn't know if he told his primary clinician.  DSUF No. 64.

Kranz checked Plaintiff's mental health records from an encounter on March 21, 2023.  DSUF No. 65.  According to the notes, "there was no indication of [suicidal ideation] on 3/21/2023."  DSUF No. 66.  Kranz reviewed the note, which reported Plaintiff stating "I'm good.  I'm super depressed and mentally exhausted.  I've been worried and concerned they will transfer me.  I am safe at this prison, I don't do well with people, I don't want to cell with others; I've been dreading it."  DSUF No. 67.

Kranz reviewed Plaintiff's diagnoses of Generalized Anxiety Disorder, severe Alcohol Use Disorder, and Adult Anti-Social Personality Disorder.  DSUF No. 68.  Kranz noted Plaintiff had no history of self-injurious behavior or suicide attempts, was compliant with his medication, and attended groups frequently "with good participation."  DSUF No. 69.  Kranz noted Plaintiff was vague about his

6

"stressors" and the "bad news" from his son—except that he was "mentally exhausted" from being housing in the RHU.  DSUF No. 70.

Kranz documented that Plaintiff's "self report regarding being suicidal for a week was incongruent with documentation.  In addition, it appears [Plaintiff] is wary of a possible transfer and is attempting to use impression management to obtain a [level-of-care] change."  DSUF No. 71.  The CIT determined Plaintiff could remain at the EOP level of care.  DSUF No. 72.

Kranz noted when Plaintiff "was told that he wouldn't be going to [Correctional Treatment Center (CTC)] and that he can program at EOP [level of care] and work on coping skills to manage his stressors," Plaintiff responded "ok, what's your name?  Spell it!  Ok, after I go back in my cell and do what I got to do I'm going to file paperwork on you for deliberate indifference."  DSUF No. 73. Kranz did not dare or incite Plaintiff to harm himself as a prerequisite to receiving mental health treatment.  DSUF No. 74.

Kranz determined Plaintiff's statement suggested a "planned calculation to use impression management" to secure a higher level of care.  DSUF No. 75.  Plaintiff demonstrated "future orientation regarding planning to 'file paperwork'" after engaging in "attention seeking, maladaptive" behavior.  DSUF No. 76.  Kranz noted Plaintiff made "conditional threats to tie a sheet around his neck if he wasn't transferred to MHCB."  DSUF No. 77.

During his interactions with Plaintiff, Kranz adequately and appropriately evaluated Plaintiff's suicide risk under CDCR policies and procedures.  DSUF No. 78.  Kranz made the appropriate clinical decision for Plaintiff to remain at his housing assignment.  DSUF No. 79.

## VI. PLAINTIFF'S STAGED SUICIDE ATTEMPT.

After the interview with CIT, nonparty staff escorted Plaintiff back to his cell. DSUF No. 80.

7

Around 7:05 P.M., custody staff issued a code because Plaintiff placed a sheet around his neck, tied the sheet to the window, and stood on his sink or toilet seat. DSUF No. 81.  Nonparty staff ordered Plaintiff to remove the sheet.  DSUF No. 82.

Medical staff completed a preliminary medical form around 7:12 P.M.  DSUF No. 83.  The medical form reflected no injuries and a comment from Plaintiff: "[j]ust keep an eye out on me."  DSUF No. 84.

Nonparty staff escorted Plaintiff to the Treatment and Triage Area (TTA) around 7:44 P.M.  DSUF No. 85.  During the examination, staff wrote "[n]o ligature marks or bruising noted and airway clear."  DSUF No. 86.  After being assessed, nonparty staff escorted Plaintiff to the Alternative Housing Unit around 8:08 P.M.  DSUF No. 87.

After the incident, Kranz's impression was that this was not a suicide attempt; instead, it was a was an attempt to affect a change in Plaintiff's level of care, avoid a pending transfer, or avoid his RHU housing assignment.  DSUF No. 88.

**VII. DEFENDANTS' INTERACTIONS WITH PLAINTIFF AFTER THE MARCH 26, 2023 INCIDENT.**

On March 27, 2023, around 1:30 P.M., Kranz evaluated Plaintiff.  DSUF No. 89.  Plaintiff said he was worried about being transferred, afraid he might end up hurting someone if housed with a cellmate, and wanted placement in the CTC.  DSUF No. 90.  Plaintiff noted other stressors, including his child's school problems and discontent with his medications.  DSUF No. 91.

Plaintiff said he had an upcoming Institutional Classification Committee (ICC) regarding his housing placement.  DSUF No. 92.  Plaintiff agreed to continue at the EOP level of care within the RHU until the ICC determined whether he would be transferred.  DSUF No. 93.  Plaintiff was future-oriented, commenting on desiring to return to programming and discussing his upcoming ICC.  DSUF No. 94.

Kranz did not deem the behavior on March 26, 2023, a suicide attempt because there was no injury, Plaintiff "appeared to stage a suicidal gesture that was

deemed high rescue, low lethality" behavior to affect a change in Plaintiff's level of care.  DSUF No. 95.

## VIII.  DR. HEIDLER'S SUPERVISION OF DR. KRANZ

Plaintiff has never seen Heidler and Kranz together at the same time, has never seen Heidler provide training to Kranz, and has never seen Heidler speak to Kranz.  DSUF No. 96.  Plaintiff is unaware of the training or supervisory actions Heidler should have taken or the scope of Heidler's duties or requirements as a supervisor.  DSUF No. 97.  Licensed practitioners who work for CDCR or CCHCS are not required to have regular clinical supervision of their work.  DSUF No. 98.  Heidler's level of supervision and monitoring was within the requirements of the local and statewide policies for CITs in CDCR.  DSUF No. 99.  And Kranz met the training requirements for his position.  DSUF No. 100.

## IX.  PLAINTIFF'S GRIEVANCES.

At all relevant times, CDCR required inmate-patients to use an administrative grievance process to bring health care related complaints.  DSUF No. 101.  The grievance process to exhaust administrative remedies as to health care related claims was available to Plaintiff at all relevant times.  DSUF No. 102.

### A.    The Health Care Grievance Process.

Under the California Code of Regulations, title 15, §§ 3999.225–3999.237,[3] patients may grieve issues regarding health care policies, decisions, actions, conditions, or omissions using a CDCR 602 HC, Health Care Grievance form.  DSUF No. 103.  The patient must submit a healthcare grievance within thirty days of the "action or decision being grieved" or "[i]nitial knowledge of the action or decision being grieved."  DSUF No. 104.

---

[3] Courts may take judicial notice of regulations and prison rules and regulations.  *See Harrison v. Kernan*, 971 F.3d 1069, 1071 n.2 (9th Cir. 2020); *Brown v. Valoff*, 422 F.3d 926, 931 n.7 (9th Cir. 2005); *Mangiaracina v. Penzone*, 849 F.3d 1191, 1193 n.1 (9th Cir. 2017); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1153 n.3 (9th Cir. 2017).

9

Health care grievances are subject to two levels of review: (1) health care grievances are processed at the institutional level by Health Care Grievance Offices at each institution and (2) health care grievance appeals are processed at the headquarters level by the Health Care Correspondence and Appeals Branch (HCCAB), if requested. DSUF No. 105. Health care grievances/appeals are subject to a headquarters disposition before administrative remedies are deemed exhausted. DSUF No. 106. Health care grievances are tracked and maintained in an electronic database known as the Health Care Appeals and Risk Tracking System. DSUF No. 107.

### B.    Plaintiff's Relevant Health Care Grievances.

Following the incident, Plaintiff had access to an available administrative remedy through the grievance process at CMC. DSUF No. 108. On April 6, 2023, healthcare staff received Plaintiff's grievance with tracking number CMC HC 23000342. DSUF No. 109. In the grievance, Plaintiff complained about Kranz's treatment after Plaintiff expressed suicidal ideation. DSUF No. 110. Plaintiff did not mention or name Heidler in his grievance, and Plaintiff did not address any defects in Kranz's supervision. DSUF No. 111. At the first level of review at the institutional level, CMC denied intervention on June 2, 2023. DSUF No. 112. Plaintiff appealed the Institutional Level Response, which was received at the headquarters level on June 12, 2023. DSUF No. 113. Plaintiff did not mention or name Heidler in his appeal, and Plaintiff did not address any defects in Kranz's supervision. DSUF No. 114. At the second level of review at the headquarters level, HCCAB issued a disposition of no intervention on August 24, 2023. DSUF No. 115.

In the middle of this litigation, Plaintiff submitted another grievance with tracking number CMC HC 26000250, which was received by healthcare staff on April 21, 2026. DSUF No. 116. Plaintiff rehashed aspects from his first grievance and added that Kranz falsified a report regarding a purported injury sustained on

10

March 26, 2023. DSUF No. 117. The recent grievance did not mention Heidler. DSUF No. 118. Plaintiff was issued an Institutional Level Response dated June 24, 2026, with a disposition of no intervention. DSUF No. 119. There is no record that this grievance was received for headquarters level review. DSUF No. 120.

## LEGAL STANDARD

The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56 advisory committee note to 1963 amendment). Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard requires more than the "mere existence of *some* alleged factual dispute between the parties"; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A party seeking summary judgment bears the initial burden of and identifying those portions of the evidence in the record that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party meets its initial burden, the non-moving party must produce specific evidence to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 587 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

11

The Court must view the evidence and draw all reasonable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255. Nonetheless, the Court need not draw all possible inferences in that party's favor, but only reasonable ones. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

## ARGUMENT

### I. PLAINTIFF FAILED TO EXHAUST HIS CLAIM AGAINST HEIDLER.

Plaintiff submitted a grievance regarding Kranz's interaction with Plaintiff on March 26, 2023, and a late grievance in April 2026. But the grievances are silent as to Heidler. Consequently, Plaintiff's claim against Heidler must be dismissed.

### A. A Grievance Must Include Sufficient Factual Information.

The PLRA requires inmates to exhaust all available administrative remedies before initiating a civil action with respect to prison conditions. 42 U.S.C. § 1997e(a); *see also Cano v. Taylor*, 739 F.3d 1214, 1219 (9th Cir. 2014) ("The Ninth Circuit has explained that Congress purposefully made exhaustion a precondition to suit, rather than to judgment."). This requirement is mandatory, *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

A grievance must contain enough facts to put the prison on notice of the nature of the wrong for which the prisoner seeks redress. *See Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009). The grievance must "provide the level of detail required by the prison's regulations." *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)). The California Code of Regulations requires inmate-patients to include the following in health care grievances: "any involved staff member's last name, first initial, title or position, and the date(s) and description of their involvement" or "any other available information that may assist in processing the health care grievance." Cal. Code

Regs. tit. 15, § 3999.227(g)(1)–(2).  A patient must submit a health care grievance/appeal within 30 calendar days of the action of decision being grieved, or initial knowledge of the action or decision being grieved.  *Id.* § 3999.227(b).

The PLRA mandates that inmates exhaust their administrative remedies *before* bringing a lawsuit.  *Woodford*, 548 U.S. at 85; *Cano*, 739 F.3d at 1219.  To properly exhaust administrative remedies, an inmate must complete the grievance process in accordance with the prison's procedural rules, *including compliance with an agency's deadlines.  See Jones*, 549 U.S. at 217–18 (citing *Woodford*, 548 U.S. at 93–95); *see also id.* at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Woodford*, 548 U.S. at 90.

### B.    Plaintiff Failed to Exhaust Administrative Remedies Against Heidler

Plaintiff had access to the grievance process at CMC.  DSUF Nos. 102, 108.  Plaintiff needed to submit a grievance within thirty days of the incident, which required "any involved staff member's last name, first initial, title or position, and the date(s) and description of their involvement" or "any other available information that may assist in processing the health care grievance."  Cal. Code Regs. tit. 15, § 3999.227(b), (g).  Plaintiff's two grievances only addressed Kranz's alleged conduct.  DSUF Nos. 110, 117.  They are silent regarding Heidler.  DSUF Nos. 111, 118.  Further, the second grievance is not yet fully exhausted through both levels of review and is untimely because it was filed over three years after the March 2023 incident.  DSUF Nos. 116, 120; Cal. Code Regs. tit. 15, § 3999.227(b); *Farias v. Lopez*, No. 21-cv-04167-BLF, 2023 WL 6466395, at *4 (N.D. Cal. Oct. 3, 2023) ("[Plaintiff's] grievance was untimely because the regulations in effect required him to file a CDCR Form 602 within 30 days of the event.").

Plaintiff failed to put officials on notice of Heidler's alleged actions.  *See Porter*, 534 U.S. 516, 524–25.  Plaintiff cannot ignore the level of detail required and the additional proof needed to bolster a claim under a theory of supervisory

13

liability.  *See* Cal. Code Regs. tit. 15, § 3999.227(g); *infra* Section II(A) (detailing legal standard for supervisory liability).  Plaintiff cannot use a tardy second grievance to circumvent the exhaustion requirement.  *See Woodford*, 548 U.S. at 95.  Therefore, Plaintiff failed to exhaust as to Heidler.

**II.    DEFENDANTS DID NOT VIOLATE PLAINTIFF'S EIGHTH AMENDMENT RIGHTS BECAUSE PLAINTIFF'S CLAIM OF SUICIDAL IDEATION WAS NOT CREDIBLE, DEFENDANTS WERE NOT DELIBERATELY INDIFFERENT, AND PLAINTIFF LACKS EVIDENCE TO SUPPORT SUPERVISORY LIABILITY.**

Plaintiff tried to con his way into his preferred housing.  When Kranz saw through Plaintiff's ruse, Plaintiff demanded Kranz's name, threatened to stage a suicide, and threatened to file a claim.  Plaintiff's words and actions undercut and defeat his Eighth Amendment claim.

### A.    Deliberate Indifference Is a High Legal Standard.

In the medical context, prison officials violate an inmate's Eighth Amendment rights only if they exhibit deliberate indifference to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976).  An Eighth Amendment violation involves objective and subjective prongs.  *See Farmer v. Brennan*, 511 U.S. 825, 829, 834, 838–39 (1984).

The first question is whether an objectively sufficient serious risk of harm existed.  *See Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005); *Farmer*, 511 U.S. at 834.  "A deprivation is sufficiently serious when the prison official's act or omission results 'in the denial of the minimal civilized measure of life's necessities.'"  *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (quoting *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009)).

The second inquiry is whether correctional staff had a 'sufficiently culpable state of mind,' acting with deliberate indifference."  *See Hearns*, 413 F.3d at 1040 (quoting *Farmer*, 511 U.S. at 834).  "Deliberate indifference is a high legal standard," *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004), and requires "sufficiently culpable state of mind."  *Hearns*, 413 F.3d at 1040 (quoting *Farmer*,

14

511 U.S. at 834); *see also Hallett v. Morgan*, 296 F.3d 732, 745 (9th Cir. 2002) ("This is not an easy test for Plaintiffs to satisfy."). It requires more than negligence. *Farmer*, 511 U.S. at 835. A defendant is only liable if they knew of an excessive risk of harm *and* disregarded the risk. *Id.* at 837. Thus, a defendant must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

In medical cases, a deliberately indifferent response may be shown by the denial, delay, or intentional interference with medical treatment or by the manner in which medical care was provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (citing *Estelle*, 429 U.S. at 104–05). But "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105–06. Moreover, a mere difference in medical opinion does not establish deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

"Liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citing *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir. 1980))); *see also Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989) ("Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."). "Although there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them." *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020) (brackets omitted) (quoting *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1182 (9th Cir. 2007)); *see also Lemire*, 726 F.3d at 1074–75, 1085.

15

### B. Plaintiff Did Not Face an Objectively Serious Risk of Harm.

Plaintiff does not have any credible evidence that he suffered a sincere objective risk of serious harm when Kranz performed his mental health assessment.

When Kranz assessed Plaintiff on March 26, 2023, Plaintiff did not present any credible evidence of a mental health emergency. DSUF No. 61–77. Instead, Plaintiff responded with vague information that did not align with Plaintiff's medicine compliance, group program attendance, and his absent history of self-injurious behavior or suicide attempts. DSUF No. 47, 55, 64, 66, 69–70. And Plaintiff's medical records reveal a pattern of dissatisfaction with his RHU placement and desire to avoid being transferred. DSUF Nos. 39, 41, 48, 50–52, 54, 63, 67, 71, 75. A generalized suicide risk is insufficient to show an objective risk. *See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024 (3d Cir. 1991); *Vivanco v. California Dep't of Corr. & Rehab.*, No. 1:17-cv-00434-BAM, 2019 WL 2764397, at *6 (E.D. Cal. July 2, 2019) ("The evidence Plaintiff cites, at most, indicates a generalized risk of suicide rather than the heightened risk required to establish deliberate indifference."), *aff'd*, 817 F. App'x 492 (9th Cir. 2020).

Overall, Plaintiff cannot show he suffered a serious risk of harm at the point Kranz examined him.

### C. Kranz Did Not Know of Nor Consciously Disregard an Excessive Risk of Harm to Plaintiff's Health or Safety Because Plaintiff's Self-Report Was Insincere and Unsupported by His Health Record.

Even assuming Plaintiff had an objective risk of serious harm, Kranz was not deliberately indifferent.

Plaintiff's self-reported mental health crisis did not align with Plaintiff's past mental health history or the evidence at the time Kranz examined Plaintiff. Plaintiff lacked a history of self-injurious behavior or suicide attempts. DSUF Nos. 43, 49–50, 55, 66, 69. Plaintiff adhered to his medication. DSUF Nos. 49–50, 53, 56, 69. Plaintiff participated in group programming. DSUF Nos. 47, 69. When Kranz

16

probed Plaintiff's mental state, Plaintiff's responses were vague. DSUF Nos. 64, 70. And Plaintiff's repeated dissatisfaction with his RHU placement, desire to avoid transfer, and prior experience of making threats to gain a higher level of care reveals the insincerity of his suicidal ideations. DSUF Nos. 39, 41, 48, 50–52, 54, 63, 67, 70–71, 75, 77, 90. As Kranz concluded, the reality of Plaintiff's mental health did not align with Plaintiff's version of it, and Plaintiff did not warrant a higher level of care of being assigned to a MHCB. DSUF Nos. 72, 75; *cf. Moore v. Dunlap*, No. 24-2704, 2026 WL 184223, at *1 (9th Cir. Jan. 23, 2026) ("[Plaintiff] has not established that prison officials had advance knowledge of suicide *plans*, rather than suicidal *ideation*.").

Kranz's assessment proved correct after he informed Plaintiff he could remain at his current level of care. Unsuccessful in manipulating Kranz, Plaintiff's demeanor flipped, and his response revealed his insincere mental health claims. *See* DSUF Nos. 73, 75–77, 88, 95. Plaintiff asked for Kranz's name, threatened to stage a suicide attempt, and then threatened to file a grievance against Kranz. DSUF No. 73. By planning to file a grievance or complaint against Kranz *after* staging a suicide attempt, Plaintiff revealed his threat of committing suicide was not sincere and manipulative to secure his desired housing assignment. *See* DSUF Nos. 75, 75–77, 88, 95. Based on Plaintiff's health record and his examination, Kranz was not aware of facts that could have led him to know that Plaintiff faced a substantial risk of serious harm at his current housing assignment.

At best, Plaintiff's claim boils down to a disagreement over the proper course of treatment, which is insufficient to establish a constitutional violation. *See Estelle*, 429 U.S. at 107. And any claim that Kranz was negligent or should have known about the risk is also insufficient. *See Farmer*, 511 U.S. at 835, 838. Therefore, Plaintiff's Eighth Amendment claim against Kranz fails. *See Arellano v. Calderon*, No. 22-cv-441 TWR (LR), 2024 WL 1163177, at *14–16 (S.D. Cal. Mar. 18, 2024) (granting summary judgment where plaintiff reported suicidality

17

after learning staff would discharge him from MHCB to his housing at the CCCMS level of care); *see also Cano*, 739 F.3d at 1217–18 (affirming summary judgment where plaintiff was regularly seen by mental health staff and where his suicide threats "were manipulative in nature"); *Vasquez v. Cnty. of Santa Clara*, 803 F. App'x 100, 102 (9th Cir. 2020) (affirming summary judgment where mental health staff reviewed decedent's medical records, consulted with custodial staff, and determined decedent was not suicidal based on professional opinion).

**D.    Heidler Cannot Be Liable for Supervisory Liability Because Plaintiff Has No Evidence of Her Personal Involvement or A Sufficient Causal Connection.**

Heidler cannot be liable because she was not deliberately indifferent to Plaintiff's mental health risk.  As a threshold matter, it undisputed that Heidler did not see, treat, or interact with Plaintiff on March 26, 2023.  DSUF Nos. 58–59.  Thus, Plaintiff cannot assert a deliberate indifference claim against Heidler for any direct action she took on the day of the March 26, 2023 incident.  Instead, Plaintiff rests on a theory of supervisory liability that fails because it is based on speculation.

Plaintiff alleges Heidler failed to supervise or train her subordinates.  Dkt. No. 1 ¶ 4 (p. 4), ¶¶ 36–39 (p. 7), ¶ 63 (p. 9), ¶ 67 (p. 9).  Plaintiff claims "inmates" complained to Heidler about Kranz's "lack of professionalism," Heidler "was made aware" Kranz "would dare inmates to follow through on their suicidal ideations," and Heider "knew" about Plaintiff's auditory hallucinations and that Plaintiff's prescribed medication had a side-effect of increased risk of suicidal thinking or behaviors.  *Id.* ¶¶ 38–39 (p. 7), ¶ 47 (p. 7), ¶ 65–66 (p. 9).  But Plaintiff cannot point to any specific, nonspeculative information regarding the training Heidler gave Kranz, any professional lapses based on Plaintiff's own knowledge, Heidler's knowledge of the side-effects of Plaintiff's medication, or Heidler's alleged awareness of Kranz daring inmates to act on their suicidal ideations.  DSUF Nos. 5, 96–100.

18

Instead, Heidler treated Plaintiff two months before the March 26, 2023 incident.  DSUF Nos. 40–44, 58.  Heidler talked through Plaintiff's concerns, coached Plaintiff to stay in the present, and traced Plaintiff's stress to the investigation against him for introducing illicit substances into the prison.  DSUF Nos. 40–44.  Plaintiff cannot show that Heidler failed to address a serious risk of harm.  Instead, she showed care in ensuring his mental health needs were being met.

Heidler was not personally involved in Plaintiff's care on March 26, 2023, or causally connected to any constitutional violation on March 26, 2023.  *Leer v. Murphy*, 844 F.2d 628, 633–34 (9th Cir. 1988) (affirming summary judgment where an inmate failed to raise an issue of material fact regarding the causal connection between each official's actions and the violation).  Plaintiff has no evidence of any deliberately indifferent action taken by Heidler, and Plaintiff's speculation cannot defeat summary judgment.  *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001); Fed. R. Civ. P. 56(c).  Plaintiff cannot hold Heidler liable solely because of her job title and duties.  *See Hansen*, 885 F.2d at 645–46; *Lovett v. Cnty. of Los Angeles*, No. 2:22-cv-07394-KK-PD, 2024 WL 4766205, at *14 (C.D. Cal. Aug. 1, 2024) (granting summary judgment on supervisory liability claim where allegations were conclusory and plaintiff lacked evidence that the supervisor personally violated rights or "had actual knowledge of, and acquiesced in, any constitutional deprivations"), *report and recommendation adopted*, 2024 WL 4765853 (C.D. Cal. Sept. 23, 2024).  Therefore, Plaintiff's Eighth Amendment claim against Heidler fails.

## III.  DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity shields Defendants from liability.

19

### A.    Qualified Immunity Shields All Except Those Who Are Plainly Incompetent or Who Knowingly Violate the Law.

Qualified immunity shields prison officials from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This defense "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. Courts analyze qualified immunity under a two-prong test: (1) whether the officials violated the Constitution, and (2) if so, whether the constitutional right at issue was clearly established at the time of the violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). Courts have discretion to decide which prong to analyze first based on the circumstances of the case. *Pearson*, 555 U.S. at 236.

Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). For a right to be clearly established, the "contours" of that right must have been "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Sjurset v. Button*, 810 F.3d 609, 615 (9th Cir. 2015). Although a case directly on point is not necessary, "precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft*, 563 U.S. at 741). Thus, officials are entitled to qualified immunity so long as their conduct was "arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). Also, the right at issue must be narrowly defined in light of the specific factual context, not at a high level of generality. *E.g.*, *Mullenix*, 577 U.S. at 12

20

("We have repeatedly told courts not to define clearly established law at a high level of generality." (ellipses omitted) (quoting *Ashcroft*, 563 U.S. at 742)).

### B.   Qualified Immunity Shields Defendants from Liability.

Defendants did not violate Plaintiff's Eighth Amendment rights. *See supra* Part II.  Moreover, Plaintiff cannot satisfy his burden to show that the alleged violated rights were clearly established when narrowly defined considering the specific factual context.  *See Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) ("[Plaintiff] bears the burden of showing that the right at issue was clearly established.").

Framing the right at issue with appropriate specificity, it would not have been evident to a reasonable psychologist that Plaintiff was entitled to a higher level of care where Plaintiff's health record lacked a history of self-injurious behavior or suicide attempts, Plaintiff took his medication and engaged in group programs, Plaintiff's exam responses were vague, knowledge of the side-effects of Plaintiff's medication was outside the scope of Defendants' practice, and Plaintiff—after hearing that he would remain at the same level of care—threatened to file a grievance or complaint against Kranz *after* staging a suicide attempt.

To overcome Defendants' qualified immunity, there must be law that is "'particularized' to the facts of the case," such that "any reasonable official in the defendant's shoes would have understood that" it was unconstitutional to leave Plaintiff at his level of care where his report of suicidal ideation did not align with his medical record or the findings of his mental health examination. *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (citing *Ashcroft*, 563 U.S. at 741– 42).  Defendants are entitled to qualified immunity unless Plaintiff can "identify a case where an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *White*, 580 U.S. at 79.  Plaintiff cannot do so. Plaintiff cannot show he was entitled to a higher level of mental health care

21

following Kranz's professional evaluation that Plaintiff's reported suicidality was not genuine.  Accordingly, Defendants are entitled to qualified immunity from suit.  And even if the Court finds qualified immunity inappropriate for Kranz, immunity still protects Heidler.  *See Scott v. Cnty. of Kern*, No. 1:24-cv-00423-CDB, 2025 WL 3035176, at *17 (E.D. Cal. Oct. 30, 2025).  ("At the time of the events set forth in the operative complaint [in March 2023], clearly established law did not obligate the supervisory County Defendants to implement a specific, or superior, suicide treatment or prevention policy.").

## CONCLUSION

Plaintiff attempted to manipulate his way into his preferred housing assignment.  But Plaintiff's feigned self-reported mental distress was uncovered by Dr. Kranz's review of Plaintiff's file and the mental health examination.  When Kranz explained his clinical decision to keep Plaintiff at his level of care, Plaintiff showed his cards.  Plaintiff cannot manipulate medical staff and then stage a sham suicide attempt in retaliation for not receiving his preferred treatment that is unsupported by mental health experts.  Moreover, Plaintiff cannot hold Dr. Heidler liable under a speculative vicarious liability theory.  Accordingly, the Court should (1) grant Defendants' motion for summary judgment, (2) enter final judgment in favor of Defendants and against Plaintiff, and (3) dismiss this action in its entirety with prejudice.

Dated: July 2, 2026

Respectfully submitted,

ROB BONTA
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General

*/s/ Macklin Thornton*
MACKLIN THORNTON
Deputy Attorney General
*Attorneys for Defendants*
*E. Heidler and E. Kranz*

LA2025400772

22

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants E. Kranz and E. Heidler, certifies that this brief contains 6,956 words, which:

_X_ complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].

Dated: July 2, 2026                                     Respectfully submitted,

                                                         ROB BONTA
                                                         Attorney General of California


                                                         */s/ Macklin Thornton*
                                                         MACKLIN THORNTON
                                                         Deputy Attorney General
                                                         *Attorneys for Defendants*
                                                         *E. Heidler and E. Kranz*

23