ROB BONTA
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General
MACKLIN THORNTON
Deputy Attorney General
State Bar No. 327927
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  Telephone:  (619) 321-5166
  Fax:  (916) 732-7920
  E-mail:  Macklin.Thornton@doj.ca.gov
*Attorneys for Defendants*
*E. Heidler and E. Kranz*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| **ROBERT ANTHONY GOINS,** | 2:25-cv-02168-SB-ACCV |
| Plaintiff, | **DECLARATION OF MACKLIN W. THORNTON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **E. KRANZ, et al.,** | |
| Defendants. | |

I, Macklin W. Thornton, declare:

1.    I am a Deputy Attorney General in the Correctional Law Section of the California Attorney General's Office, counsel of record for Defendants E. Kranz and E. Heidler in this action.  I am competent to testify to the matters set forth in this declaration and, if called upon by this Court, would do so.  I submit this declaration in support of Defendants' Motion for Summary Judgment.

/ / /

/ / /

/ / /

1

2. Attached as **Exhibit 1** is a true and correct copy of excerpts from the deposition transcript of Plaintiff Robert Goins, which took place on May 29, 2026.

3. Attached as **Exhibit 2** is a true and correct copy of the Expert Report of Robert D. Canning, PhD, which is dated April 14, 2026.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge. Executed on June 25, 2026 in San Diego, California.

*/s/ Macklin Thornton*
MACKLIN W. THORNTON
Deputy Attorney General

2

# EXHIBIT 1

Case 2:25-cv-02168-SB-ACCV  Document 76-4  Filed 07/02/26  Page 4 of 64  Page ID #:510

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

ROBERT ANTHONY GOINS,                )        2:25-cv-02168-SB-ACCV
                                     )
            Plaintiff,               )
v.                                   )
                                     )
E. KRANZ, et al.,                    )
                                     )
            Defendants.              )
_____)


DEPOSITION OF ROBERT ANTHONY GOINS

VOLUME 1, PAGES 1 THROUGH 92

FRIDAY, MAY 29, 2026

Reported by:
Kathleen Madden Keenaghan
CSR No. 14577
Job No. 10190721

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

ROBERT ANTHONY GOINS,            )     2:25-cv-02168-SB-ACCV
                                 )
          Plaintiff,             )
v.                               )
                                 )
E. KRANZ, et al.,                )
                                 )
          Defendants.            )
_____)


        DEPOSITION OF ROBERT ANTHONY GOINS commencing at the hour of 1:18 p.m., on Friday, May 29, 2026, taking place over the Zoom application before Kathleen Madden Keenaghan, Certified Shorthand Reporter Number 14577, in and for the State of California.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

APPEARANCES


For the Plaintiff:

            BY:   ROBERT ANTHONY GOINS
            CDCR No. BL8291
            California Men's Colony
            P.O. Box 8101
            San Luis Obispo, CA 93409-8101




Attorneys for Defendants E. Heidler and E. Kranz:

            BY:   MACKLIN THORNTON (SBN 327927)
            Deputy Attorney General
            600 West Broadway, Suite 1800
            San Diego, California 92101
            Telephone: (619) 321-5166
            Fax: (916) 732-7920
            E-mail: Macklin.Thornton@doj.ca.gov




Also present:   James Ferris, CDCR No. H28141

                Ryan Asanas, Aptus Monitor

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

I N D E X

Examination of:


Examination by:                                                 Page

ATTORNEY THORNTON                                               6




                          E X H I B I T S

Number                  Description                            Page

Exhibit 1               7219 Medical Report of Injury          62

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

                          Friday, May 29, 2026

                               1:18 p.m.

          THE COURT REPORTER:  Good afternoon.  We are now on the record.  Today's date is May 29th, 2026, and the time is 1:18 p.m.  We are here for the remote deposition of Robert Anthony Goins in the matter of Robert Anthony Goins versus E. Kranz, et. al, case number 25-CV-02168-SB taking place over the Zoom application with all attendees appearing remote.

          My name is Kathleen Keenaghan.  I am a California certified shorthand reporter and code compliant deposition officer for today's proceeding.  My California license number is 14577.

          Will counsel please state your appearance for the record, beginning with the noticing attorney?

          ATTORNEY THORNTON:  Thank you.  My name is Macklin Thornton.  I am the Deputy Attorney General for the California Attorney General's office.  I represent the defendants in this case, E. Kranz and E Heidler. Accompanying me from my office is Deputy Attorney General Brittany Boiko who will be observing this deposition.

          THE COURT REPORTER:  Thank you.  And Mr. Ferris, would you please state your CDCR number?

          INMATE FERRIS:  Yes, ma'am.  H28141.

          THE COURT REPORTER:  Thank you, sir.  And

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Mr. Goins, would you please hold up your right-hand so I may swear you in?  Thank you.

ROBERT ANTHONY GOINS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY ATTORNEY THORNTON:

Q   Good afternoon.  We are all appearing by videoconference today.  Mr. Goins, if you cannot hear me or the sound breaks or the video breaks out, please let me know.  Can you do that?

A   Yes.

Q   Thank you.  Before we begin, Mr. Goins, I just want to give you an update on some discovery items because I understand the mail can take a little while.

As for a written discovery, you served for 50 interrogatories, 45 Requests for Production of Documents and 44 Request for Admission.  Defendants have timely responded to your Interrogatories and Request for Production of Documents which includes of the production of 5,943 pages of Documents.  That should be in transit to you.  It might take a little time given the size of the documents.  Defense will also respond timely to your Request for Admission.

As for the deposition, my office and the CDCR have made tremendous efforts to accommodate your preferences so this

deposition can proceed.  This is includes scheduling the deposition of the afternoon per your request.  Providing sufficient notice that the defendants were taking your deposition and take the unprecedented step of letting your peer support specialist, James Ferris, to appear with you at the deposition to provide emotional support.

With these generous accommodations, I hope the deposition can continue as you said it would at the last hearing before the Court.  Are you ready to proceed with this deposition?

A    Yes.

Q    Thank you.  Mr. Goins, can you please state your name and spell it for the record?

A    Robert Anthony Goins, R-O-B-E-R-T, A-N-T-H-O-N-Y, G-O-I-N-S.

Q    What is your date of birth?

A    August 1st,1987.  8-1-1987.

Q    And you are currently incarcerated, correct?

A    Correct.

Q    What is your California Department of Corrections and Rehabilitation, or I will refer to it as CDCR.  What is your CDCR number?

A    BL 8291.

Q    And you are the plaintiff in this case.  Are you representing yourself?

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q    And how long have you been incarcerated for the current incarceration term?

A    Eight years.

Q    How long is your current sentence?

A    I was sentenced to 18 years.  So I've got for five more years to go.  I don't know how you want me to answer that.

Q    That's okay.  Are you eligible for parole?

A    I am.

Q    When are you eligible for parole?

A    In five years.

Q    Oh.  Congrats.  Do you have any advanced degrees past high school?

A    No.

Q    So you do not have any medical training, correct?

A    I do not.

Q    Are you familiar with the mental health policies of CDCR or the California Correctional Health Services or California Men's Colony?

A    Look, somebody helped me out along the way with all of this.  So I don't know about the law.  I don't know about too much of the deliberate indifference.  I don't really know too much about any of that.

Q    Okay.  Are you aware of the crisis intervention team at California Men's Colony?

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

you have to look that up.  I'm not aware.  Hey.  I don't know how you want me to answer these questions.  Like, I'm answering them, but you want me to answer them how you want me to answer them and no.  I'm not going to do that.

**Q   I just want to know based on your experience so when I ask about your mental health diagnoses, I'm entitled to know that based on your experience and what you know sitting here today.  Does that make sense?**

A   So what do you -- I don't know how you want me to answer that.

**Q   Well, I want to --**

A   What would you like for me to say?  What would you for like me to say.

**Q   Well, going back to my original questions.  You listed a few conditions that you suffer from.**

A   I also said there is no penological justification to excuse the conduct of Psychologist Kranz to deny my request for crisis intervention treatment.

ATTORNEY THORNTON:  Okay.  Move to strike as unresponsive.

BY ATTORNEY THORNTON:

**Q   Mr. Goins, I'm going to try this question again that you previously did not answer.  Did you have any previous health diagnoses from before March 26, 2023?**

A   You have to look at my medical record.  I don't

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

know.  I got stabbed in my neck when I was 16, hit in the head with a machete when I was 22.  So I already had neck injuries.

Q   Did you have any neck surgeries?

A   I did have neck surgery.  Twenty-two staples -- I mean 22 stitches, 14 staples.

Q   How long did the side effects from any pain from the injury or surgery last after that injury?

A   I still deal with it.  That just made it worse.

Q   Okay.  That is helpful.  Are you aware of any other physical health diagnoses from before March 26, 2023?

A   You have all those answers already.  I don't know how to answer that so --

Q   Okay.  Mr. Goins, how do you know Defendant Heidler?

A   Heidler interviewed me on January 10th, 2023, and was intimately aware of my major depressive disorders and my daily auditory hallucination issues.

Q   What does Defendant Heidler look like?

A   A Caucasian woman with hair your color, per se.

Q   So, like, reddish hair?

A   I don't know, blondish, reddish.  I don't know how she was wearing it that day, but from what I remember.

Q   Okay.  Did you have any interactions with Defendant Heidler from before the incident on March 26, 2023?

A   Look, Ms. Heidler was aware inmates faced a

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q    Why did you see Defendant Heidler in January 2023?

A    I seen her.  I -- I really don't even remember at that time.  I just know that she was aware of my major depressive disorders and my auditory hallucination issues.  So she knew everything that was going on with me ahead of time.  I have a chart, so they knew what was going on.

Q    But sitting here today you can't remember why you saw Dr. Heidler in January 2023?

A    I know that Psychologist Kranz falsified his reports.  That's what he did do.  You did not send me back based on what he knew.  He just took somebody else's word for it and sent me back which is rude and unprofessional.  Let's talk about -- let's talk about what matters.  You know that I have mental health issues.  You know that I suffer from these issues.  It's all on record.  Why are you trying to get around that fact?

        ATTORNEY THORNTON:  Move to strike as unresponsive.  That's not what I asked, Mr. Goins.

BY ATTORNEY THORNTON:

Q    Besides January 2023, how many other occasions did you speak with Dr. Heidler?

A    All I can remember is that she interviewed me on January 10th, 2023.  She was aware of my diagnoses.

Q    So are you saying you never spoke with Doctor Heidler again after January 10th?

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

A    I'm not saying that.  No.  That's not what I'm saying.  Because I probably did.  I probably just don't remember.  I'm not saying that, but I what I am saying is I do remember talking to her on the tenth of January, which is three months before I attempted to commit suicide based on Psychologist Kranz being rude and unprofessional.

Q    **But do you remember any other interactions --**

A    I just said no.

Q    **-- with Dr. Heidler?**

A    I just said nope.  I don't remember.

Q    **Do you have any reason to suspect that Dr. Heidler would want to harm you?**

PRO SE GOINS:  I am going to object to answering that question.

BY ATTORNEY THORNTON:

Q    **On what basis, sir?**

A    Just because I don't understand.  What do you mean by harm me?

Q    **Do you have any evidence to suggest about Dr. Heidler wanted to harm you ever?**

A    I don't how to answer that question.  So next.

Q    **Are you refusing to answer the question, sir?**

A    I'm just telling you I object because I don't know how to answer that question.  What do you mean?  Do I think she's going to harm me?  Like, what do you mean by that?

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

speak with him before I was even allowed to go to the crisis

bed.  So like I said, it's multiple people here in that

mental health area -- category.  I don't know who I talked

to or what.  I really don't know.  I don't know.  I just --

on this day, I know on this day, I went to him for help.

    Q   Okay.

    A   And he denied me intervention crisis intervention

treatment.

    Q   Okay.  So at least we could say as far as you know

sitting here today, the first time you interacted with

Mr. Kranz was March 26, 2023?

    A   As far as I know.

    Q   Okay.  That's helpful.  How many times total do you

remember interacting or talking with Dr. Kranz?

    A   You mean on March 2026 -- or 2023?

    Q   During your -- just throughout your time at

California Men's Colony?

    A   All I know is I spoke to him on that day, and I went

to him for help.  He minimized the situation.  I was

injured.  He knew he messed up because he apologized to me

the next day after my suicide attempt.  So you are asking me

all these questions, but there is like -- I keep telling you

there's no penological justification to excuse his conduct.

        ATTORNEY THORNTON:  Moved to strike as

unresponsive.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

BY ATTORNEY THORNTON:

Q   Mr. Goins, are you saying the only times you remember speaking to Mr. Kranz was on March 26th and March 27th, 2023?

A   I remember March 26 and the following day, yeah, and the housing, yeah.  Of course.

Q   Okay.  But do you remember any other days after the 26th and the 27th when you spoke with Dr. Kranz?

A   I don't.

Q   Okay.  Does Mr. -- sorry.  Does Dr. Kranz have a reputation amongst the inmate population at California Men's Colony?

A   Psychologist Kranz was daring people to harm themselves in order to get help.  That is his reputation.

Q   Besides the incident with yourself, have you ever seen Dr. Kranz work with other inmates before?

A   I mean, when people talk to him, I am pretty sure it is confidential.  So I have not seen anything, but I have heard other inmates come back and say I am suicidal.  And he will not allow me to go to the crisis bed unless I tried to kill myself.

Q   What inmates have you heard that from, sir?

A   There are multiple inmates back there.  I don't know them all by name.  I was in the hole.  I was in the disciplinary section.  So people come and go all the time.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

A    She had a reputation for turning a blind eye to the facts.   She knew Psychologist Kranz was daring people to harm themselves.

Q    **How do you know that?**

A    Because nobody was allowed to go to get crisis intervention treatment.

Q    **Have you --**

A    So if no one is allowed to get crisis intervention treatment, unless they ask what it is they are going through and she is responsible -- she is responsible for training him.

Q    **Have you ever complained to Dr. Heidler about Dr. Kranz?**

A    I wrote a 602 on Psychologist Kranz.  No.  Whoever I spoke with pertaining to that 602 -- I believe it was her. I don't know.

Q    **How do you know it was her regarding the 602?**

A    I don't.  I said I believe.  I believe.  I don't know I'm not 100 percent sure.

Q    **Okay.  Have you heard from any other inmates about their experience complaining to Dr. Heidler complaining about Dr. Kranz?**

A    I have.

Q    **How many inmates have told you that they have complained to Dr. Heidler about Dr. Kranz?**

Case 2:25-cv-02168-SB-ACCV    Document 76-4    Filed 07/02/26    Page 19 of 64    Page ID #:525

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

deliberately failed to provide and crisis intervention treatment, and there is no justification to excuse that conduct.

ATTORNEY THORNTON:  Move to strike is unresponsive.

Mr. Goins, I just again want to caution you about the risk you're taking about giving unresponsive answers to my questions.

A   I'm giving you answers.  You are just not accepting them for whatever reason, but I told you from the beginning, my answers are my answers.

Q   **My original questions were about any knowledge that Heidler had about Kranz's actions in treatment of inmates under their mental health concerns?**

A   She is responsible for training him.  So she has to have all the knowledge of what it is he is doing and he isn't doing.  She is responsible for the training.

Q   **Is that just because she is his supervisor?**

A   I don't know.

Q   **Did you ever hear any inmates explicitly mention misconduct by Dr. Kranz when they spoke to Dr. Heidler?**

A   I have heard multiple inmates complain to her about Kranz, and she did nothing.

Q   **What did those inmates say to Dr. Heidler about Dr. Kranz?**

A   That he was daring people to harm themselves in

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

order to get help.

Q   So you actually heard that with your own ears?

A   Maybe not in those words, those words exactly with daring, similar.

Q   So you are saying you don't know exactly what those inmates told Heidler?

A   I don't know verbatim, but it was to that extent.

Q   And how many times did you hear other inmates complying about Dr. Kranz to Dr. Heidler?

A   All the time.  All the time.  I was back there for about three months, so about 30 or 40 times.

Q   With the only inmate that you can explicitly require that share that information with you was inmate Riggs?

A   That I know by name.

Q   But you don't know any other inmates by name who complained to Dr. Heidler -- I'm sorry -- complained to Dr. Heidler about Dr. Kranz?

A   Not that I can think of off the top of my head.  No. Because we deal with each other based on monikers.  So I don't -- I can give you their name, like --

Q   Do you have those inmates' monikers then?

A   Go-fish, Brownie.  These are people that I know, but how does that help if we don't -- if I don't have their government names.

Q   Did inmates with monikers Go Fish and Brownie, were

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

they in the same housing unit as you then?

   A   They were.

   Q   What housing unit was that?

   A   I was in -- I want to say building 4, which is the hole.  It is disciplinary.  There's Ad Seg.  That was the, building 4, Ad Seg.

   Q   Is Ad Seg also referred to as the Restricted Housing Unit?

   A   Correct.

   Q   So you were housed, you said building 4 in a housing unit on March 26, 2023?

   A   Correct.

   Q   Do you remember when you heard these other inmates complain to Dr. Heidler?

   A   It was just on a day-to-day basis.  It wasn't a specific date.  It was just certain days people would come back test off because they could not get help here are their days people would attempt to kill themself to get help.  And I just happened to just experience it.

   Q   Do you overhear these conversations to Dr. Heidler?

   A   I did not hear any -- no.  I did not.  No.  I did not, but the fact of the matter is that I went to Psychologist Kranz for help, and he minimized my issues. Okay.  Ms. Heidler -- Ms. Heidler turned a blind eye to the facts, and she knew Psychologist Kranz was daring people to

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

harm themselves.

ATTORNEY THORNTON:  Okay.  Move to strike is nonresponsive.

BY ATTORNEY THORNTON:

Q    I'm a little confused, Mr. Goins.  I thought you did say you did hear other inmates complain to Dr. Heidler about Dr. Kranz?

A    I told you it was day to day.  It just depends who is still here.  It's different people all the time.

Q    Okay.  Did you overhear these conversations --

A    Sometimes.  Not all the times, not all the time.

Q    Let me finish my question first.  Sorry.  Did these conversations take place before or after March 26, 2023?

A    Before.

Q    You mentioned you were in the Administrative Segregation Unit on March 26, 2023, correct?

A    Correct.

Q    Why were you placed in the administrative segregation unit?

A    My girlfriend had brought me narcotics to the visiting room, and we pretty much got in trouble.

Q    Did you receive an RVR because of that?

A    I did.

Q    And the visitor, did they -- do you know if they were charged with a crime?

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

hear anything that I was going to say.

Q   Can you tell me more about that with the agitation? Did he say anything?  Was his body language doing anything?

A   He said everything you do is your choice.  No one forced you.  There is no treatment that will help you and that I will never get a better and he is sending me back to my cell.  And until I started making better decisions, there is nothing he can do for me.

Q   Is it possible that he could have been talking about the issue with the contraband and the visitor?

A   I don't see how that is possible when I'm talking about killing myself.  How does contraband and a visitor have to do with me telling you that I am suicidal?

Q   When you spoke to Dr. Kranz on March 26, did you tell him about any concrete details regarding a suicidal plan?

A   Yes.  After he responded in that manner, I said okay.  I am going to kill myself.  I am going to hang myself.  When I go to my cell, I'm going to tare a sheet, and tie it around a window and tie it around my neck, and I'm going to hang myself, and that's what I did.  I went back.  I stood on the sink.

Q   Okay.  Did he say anything else to Dr. Kranz?

A   You said did he say anything else?

Q   Sorry.  Let me rephrase that.  I apologized -- did

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

you say anything else to Dr. Kranz.

A    Nope.  Not that I can remember.  I told him I was going to kill myself and that his deliberate indifference was going to cost him because I knew after that point that he was doing something wrong.

Q    How is that deliberate indifference going to cost him, as you said?

A    Because I'm letting you know that I am suicidal, and you're refusing to give me crisis intervention treatment that alone is a deliberate indifference.

Q    Okay.  But how's it going to cost Dr. Dr. Kranz?  Is it a lawsuit or grievance I'm just trying to understand what document?

A    I was thinking more so along the lines of I am going to die, and when my family finds out that I am dead because you did not allow me crisis intervention treatment, that is going to cost you.  I did not even think I was going to be here today.

Q    Okay.  Did you ever mention filing a grievance or a lawsuit against Dr. Kranz in that interaction with him on March 26th?

A    No.  Not that I remember.  I remember wanting to be dead.

Q    Mr. Goins, was Dr. Kranz unwilling to help you unless you actually hurt yourself?

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

A    Yes.  That's what it seemed.

Q    **How did it appear to you that Dr. Kranz would not help you without actually hurting yourself?**

A    Because when I told him that I felt helpless, his response was no one forced you, and there is no treatment that will help you, and until I see you make better decisions, there is nothing I can do for you.  And I was like, better decisions?  What better decisions you want me to make?  Kill myself?  Well, that's what I'm telling you.  That's what I'm feeling, and I'm hearing and where my mind is at mentally.  This is what I'm going through, and he just minimized my whole situation and the fact that he minimized the whole situation, not by personal observation, once again, which he admitted on page 5 in his report.  He stated I had no injuries when, in fact, I had serious injuries.  And he wrote his report based on what somebody else told him, and it was not even mental health.  It was -- I believe it was CDC, an officer or something.

So he was willing to lie on me in order not to provide me proper crisis intervention treatment.  So he was willing to write a false report in order to not provide me with crisis intervention treatment.  So --

Q    **I think we are getting a little further away from my question, sir.  The question was what evidence do you have that Dr. Kranz would not help you unless you hurt yourself?**

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Did he tell you that?  Sorry.  Let me rephrase.  Did Dr. Kranz tell you that he would not help you unless you hurt yourself?

A   He said there's nothing that I can do for you, and I'm sending you back to your cell.  And I told him, okay.  I am going to kill myself.  I am going to take a sheet.  I am going to tie it around the window, and I'm going to tie it around my neck, and I am going to kill myself.  I went to Psychologist Kranz for help, and he minimized my situation.

Q   But he did not actually tell you that you have to hurt yourself before getting care, right?

A   He did not have to say it verbatim.  That is exactly what he said.  There is nothing I can do for you unless I make better decisions.  That's how I took it.  And clearly I was not in my best state of mind at that time.  So once again, still his fault because he should have provided me with the proper crisis intervention treatment that he should have provided me with.  Don't leave me to read between the lines and figure out how you are supposed to do your job.

Q   Mr. Goins, did Dr. Kranz require housing unit inmates to attempt to harm themselves before he would give mental health treatment for suicidal ideations?

A   It seems like the only ones that were allowed to get or did receive any type of crisis intervention treatment are the people that would harm themselves.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q   Okay.  That's helpful, but it was not entirely -- that was not entirely responsive to my question.  My question was, did Kranz require you or other inmates to attempt to harm themselves before he would give them mental health treatment for suicidal ideations?

A   Yes.

Q   How do you know that?

A   Because I heard it when they came back and the things would transpire.  Alarms would go off.  Another person would try to commit suicide after they talked to Psychologist Kranz.

Q   But you never heard Dr. Kranz require inmates to attempt to harm themselves before providing care, right?

A   Well, with other inmates, no.  Those settings are confidential.  So no.

Q   So the only basis that you would have that he would require other inmates to harm themselves --

A   Is on the testimony of other inmates.

Q   Okay.  What other inmates -- let me start that again.  Sorry.

Who are the inmates that Kranz required attempted harm before receiving treatment?

A   I don't know.  So many.  Like I said, multiple people come in and out of that place, what they call the tier, after that time.  So I don't know by name.

Q    Can you give me an estimate on how many inmates it could have been?

A    Thirty to 40.

Q    But you cannot give me a precise name?

A    No.  I can't.

Q    Do you recall what time Dr. Kranz stopped your interview on March 26, 2023?

A    No.

Q    What actions should Dr. Kranz have taken to address your mental health on March 26, 2023?

A    I don't know what protocol is for psychologist when an individual is coming to them and informing them that they are suicidal.  So I did not go to school for that.

Q    Okay.

A    I did my part.  I went and called out for help.  And he refused me help and because of that, I was injured.

Q    After Dr. Kranz and the rest of the crisis intervention team left the interview with you, were you escorted back to your cell?

A    I was.

Q    Who escorted you back to your cell?

A    I believe it was another officer aside from CO Rizo. I don't think it was Rizo.  I think it was somebody else.

Q    And it was Mr. Powell?

A    No.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q    And when were you first diagnosed with alcoholism?

A    I can't answer that.  I don't know.

Q    But it was before March 26, 2023, I am guessing?

A    Yes.

Q    How do you know about the side effects of naltrexone?

A    I know of all the side effects because I had to sign in order to get it -- my signature in order to get it.  So.

Q    Do you recall what time you attempted self-injurious behavior on March 26, 2023?

A    I don't know the exact time.  No.  At this time I cannot say the exact time.  Like I said, I believe it was 5:00, 6:00 or 7:00 o'clock, around that time because when they allowed me -- when they asked me to follow proper protocol, it was nighttime so, but I don't know the exact time here.  No.

Q    And did you attempt the self-injurious behavior yourself?

A    Yes.

Q    Can you describe for me the self injurious behavior that you did?

A    I got back to the cell paragraph, tore a sheet.  I tied it around my neck.  I tied it around of the window.  I stood on the sink, and I prepared to step off.  One of the officers stepped by and saw me on the sink and saw me about

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

to step off, and gave me direct orders to step down and take that sheet from around my neck.  I did not respond and that's when I heard the alarm go off.  Multiple COs ran in the cell and sprayed pepper spray, and I started choking. And that's when I stepped off the sink injuring my neck and my shoulder.

Q   So is your testimony that you followed through with hanging yourself By the sheet?

A   Yes.

Q   And you stepped off the -- when you stepped off the sink, were your legs dangling or were your feet on the floor?

A   No.  What do you mean were my legs were dangling?

Q   Well, let me ask this.  How tall are you, sir?

A   About 5' 10, 5' 11".

Q   And how high -- where did you tie the sheet to before you would hang yourself?

A   To the window -- the top of the window.

Q   And?

A   There's a little loop you can tie it to.

Q   And how tall was -- sorry.  What was the height difference from the floor and where you tied it around the window?

A   Enough for me to hang myself.

Q   Okay.  So you are saying your feet were dangling

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

above the floor and they were not touching it after you stepped off the sink?

    A    Correct.  But the way that I had the noose, I don't think I did it right because it came off.  Like it snapped and that is when they came -- that is when they came and cuffed me with leg and wrist restraints, and administrative emergency mental health referral procedures.

    Q    So as soon as you stepped off the sink, the cloth broke and you fell to the floor?

    A    No.  I just -- once I rushed -- I stepped off the sink -- yes.  It came.  It snapped.  It pulled.  I felt my throat pop in and out, like, my Adam's apple popped in and out and by that time, like I said, they were all in there. I was choking on the pepper spray.  I was jacked up here.  I was just jacked up.

    Q    So you are saying you did not comply with staff orders to step off and remove the noose and step off the sink?

    A    No.

    Q    Instead you just stepped off the sink?

    A    No.  I did not.

    Q    Did you say you had pepper spray used against you?

    A    Yeah.  When they ran in, they came in with pepper spray and shields.  That is when I started choking, and I just stepped off the sink.  I wanted to end it.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q    Were you pepper sprayed before you stepped off the sink or after you stepped off the sink?

A    Before.

Q    How long of a pepper spray burst was it?

A    I don't remember.  I just started choking.

Q    Was it more or less?

A    I was not counting down.  I don't know.  I wasn't counting.  I'm trying to end my life.

Q    And did one officer or more than one officer use pepper spray?

A    Once again, I don't know.  It was multiple officers in the cell restraining me, covering me up.

Q    Have you ever had pepper spray used against you before this incident?

A    No.

Q    One second.  I am just reviewing my notes.

So are you saying that you stepped off the sink in attempt to hang yourself while other officers were present in your holding cell?

A    They all --

Q    Are you --

A    They all rushed in.  They all ran in.  There were multiple officers that ran in.  Once I did not comply, they all rushed in.

Q    And then as they were running in, you stepped off

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

the sink?

A    I took a small prayer, and I took a leap of faith, and I tried to kill myself.

Q    Did the sheet that was around your neck, did it rip immediately as you fell off our stepped off the sink?

A    It did not rip.  It came from over me.  Like, it came off as if I did it wrong.  It did not physically tear or rip.  I don't know how it came off, but it came off.  I don't know.  It snapped my throat, and then it just slid off and then the next thing you know, I am being tackled and choking.

Q    So the -- I am just trying to make sure I'm understanding correctly.  That was helpful.  So if the sheet was around your neck and you stepped off and it slipped over your head, but it did not rip?

A    Correct.

Q    Okay.  Thank you, sir.  I appreciate that.  Thank you for walking through that with me.  I know it must be hard to talk about.

After professional staff entered your cell, what happened next?

A    They cuffed me up with leg and wrist restraints and initiated emergency mental health referral procedures.

Q    Were you escorted to the triage or the TTA?

A    I don't remember.  Whatever -- whatever the

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q   Okay.  That's helpful.  I just wanted to ask.  I will stop sharing this exhibit.

After you received medical care and a quick checkup, where were you placed afterwards?

A   In housing in the crisis bed.

Q   And did you spend the whole night there?

A   I did.

Q   Did you receive any medication after the hanging incident on March 26th?

A   I can't remember.

Q   Do you remember receiving any other medical care after the hanging incident on March 26th?

A   I can't remember.

You're saying after?  What do you mean after?  Like, the very next day because -- or what do you mean because yeah. I have received a -- received physical therapy, pain injections, like, yes.  I did receive medical care.

Q   I will clarify my question.  In the evening of March 26th after your hanging incident, but before the morning of March 27th, did you receive any other medical care?

A   I don't remember.

Q   The next day on March 27th, 2023, did you speak with Dr. Kranz again?

A   Yes.  He came down to our housing, the suicide

watch.  He apologized to me and he talked me back to going to the yard.

Q    Talked to about going where?

A    He apologized to me and he talked to me into going back to the yard.

Q    Why would he have to talk or convince you to go back to the yard?

A    What do you mean why did he have to talk?  I don't know why he had to talk, or why he would convince me.  It was just at that time.  Once it was done and over, the medication had worn off.  He made some type of sense to me, and I went back to the yard.

Q    Did anyone else over here part of your conversation with Dr. Kranz on March 27th?

A    Not that I remember.  I don't know.

Q    I want to circle back on a few points that you just mentioned when you chatted with Dr. Kranz on March 27th. What did -- can you explain in more detail what you both talked about on the 27th?

A    No.  I cannot.

Q    What did Dr. Kranz tell you on March 27th?

A    I don't know what he told me.  I told you that he apologized.  He came in.  He was like look.  We got off on the wrong foot.  Can we start over?  You know, I apologize. What is going on with you?  How can I help you, but by that

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

time, it was too late.  It was too late.

Q   Did you ever express concern about being transferred or about being housed in a different cell?

A   No.  I don't remember that.

Q   Did you ever tell Dr. Kranz that you wanted to go to the CTC?

A   Yes.

Q   Why did you want to go to the CTC?

A   Because I was feeling suicidal.

Q   Did you ever tell Dr. Kranz that you wanted to be placed in a single cell?

A   I don't remember that.

Q   Do have a preference of being in a single cell as opposed to a cell with other inmates?

A   Still in prison.  It's irrelevant to me.

Q   Do you have a preference between being in a single cell or with other inmates?

A   I'm still in prison here.  It's irrelevant to me.

Q   How is it irrelevant to you?

A   Because I don't care whether I am in a single cell or with somebody in a cell.  I want to be out of all the cells.

Q   Did you ever tell Dr. Kranz that you were not content with the medication?

A   I believe, I did.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q   What medication did you talk to Dr. Kranz about?

A   I don't know.  I don't know specific medication, but I informed him that my depression was high.  My anxiety was high.  I told them that, you know, my suicidal thoughts -- I expressed all of that to them after the fact when they finally wanted to hear me.  Because let's not forget, he was rude and unprofessional when I went to him for help, and the first thing he did was minimize my issues.

Q   Did you ever talk with Dr. Kranz about your upcoming meeting with the Institutional Classification Committee regarding your housing status?

A   I don't remember that.

Q   Is it possible you did discuss your housing status and placement with Dr. Kranz?

A   I don't remember that.  No.

Q   Have you ever presented -- let me start again.

Have you ever threatened self harm or discussed having symptoms that you actually don't have to change your housing status will placement?

A   Absolutely not.

Q   Did you ever tell Dr. Kranz that you were worried that you might end up hurting someone if you were placed in a cell with someone else?

A   I don't remember that.

Q   Have you told me everything that you remember about

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

your conversation with Dr. Kranz on March 27th?

A    I told you all that I can thus far.

Q    And you don't recall anything else?

A    I do not.

Q    Do you know who Dr. Kranz's supervisor was on March 26, 2023?

A    Ms. Heidler?  I'm not aware.  No.  I don't know.  I don't know who his supervisor is.  Yeah.  I believe so.  I believe it was Ms. Heidler.  She was responsible for training him.  So wouldn't that be his supervisor?

Q    How do you know Dr. Heidler was responsible for training Dr. Kranz?

A    Because I believe it is in some paperwork that I read, that she is above him.

Q    Have you ever seen Dr. Heidler and Dr. Kranz together at the same time?

A    I haven't.  No.

Q    Have you ever seen Dr. Heidler provide training to Dr. Kranz?

A    No.

Q    Have you ever seen Dr. Heidler speak to Dr. Kranz?

A    No.

Q    How did Dr. Heidler fail to adequately train or supervise Dr. Kranz?

A    Ms. Heidler was aware that inmates face a

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

substantial risk of harm and chose to disregard the risk by failing to take responsible measures to obey, and what I mean by that is, Ms. Heidler turned a blind eye to the facts.  She knew Psychologist Kranz was daring people to harm themselves in order to get help and she provided no solution.

Q   What training or supervisory actions should Heidler have taken?

A   I don't know the protocol for the training, but I know that in the training, it is not to tell the inmate that there is nothing that you can do to help them or to make better decisions.  You need to do something or show me something.  Like, who says that?

I'm coming to you for healthcare, I'm coming to tell you that I am in danger of harming myself to I need help.  And instead of helping me, you dared me to harm myself.

Q   Do have any experience or training in her duties or requirements as a supervisor?

A   I do not.

Q   How many suicide attempts have occurred at California Men's Colony before March 26, 2023?

A   I don't know that answer.

Q   How many suicide -- so sorry.  The last question was about suicide attempts or suicides.

How many suicides have occurred at California Men's

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Colony before March 26, 2023?

A   I don't know that answer.  I am not aware.

Q   **Have you ever threatened self-harm to avoid an unfavorable cell assignment or housing assignment?**

A   No.

Q   **Have you used any medical sources to base your allegations on?**

A   You have to reiterate that for me.  I don't understand what you mean by that.

Q   **Okay.  Have you used any medical sources as the basis of your lawsuit?**

A   Have I used any medical sources as the basis of my lawsuit.  What are medical sources?

Q   **Like, any medical journals or information from your medical chart or information from another doctor that you have talked to, and stuff like that?**

A   Have I used it to do what?

Q   **Or like -- let me try rephrasing it again.**

A   Yeah.  Because I am not --

Q   **That's okay.  I can do a better job of rephrasing it.  I understand.**

**When you drafted your complaint in this lawsuit, did you review any medical records or medical journals to help you draft your complaint?**

A   Well, I did not draft of my complaint.  Like I told

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

A    What you mean what document?  His report.

Q    **Yes.  And trying to understand the basis for the new claim for Dr. Kranz is a deliberate indifference?**

A    Well, you have to go back and just read it.  He said it himself.  I don't know if it's page 3 or page 5.  I have to go back and look, but he admitted to writing his report based on what he read and not by personal observation.

Q    **And I'm just trying to -- I don't know where that document is.  And you kind of explained to me where that document you are referring to is?**

A    Like I said, I have to go back and try and find the document.  I can't give you the exact, but when I amend it, I will make sure I put it all in that packet.

Q    **That's helpful, sir.  I just want to ask one more question.  Is it a different document than the complaint you filed with this court in this lawsuit?**

A    No.  I don't believe so.  It is part of what he admitted.  These were his words.

Q    **Okay.  And have you submitted a grievance about this issue?**

A    I have.

Q    **Under 602?**

A    Yes.  I have.

Q    **And did you get a response to your grievance yet?**

A    Not yet.

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

Q    When did you submit that grievance?

A    A couple of weeks ago.

Q    Okay.  Thank you, sir.  Anything else you want to add?

A    No, sir.

Q    Excellent.  If you want a copy of this deposition transcript, you are welcome to make arrangements from the court reporter, but please remember, you have to pay for it yourself.  If you purchase and review the transcript, you're allowed to make changes, but keep in mind, if you do make changes, I can comment on those changes in court.  Do you understand?

A    I do, and I would like copies.

Q    Okay.  We can handle the logistics and payment with the court reporter after.  But thank you for your time and patience in answering my questions.  The deposition is now concluded.  We can go off the record if that is okay with you, Mr. Goins?

THE WITNESS:  It's okay.

THE COURT REPORTER:  We are going off the record at 3:41 p.m.

(The deposition concluded at 3:41 p.m.)

Volume 1
Robert Anthony Goins

Robert Anthony Goins (BL8291) vs.
E. Kranz, et al.

REPORTER'S CERTIFICATE

I, Kathleen Madden Keenaghan, a Certified Shorthand Reporter for the State of California, do hereby certify:

That the foregoing transcript of proceedings was taken before me at the time and place set forth; that the testimony and proceedings were reported stenographically by me and later transcribed by computer-aided transcription under my direction and supervision; that the foregoing is a true record of the testimony and proceedings taken at that time.

I further certify that I am in no way interested in the outcome of said action.

I have hereunto subscribed my name this 5th day of June, 2026.

_____

Kathleen Madden Keenaghan

CSR No. 14577

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# EXHIBIT 2

ROB BONTA
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General
MACKLIN THORNTON
Deputy Attorney General
State Bar No. 327927
 600 West Broadway, Suite 1800
 San Diego, CA 92101
 Telephone: (619) 321-5166
 Fax: (916) 732-7920
 E-mail: Macklin.Thornton@doj.ca.gov
*Attorneys for Defendants*
*E. Heidler and E. Kranz*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **ROBERT ANTHONY GOINS,**<br><br>Plaintiff,<br><br>v.<br><br>**E. KRANZ, et al.,**<br><br>Defendants. | 2:25-cv-02168-SB-ACCV<br><br>**EXPERT REPORT OF ROBERT D. CANNING, PHD** |

I, Robert D. Canning, PhD, declare:

1.    I am not a party to this case. I am competent to testify to the matters set forth in this expert report and, if called upon by this Court, would do so.  I submit this expert report in the above-captioned action pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

### Expert's Background and Experience

2.    I am a licensed clinical psychologist in the State of California. I received my PhD in clinical psychology from Palo Alto University (formerly Pacific Graduate School of Psychology) in June 1993; completed a clinical internship at the University of Pittsburgh Medical Center; and

1

a post-graduate fellowship in psychiatric epidemiology from 1993 to 1995. I have been licensed by the State of California since February 1997. Between 1995 and 2001, I was a clinical psychologist for the Veterans Administration and then the University of California Davis Medical Center Department of Psychiatry and Behavioral Sciences. A current curriculum vitae is attached to this declaration as an Exhibit.

3.      From August 2001 through August 2025, I was employed by the California Department of Corrections and Rehabilitation (CDCR).[1] From 2001 to 2005, I performed mental health clinical duties at the California Medical Facility in Vacaville, CA. In September 2005, I accepted a position as senior psychologist at the CDCR statewide mental health program in Sacramento. In that position I was the chair of the department's suicide prevention committee. I participated in a wide variety of mental health policy discussions and the implementation of those policies. I have a broad and detailed knowledge of CDCR's mental health policies and procedures regarding outpatient and inpatient treatment of mental health problems. In addition, in 2013 and 2015 I was a senior psychologist at several institutions supervising the day-to-day work of mental health clinicians. From 2016 through 2018, I was part of a team that designed and then deployed the Department's electronic medical record system. From February 2020 through August 2025, I was a senior psychologist with the mental health program's suicide prevention, quality management, and mental health informatics programs.

4.      As part of my duties at the mental health program's headquarters, I created and delivered the department's seven-hour suicide risk assessment training for clinicians (2013), designed the program's original SRASHE mentoring program (2014), co-authored the original safety planning program and training (2018), and conducted numerous trainings for mental health and medical staff on suicide prevention, screening, and risk evaluation. I designed and implemented statewide suicide screening measures for restricted housing units and designed the original iteration of the department's suicide risk assessment form in the electronic medical record system.

---

[1] At the end of 2018 I formally retired from state service but returned in February 2020 as a "Retired Annuitant," a classification used by the state to allow retired employees with special expertise to work part-time in their previous position.

2

5.    Outside of my employment by CDCR, I have acted as an expert for attorneys and carceral systems regarding suicide prevention and the delivery of mental health services in custodial settings. I have been a named expert for both plaintiffs and defendants in wrongful death litigation. I am currently a subject matter expert for the court-appointed monitor in the U.S. DOJ's CRIPA litigation with the Los Angeles County Sheriff's department in *United States v. County of Los Angeles*, No. 2:15-cv-05903 (C.D. Cal.). In that role I work with the monitor and other experts to review clinical care, make site visits to the jail facilities, and participate in periodic reports to the federal district court.

6.    I have been a National Commission on Correctional Health Care Certified Correctional Health Professional since 2016. I have co-authored publications regarding suicide prevention in custodial settings and the delivery of mental health services in those settings. I served as an instructor on suicide risk assessment for mental health clinicians for the American Association of Suicidology from 2007 through 2024.

7.    I am familiar with the standard of care and skill ordinarily exercised by reputable members of the psychology professions providing mental health care in carceral settings.  I am also familiar with the practices, policies, and procedures promulgated by CDCR and California Correctional Health Care Services (CCHCS) regarding delivery of mental health care to individuals incarcerated in CDCR prisons.

## Scope of Assignment

8.    My fees for expert services in this case are $200 per hour for document review and report writing, and $200 per hour for deposition and court appearances. I have not testified in court or been deposed in the last four years.

9.    I have been asked by the Office of the Attorney General of the California Department of Justice to offer opinions on the following questions:

a. *Did Drs. Heidler and Kranz respond to Plaintiff's claims of suicidal ideation appropriately and follow the appropriate standard of care; and*

b. *Did Dr. Heidler train and supervise Dr. Kranz appropriately and follow the appropriate standard of care in supervising him?*

3

10.    I have reviewed the following documents to assist in the formulation of my opinions:

  a.  Plaintiff's complaint (Court Document No. 1)

  b.  Medical records from CCHCS for Plaintiff for the period January 1, 2023 through April 30, 2023;

  c.  The CDCR Mental Health Services Delivery System (MHSDS) Program Guide, 2021 Revision: https://cchcs.ca.gov/wp-content/uploads/sites/60/2021-Program-Guide-2.1.22.pdf;

  d.  California Men's Colony (CMC) Operational Procedure No. 3043 Crisis Intervention Team, August 2022;

  e.  CCHCS Mental Health Services policy 12.01.700 Crisis Intervention Teams dated July 8, 2021;

  f.  CDCR training records for Defendant Kranz; and

  g.  Email excerpt from Dr. Elizabeth Heidler to Deputy Attorney General Macklin Thornton on February 27, 2026.

**CDCR's Mental Health Services**

11.    CDCR's mental health care delivery system based on the *Coleman* court-approved policies and procedures contained in the department's MHSDS Program Guide, most recently updated in 2021.[2] This document delineates care guidelines for patients at all levels of custody in CDCR. Specifically, mental health services are based on "levels of care" assigned through screening and evaluation by mental health clinicians. Levels of care denote the acuity of an incarcerated individual's mental health needs and ability to function in a correctional environment. The lowest (i.e. least acute) level of care is the Correctional Clinical Case Management System (CCCMS) which exists in almost all CDCR institutions. For patients with higher levels of acuity and chronic mental health problems or those suffering from mental health

---

[2] *Coleman v. Newsom*, No. 2:90-cv-520 (E.D. Cal), is a longstanding class action providing for constitutionally adequate mental health services for all seriously mentally ill inmates in CDCR. The MHSDS Program Guide (2021 Revision) is the approved remedy and prescribes the delivery of mental health services to the class.  The Program Guide may be accessed online at https://cchcs.ca.gov/wp-content/uploads/sites/60/2021-Program-Guide-2.1.22.pdf.

4

crises, the Enhanced Outpatient Program (EOP) level of care provides more intensive individual and group treatment in protected housing units. For patients in need of inpatient psychiatric treatment, the department has short-term and longer-term inpatient facilities. The Mental Health Crisis Bed (Crisis Bed) level of care provides crisis stabilization and treatment in licensed hospital units for up to ten days, while the Acute Inpatient (Acute) and Intermediate levels of care treat patients for up to six months in licensed psychiatric hospital settings.

12.     Each CDCR institution maintains an interdisciplinary Crisis Intervention Team (CIT) that provides responsive crisis intervention strategies directed toward resolving patient mental health crises. The team includes a mental health clinician, a supervisory-level custody officer, and a member of the nursing staff. Resolving crises by identifying root causes of the patient's concerns serves to improve the care provided to the patient in crisis and allows assessment of the crisis physically closer to the source of the stressor. Prompt attention to potential crisis issues also allows staff to work with the patient to address custodial, medical or mental health concerns that could lead to self-harm or suicidal behavior. The interdisciplinary model of the CIT improves the collaboration and partnership of the disciplines to meet the needs of the patients. All CDCR mental health clinicians receive CIT training as part of their ongoing employment.

13.     The MHSDS Program Guide specifies in Chapter 10, Section D that "[a]ny CDCR employee … who becomes aware of an inmate's current suicidal ideation, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation … until a clinician trained to perform a suicide risk assessment … conducts a face-to-face evaluation."  These evaluations are documented in the department's electronic health records system (EHRS) in a document called the Suicide Risk and Self-Harm Evaluation (SRASHE). The SRASHE contains information about current and historical suicidal ideation, lifetime and recent risk and protective factors for suicide, and current risk for suicide. It also uses a standardized set of questions about suicidal behavior, intent, and planning called the Columbia Suicide Severity Rating Scale (C-SSRS). The C-SSRS is commonly used in both community and correctional settings to aid clinician evaluations of suicide risk.

5

14.     CDCR mental health clinicians on an institution's CIT are required to complete a SRASHE as part of the patient encounter when suicidal ideation is present. The SRASHE is used to document contact with collateral sources of information, a mental status exam, and a suicide safety plan, which flows directly from the clinician's judgment of risk. The SRASHE is completed each time a patient is evaluated for suicide risk and information from previous risk evaluations are "pulled forward" into the current SRASHE.

15.     CDCR's mental health program maintains a robust and broad menu of trainings in suicide prevention and response. All mental health staff are required to attend suicide prevention training as part of their annual On-the-Job-Training requirement. Mental health clinicians are required to complete a seven-hour specialized training entitled Suicide Prevention and SRASHE Core Competency Building once every two years. Additionally, each calendar year mental health clinicians complete a SRASHE mentoring session which includes an audit of a sample of the clinician's completed SRASHEs and a feedback session focused on improvement of documentation. Institutional suicide prevention programs conduct periodic audits of SRASHEs and provide feedback to clinicians about their work. Finally, members of the prison CIT complete both general CIT training and individual training sessions related to their CIT duties.

**Plaintiff's Mental Health Documentation and Chronology**

16.     Plaintiff's most recent stay in CDCR custody began on March 24, 2020, at Wasco State Prison reception center. He was transferred to CMC on November 13, 2020, and remained housed there through the time of the incidents at issue in this case. For the first three years of Mr. Goins' incarceration his level of mental health care was CCCMS. In early 2023, after his MHCB stay from January 7 through January 13, 2023, he was enrolled in the EOP level of mental health care.

17.     The background for the incident in question begins on January 7, 2023, when Mr. Goins, after an incident in the CMC visiting room, was told he would be rehoused in restricted housing pending an investigation. Soon after he was told of the impending housing change, he expressed suicidal ideas and after a mental health evaluation was referred for a higher level of mental health care in the CMC MHCB unit.

6

18. Upon admission to the MHCB, he told a clinician "[I]f I go up to [restricted housing] I am going to kill myself, I know what I am going to do. I don't deserve to be up there." He was described as "… agitated, anxious and distressed following his being informed he would be placed in [restricted housing] secondary to allegations his visitor was attempting to introduce illicit substances to the institution through visiting." Clinicians rated his chronic (long-term) suicide risk as low and his current (acute) risk as moderate due to situational stressors.

19. Mr. Goins spent six days in the MHCB unit. During that time his distress decreased, and he no longer claimed to be suicidal. A SRASHE was administered just prior to his discharge and estimated his acute risk for suicide to be low and his chronic risk to be low to moderate. He participated in a safety planning discussion and reported adequate ways of coping with any recurring suicidal thoughts or urges.

20. After discharge from the MHCB unit, Mr. Goins was housed in CMC's Restricted Housing Unit (RHU) EOP program. On a brief questionnaire used to screen for mental health issues prior to housing individuals in restricted housing, Mr. Goins had answered "No" to the question about whether he was experiencing suicidal ideation.

21. Per CDCR policy, Mr. Goins was interviewed about suicidal thoughts or behavior for five consecutive days after his discharge from the MHCB. His responses in these clinical interviews showed no suicidal ideation and decreased distress.

22. During the 72 days Mr. Goins spent in restricted housing between his MHCB discharge on January 13, 2023, and when he was interviewed by Dr. Kranz on March 26, 2023, he attended over fifty percent of his scheduled recreation therapy groups and saw his mental health clinician and assigned psychiatrist regularly. As he approached two months in restricted housing he complained to clinicians about the stress of his situation, not knowing exactly how long he would be there, his worries of being transferred away from CMC, and the intermittent family contact he had. Psychiatric technician reports from March 2023 do report some intermittent suicidal thoughts but without plan or intent to act. Despite these complaints, clinicians reported that he generally was coping well with the stress and was compliant with his prescribed psychotropic medications.

23.    At 5:45 PM on March 26, 2023, a custody officer made an emergency referral to mental health after Mr. Goins made a suicidal statement. The referral was received by Dr. Kranz who responded to the housing unit as part of the CMC CIT. In addition to Dr. Kranz, the team included a Senior Psychiatric Technician representing nursing staff and a custody sergeant.

24.    Clinical documentation (SRASHE and CIT progress note) of the interaction between Mr. Goins and Dr. Kranz report that Mr. Goins said he "… heard bad news about my son today … but also I've been here [in RHU] for two and half months and I'm mentally exhausted … I'm thinking about wrapping a sheet around my neck." Dr. Kranz's noted that he reviewed previous clinical documentation, specifically the regular clinical contact from March 21, 2023, which indicated no suicidal ideation and that his main concern was possible transfer. Dr. Kranz noted that the clinical record indicated Mr. Goins "full participation" in therapeutic groups and attendance at clinical contacts.

25.    Dr. Kranz' SRASHE and accompanying CIT documentation noted that Mr. Goins reported being suicidal for a week although documentation of his last visit with a mental health clinician showed no evidence of suicidal thinking prior to that evening. Dr. Kranz wrote that Mr. Goins was "mentally exhausted" from being housed in his current restricted housing unit. But when queried about what was causing him stress, he was vague and could not clearly describe the conditions which caused him increased stress. Dr. Kranz's described Mr. Goins' mental status as within normal limits until he was told he would not be admitted to a higher level of care. Dr. Kranz wrote that "given the totatity [*sic*] of this information it was deemed that [the patient] could continue to program at EOP [level of care] and work on managing stressors at EOP [level of care]." When this was communicated to Mr. Goins, he responded by asking for Dr. Kranz's name and stating "Ok, after I go back in my cell and do what I got to do I'm going to file paperwork on you for deliberate indifference." Mr. Goins declined to participate in safety planning. Dr. Kranz wrote that Mr. Goins' statement suggested "planned calculation to use" suicidal language to force the CIT to recommend a higher level of mental health care.

26.    Dr. Kranz' documentation of suicide risk indicated that the CIT believed Mr. Goins' acute risk of suicide was low and his chronic risk was also low. He justified these ratings as due

8

to Mr. Goins' lack of history of suicide attempts and his ability to positively program in his current housing environment without incident. Dr. Kranz also noted that it appeared that Mr. Goins "learned that making threats to harm himself works to increase his [level of care] to avoid [restricted housing] …" as occurred in January of 2023 after the incident in the CMC visiting center.

27.    Soon after being returned to his original housing, Mr. Goins was discovered by custodial staff standing on the toilet in his cell "with [a] strip of sheet around his neck" and attached to the nearby window frame. When custody staff ordered him to remove the cloth strip from around his neck, he complied and was subsequently examined by nursing staff who found no sign of any injury that required medical attention. Upon release to custodial staff, he was placed in Alternative Housing[3] to await a mental health evaluation for admission to a higher level of care.

28.    At approximately 1:30 PM on March 27, 2023, Dr. Kranz again evaluated Mr. Goins' suicide risk. Mr. Goins told Dr. Kranz that "I'm worrying about being transferred and going to a single cell...with my mood fluctuations I'm afraid I might end up hurting someone and I want to go home to my family. I either want to go to the [MHCB and then] to go to [the Intermediate treatment level] or get a single cell chrono." Dr. Kranz reported that other stressors included hearing that his child was having school problems and he was not happy with his current medications. Mr. Goins was quoted as saying "I want to get back on [W]ellbutrin ... it's what helped me before." Dr. Kranz quoted Mr. Goins saying that he had been counseled by his psychiatrist to try other antidepressants first which Mr. Goins apparently agreed to. Dr. Kranz provided brief psychosocial interventions which were acceptable to Mr. Goins. Kranz reported that by the end of the evaluation Mr. Goins was "… future oriented and report[ed] 'I just want get back to my programming on the yard.'" The SRASHE completed by Dr. Kranz found that both Mr. Goins' acute and chronic suicide risks were low. After the evaluation Mr. Goins returned to

---

[3] Alternative Housing is a mental health and custodial designation when an individual is awaiting evaluation for admission to a MHCB unit, typically after a suicidal statement or behavior. Individuals in Alternative Housing are under constant visual observation and placed in a suicide-resistant gown for their safety. Stays in Alternative Housing are limited to 24 hours which corresponds to the transfer timeline for admission to an MHCB unit.

9

his previous housing and mental health level of care. Per CDCR policy, his suicide risk was evaluated daily for five days after his release from Alternative Housing on March 27, 2023.

**Analysis of Defendants' Actions and Expert Opinions**

29.    As explained in her email to DAG Thornton on February 27, 2026, Dr. Heidler, as supervisor of the CIT, was available either in person or by telephone as needed by the team.

30.    Suicide risk assessment is one of the most difficult and fraught tasks for correctional mental health clinicians. Almost all patients have some level of increased suicide risk due to their personalities, mental health issues, demographic factors, criminal background, and many other factors. The risk for suicide and self-harm is not static and can change quickly depending on circumstances and triggering events thus risk assessments can become invalid within minutes of their completion. The evaluation of an individual's intentions and motivations from moment to moment is particularly difficult when working with incarcerated individuals who may not be readily forthcoming. It is my opinion that Dr. Kranz performed an adequate, appropriate, and reasonable suicide risk evaluation of Mr. Goins well within the standard of practice for correctional psychologists practicing in CDCR.[4] In addition, he adhered to the policies and procedures which govern his professional behavior as a CDCR mental health clinician.

31.    The documentation inspected for this report indicate that Dr. Kranz complied with CDCR policies. An inspection of the SRASHE forms from March 26, 2023 and March 27, 2023, show that Dr. Kranz adequately and appropriately evaluated Mr. Goins' suicide risk. He performed his duties as required by the CDCR policies and procedures for mental health clinicians and met the standard of care for clinicians evaluating suicide risk in prison inmates:

      a.   He interviewed the patient in a confidential setting;

      b.   He reviewed previous mental health evaluations and records;

      c.   He spoke with custodial staff in the patient's housing unit;

      d.   He evaluated Chronic and Acute risk factors, protective factors for suicide and

---

[4] See e.g., Stanley, I. H., Simpson, S., Wortzel, H. S. & Joiner, T. E. Documenting suicide risk assessments and proportionate clinical actions to improve patient safety and mitigate legal risk. *Behavioral Sciences and the Law* **37**, 304–312 (2019) and Obegi, J. H. Probable Standards of Care for Suicide Risk Assessment. *Journal of the American Academy of Psychiatry and Law* 45, 452 459 (2017).

10

warning signs of imminent risk;

e.  He provided judgments of risk for both Chronic and Acute risk and provided a rationale for these levels of risk; and

f.  He made a reasonable disposition (back to housing) based on his evaluation and the patient's presentation.

32.  It is my opinion that given the totality of circumstances Dr. Kranz made an appropriate clinical decision to return Mr. Goins to his previous housing, despite Mr. Goins' use of suicidal language.

33.  The determination of authenticity of suicidal statements (and behavior) is a common problem for correctional mental health clinicians.[5]  Experts on correctional suicide prevention warn that suicidal statements by inmates should always be taken seriously and thoroughly evaluated prior to making a disposition. It is a truism in correctional mental health practice that "manipulators" can also be suicide decedents and thus must be thoroughly and adequately evaluated. In the present case, Dr. Kranz thoroughly documented his evaluations and based on the patient's presentation, statements, and the context, made what, in my opinion, was the appropriate disposition for Mr. Goins.  I believe Dr. Kranz's decisions were medically acceptable under the circumstances.

34.  As program supervisor for the CMC CIT, Dr. Heidler was not a part of the CIT that interviewed Mr. Goins on March 26 or March 27, 2023, and thus had no role in the evaluation of Mr. Goins' level of suicidality. Licensed practitioners who work for CDCR are not required to have regular clinical supervision of their work.

35.  CMC Operational Procedure No. 3043 designated the MHCB Clinical Director as the CIT program supervisor. Dr. Heidler was this designated staff member and indicated in her email of February 27, 2026, to Deputy Attorney General Thornton that she "checked in with Kranz daily and reviewed documentation, as necessary" during the period January through March 2024.

---

[5] See e.g. Obegi, J. H. Differentiating genuine from feigned suicidality in corrections: A necessary but perilous task. *International Journal of Law and Psychiatry* **71**, (2020).

11

Additionally, she reports that she was available for consultation by phone on March 26-27, 2023, when Mr. Goins was evaluated by Dr. Kranz. It is my opinion that this level of supervision and monitoring is within the requirements of the local and statewide policies for CITs in CDCR.

36.    Training records reviewed for this report covered the period from May 2021 through March 2023. During this period Dr. Kranz completed trainings in the evaluation of self-harm and the alternative housing procedure (2021), the five-day follow-up procedure after alternative housing discharge (2021 & 2022), and safety planning (2021). All these trainings were delivered by Dr. Heidler, the supervisor of the CMC CIT and a Senior Supervisor Psychologist at CMC's MHCB. Dr. Kranz completed the department's mandatory seven-hour Suicide Prevention and SRASHE Core Competency Building course at CMC on July 20, 2021. Finally, he attended a SRASHE mentoring session in January 2021.

37.    In an email on February 27, 2026, from defendant Heidler to Deputy Attorney General M. Thornton she states: "My Chiefs or I were available for any questions that might arise or consultation that was needed either by phone, email or face to face. … [Dr. Kranz] attended weekly case consultations if he was available. … All CDCR clinicians are required to complete specific CIT training. I checked in with Dr. Kranz daily and reviewed documentation, as necessary."

38.    In sum, it is my opinion that Drs. Heidler and Kranz acted professionally in all their interactions with Plaintiff and met the standards of care for suicide risk evaluation in correctional settings, supervision, and the training of clinical psychologists in CDCR.


I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge.  Executed on April 14, 2026 in Little Rock, Arkansas.


_____
ROBERT D. CANNING, PHD

12

# CURRICULUM VITA

### ROBERT D. CANNING, PH.D., CCHP

Address:            217 J Street                                        Updated Feb. 2026
                    Davis, CA 95616
                    (530) 400-8965
                    rdcanning@gmail.com

## EDUCATION AND TRAINING

1973        B.A., Liberal Arts, University of Delaware

1993        Ph.D., Clinical Psychology, Palo Alto University

1993        Clinical Internship (APA Accredited), Western Psychiatric Institute & Clinic, University of Pittsburgh Medical Center

1995        NIMH Post-Doctoral Fellow, Psychiatric Epidemiology, Western Psychiatric Institute & Clinic, University of Pittsburgh Medical Center

## PROFESSIONAL LICENSURE

1997 – Present  Board of Psychology, State of California: PSY 14961

## PROFESSIONAL CERTIFICATION

2016 – Present  Certified Correctional Healthcare Professional, National Commission on Correctional Healthcare, Chicago, IL

## EXPERT CONSULTATIONS

**Correctional System Monitoring**

2023 – Present  *U.S. v. County of Los Angeles et al.* (2:15-cv-05903), U.S. District Court, Central District of California. Subject matter expert for the Monitor.

**Programmatic Consultations**

2023        Department of Correction, New York City (*Nunez v. NYC,* 1:11-cv-05845) Review and recommendations re. suicide prevention policies and procedures.

2020 – 2022  Correctional Health Services, Department of Health Services, Los Angeles County. Training for clinical staff in suicide risk assessment and consultation re. suicide prevention practices in the jails.

2019 – 2021  Jail Mental Health Team, Behavioral Health and Recovery Services, Department of Health & Human Services, County of Marin, San Rafael, CA. Review and recommendations re. suicide prevention policies.

| 2019 | Behavioral Health Team, Juvenile Detention Facility, Yolo County Probation Department, Woodland, CA. Clinical consultation and training re. suicide risk assessment with justice-involved youth. |
|---|---|
| 2018 | Disability Rights of California, San Diego Jail Suicides Project, Berkeley, CA. Expert consultation and case reviews of in-custody suicides in San Diego Jails. https://www.disabilityrightsca.org/public-reports/san-diego-jail-suicides-report |

**Civil Litigation**

| 2025 | *Holmes v. Emanuel et al.* (2 :24-cv-10845), U.S. District Court, Central District of California. Retained by defendants: Case consultation, record review, and court submission. |
|---|---|
| 2025 | *Drake v. Kernan, et al.,* (1:17-cv-01500), U.S. District Court for the Eastern District of California. Retained by defendants: Case consultation, record review, FRE Rule 26(a)(2)(B) report preparation and submission. |
| 2025 | *Kendrid v. Yahiya, et al.* (2:23-cv-1145), U.S. District Court for the Eastern District of California. Retained by defendants: case consultation, record review, and court submission. |
| 2024 | *Adkins v. Kernan et al.* (2:19-cv-00458), U.S. District Court for the Eastern District of California. Non-retained expert for defendants: case consultation, record review, and court submission. |
| 2024 | *Mahwinney v. County of Pueblo et al.* (1:23-cv-02772), U.S. District Court, District of Colorado. Retained by plaintiffs: case consultation, record review, and Rule 26(a)(2)(B) report preparation. |
| 2024 | *Rice v. Callis* (3:22-cv-06130) U.S. District Court, Northern District of California. Non-retained expert for defendants: case consultation, record review, and court submission. |
| 2024 | *Andrews v. Rauner et al.* (1:18-cv-01101) U.S. District Court, Central District of Illinois. Retained by defendants: case consultation and record review. |
| 2023 | *Moore v. Salinas Valley State Prison, et al.* (5:21-cv-01019), U.S. District Court, Northern District of California. Non-retained expert for defendants: case consultation, record review, and court submission. |
| 2023 | *Touloudjian v. Gastelo* (2:20-cv-00520), U.S. District Court, Central District of California. Non-retained expert for defendants: record review, case consultation, and court submission. |
| 2022 | *Santiago v. County of Los Angeles, et al.* (2:21-cv-07061), U.S. District Court, Central District of California. Retained by defendants: record review and case consultation. |
| 2021 | *Beaver v. County of Butte, et al.* (2:20-cv-00279), U.S. District Court, Eastern District of California. Retained by defendants: record review and case consultation. |

2019        *Moriarty v. County of San Diego, et al.* (3:17-cv-01154), U.S. District Court, Southern District of California. Retained by plaintiffs: record review, Rule 26(a)(2)(B) report submission, and deposition.

2019        *Mendez-Jimenez v. County of Sacramento, et al.* (2:18-cv-00044), U.S. District Court, Eastern District of California. Retained by defendants: record review, Rule 26(a)(2)(B) report submission, and deposition.

2019        *Lewis v. Texas Department of Criminal Justice, et al.* (4:18-cv-00311), U.S. District Court, Southern District of Texas (Houston). Retained by plaintiffs: record review and case consultation.

2018        *Sanchez v. Young County* (7:15-cv-00012), U.S. District Court, Northern District of Texas (Wichita Falls). Retained by plaintiffs: record review and consultation.

2018        *Monday v. McDonnell, et al.* (BC643290), California Superior Court, County of Los Angeles. Retained by defendants: record review, independent medical examination, report preparation, and trial testimony.

2018        *Nishimoto v. County of San Diego, et al.* (3:16-cv-01974), U.S. District Court, Southern District of California. Retained by plaintiffs: record review, Rule 26(a)(2)(B) report submission, and deposition.

2016        *Loberg et al. v. County of Los Angeles* (2:16-cv-06190), U.S. District Court, Central District of California. Retained by defendants: record review and case consultation.

2015        *Medrano v. County of Los Angeles* (2:13-cv-06664), U.S. District Court, Central District of California. Retained by defendants: record review and case consultation.

2015        *Guenther v. County of Los Angeles* (BC543601), California Superior Court, County of Los Angeles. Retained by defendants: record review and case consultation.

**Evaluation for Dangerousness**

2019        *In the Matter of Darin Jay Petty* (16F01289), California Superior Court, County of Butte, California Welfare & Institutions Code §5008(h)(1)(B) (*Murphy* Conservatorship): Retained by Public Guardian: record review, report preparation and submission.

2019        *In the Matter of Brian Michael Bell* (17CF02452/17CM01778), California Superior Court, County of Butte, California Welfare & Institutions Code §5008(h)(1)(B) (*Murphy* Conservatorship): Retained by Public Guardian: record review, report preparation and submission.

2015        *In the Matter of Keith Edward Donche* (FELJS1402505), California Superior Court, County of San Bernardino. California Penal Code §1026.5. Retained by County: evaluation of dangerousness, report submission, and trial testimony.

Robert D. Canning, Ph.D., CCHP                                      Page 4 of 8

## POSITIONS AND APPOINTMENTS

| | |
|---|---|
| 2015 - Present | Consultant on correctional mental health services and suicide prevention |
| 2005 – 2025 | Senior Psychologist, Specialist, Statewide Mental Health Program, California Correctional Health Care Services, Elk Grove, CA |
| 2007 – 2024 | Instructor, American Association of Suicidology, Washington, D.C. |
| 2005 – 2015 | Suicide Prevention Coordinator, Statewide Mental Health Program, California Correctional Health Care Services, Elk Grove, CA |
| 2001 – 2005 | Psychologist, Folsom State Prison & California Medical Facility, California Department of Corrections & Rehabilitation |
| 2003 – 2009 | Assistant Clinical Professor, Department of Internal Medicine, UC Davis Medical School, Sacramento, CA |
| 1999 – 2000 | Roxane Clinical Fellow, West Coast Center for Palliative Education, UC Davis Medical Center, Sacramento, CA |
| 1999 – 2001 | Assistant Clinical Professor, Department of Psychiatry and Behavioral Sciences, UC Davis Medical School, Sacramento, CA |
| 1998 – 2001 | Clinical Psychologist, Department of Psychiatry and Behavioral Sciences, UC Davis Medical Center, Sacramento, CA |
| 1995 – 1997 | Clinical Psychologist, PTSD Clinical Team, Northern California Health Care System, Department of Veterans Affairs, Sacramento, CA |
| 1995 – 1999 | Clinical Instructor, Department of Psychiatry and Behavioral Sciences, UC Davis Medical School, Sacramento, CA |

## PUBLICATIONS & PRESENTATIONS

Google Scholar Page: https://bit.ly/2NcT9Wx

### Publications

Obegi, J.H. & **Canning, R.D.** (2022). The Cell-Front Interview Revisited. *Correctional Health Care Report,* 23(4): 81, 97-98.

Berman, A.L. & **Canning, R.D.** (2022). Proximal risk for suicide in correctional settings: A call for priority research. *Psychological Services, 19*(3), 407-412. https://doi.org/10.1037/ser0000516

**Canning, R.D.** (2017, November). Surveillance success stories: California Department of Corrections and Rehabilitation. Published online at: https://sprc.org/wp-content/uploads/2023/01/california_final.pdf

**Canning, R.D.** & Dvoskin, J.A. (2016). *Preventing Suicide in Detention and Corrections Facilities*. In J. Wooldredge & P. Smith (Eds.) The Oxford Handbook on Prisons and Imprisonment. New York: Oxford University Press. https://dx.doi.org/10.1093/oxfordhb/9780199948154.013.25

Robert D. Canning, Ph.D., CCHP                                                    Page 5 of 8

Bourgeios, J.A., **Canning, R.D.**, Suggett, K., Rahim, N. & Rossaro, L. (2006). Depressive symptoms and physical/mental functioning in IFN/RBV treatment of post-transplant recurrent HCV. *Psychosomatics,* 47(3): 254-256. https://doi.org/10.1176/appi.psy.47.3.254

Bourgeios, J.A., Rossaro, L. & **Canning, R.** (2005). Depression as co-pilot: Clinical implications of hepatitis C and interferon/ribavirin treatment. *Psychiatric Times,* 22(5).

**Canning, R.D.** (2003). A primary care approach to mental health care for HIV/hepatitis infected inmates. *Infectious Diseases in Corrections Report,* 6(1):1-4.

Leamon M.H., Gibson D.R., **Canning R.D.**, Benjamin L. (2002). Hospitalization of patients with cocaine and amphetamine use disorders from a psychiatric emergency service. *Psychiatr. Serv.*, 53(11):1461-6. https://doi.org/10.1176/appi.ps.53.11.1461

**Canning, R.D.** & Stuber, M.A. (2001). *Pediatric transplantation*. In Trzepacz, P.T. & DiMartini, A. (Eds.) The Transplant Patient. New York: Cambridge University Press.

Hilty, D. M., Nesbitt, T. S., **Canning, R. D.** & Hales, R. E. (2000). Telepsychiatry for the management of a liver transplantation candidate in the primary care setting. G*en. Hosp. Psychiatry,* 22, 122-123.

Leamon, M. H., **Canning, R. D.** & Benjamin, L. (2000). The impact of amphetamine-related disorders on community psychiatric emergency services: 1993-1997. *Am.J.Addict.,* 9, 70-78.

Leamon, M. R., Servis, M. E., **Canning, R. D.** & Searles, R. C. (1999). A comparison of student evaluations and faculty peer evaluations of faculty lectures. *Acad.Med.,* 74, S22-S24.

**Canning, R. D.**, Harris, E. S. & Kelleher, K. J. (1996). Factors predicting distress among caregivers to children with chronic medical conditions. *J.Pediatr.Psychol.,* 21, 735-749.

Harris, E. S., **Canning, R. D.** & Kelleher, K. J. (1996). A comparison of measures of adjustment, symptoms, and impairment among children with chronic medical conditions. *J.Am.Acad.Child Adolesc.Psychiatry,* 35, 1025-1032.

**Canning, R. D.**, Dew, M. A. & Davidson, S. (1996). Psychological distress among caregivers to heart transplant recipients. *Soc.Sci.Med.,* 42, 599-608.

Feldman, S.S., Rosenthal, D.R., Brown, N.L. & **Canning, R.D.** (1995). Pathways to early sexual intercourse: A longitudinal study of the influence of peer status. *J.Res.Adolesc.*, 5, 387-412.

Canning, E. H., **Canning, R. D.** & Boyce, W. T. (1992). Depressive symptoms and adaptive style in children with cancer. *J.Am.Acad.ChildAdolesc.Psychiatry,* 31, 1120-1124.

## Presentations, Trainings, & Abstracts (2010 to present)

**Canning, R.D.** and Butler, Mary. (2023, February). Suicide Risk Assessment through a Correctional Lens. Forensic Mental Health Association of California.

**Canning, R.D.** (2021, July). Suicide Risk Assessment for Jail Clinicians. Training for Adult Forensic Behavioral Health staff, Alameda County Santa Rita Jail, Dublin, CA.

**Canning, R.D.** (2021, July). Psychological Autopsies for Correctional Settings. Presented at the Corrections-Related Suicide Webinar, Global Justice Resource Center, San Luis Obispo, California.

Robert D. Canning, Ph.D., CCHP                                                      Page 6 of 8

**Canning, R.D.** (2021, June). Working with Difficult Suicidal Jail Residents. Training for the Correctional Health Services, Department of Health Services, Los Angeles County, California.

**Canning, R.D.** (2021, March). Suicide Risk Assessment for Jail Clinicians. Training for Jail Mental Health Team, Marin County Jail, San Rafael, California.

**Canning, R.D.** (2020, May). Suicide Risk Assessment for Jail Clinicians. Training for the Correctional Health Services, Department of Health Services, Los Angeles County, California.

**Canning, R.D.** (2020, January). Screening for Suicide Risk. Training for the Correctional Health Services, Department of Health Services, Los Angeles County, California.

**Canning, R.D.** (2019, April). Suicide Risk Assessment with Individuals Confined in Forensic and Prison Settings. Training for the Forensic Assessment Unit, Department of State Hospitals, State of California, Sacramento, CA.

**Canning, R.D.** (2018, September). History of Suicide Prevention in the California Department of Corrections and Rehabilitation. Talk presented at the Annual Suicide Summit, Statewide Mental Health Program, California Correctional Health Care Services. Folsom, California.

Horon, R. & **Canning, R.** (2017, April). Suicide Risk Assessment Prevention for Correctional Mental Health Clinicians. Workshop presented at the annual conference of the American Association of Suicidology. Phoenix, Arizona.

**Canning, R**., DiCiro, M. & Colley, J. (2016, October). Medically serious self-injury among state prison inmates. Presentation at the annual meeting of the American Academy of Psychiatry and the Law, Portland, Oregon.

**Canning, R.,** DiCiro, M. & Glenn, K. (2016, March). Medically serious self-injury in state prison: A case series. Poster presented at the annual meeting of the Forensic Mental Health Association of California, Monterey, California.

**Canning, R.D**. (2015, April). Suicide risk evaluation for mental health clinicians. Invited presentation, Annual Meeting of the California Psychological Association, San Diego, California.

**Canning, R.D.** & Horon, R. (2015, February). Improving suicide risk assessment with offenders: Collaboration and research to inform practice in the California Department of Corrections and Rehabilitation and the Department of State Hospitals. Presentation at the annual meeting of the Forensic Mental Health Association of California, Monterey, California.

Horon, R., **Canning, R**., McManus, T. (2014, April). Suicide Risk Assessment: Research, refinement and innovation within California prisons. Panel presentation at the annual meeting of the American Association of Suicidology, Los Angeles, California.

McDermott, B., Warburton, K., **Canning, R. &** Scott, C. (2012, October). Safety and security across the continuum of care in psychiatry. Panel presentation at the annual meeting of the American Academy of Psychiatry and the Law, Montreal, Quebec, Canada.

**Canning, R.D.** (2011, October). Suicide among the elderly. Presentation to the Communities Taking Steps: Suicide Awareness and Prevention Conference, Sacramento, California.

Berman, A. & **Canning, R.D.** (2010, July). Standardized training for suicide risk assessment in correctional settings. Talk presented to the National Commission on Correctional Health Care meeting on Correctional Mental Health, Boston, Massachusetts.

## MEMBERSHIPS

| | |
|---|---|
| 2021 – 2025 | Forensic Mental Health Association of California |
| 1997 – 2025 | Psychologists in Public Service, Division 18 of the American Psychological Association, |
| 1998 – 2023 | Society of Psychology and the Law, Division 41 of the American Psychological Association |
| 2005 – 2023 | American Association of Suicidology |
| 2013 – 2019 | Association for Psychological Science |
| 2006 – 2010 | American Association of Forensic & Correctional Psychology |

## CREDENTIALING

| | |
|---|---|
| 2006 – 2025 | California Correctional Health Care Services, Elk Grove, CA |
| 2001 – 2005 | Medical Staff, California Medical Facility, Vacaville, CA |
| 1998 – 2001 | Medical Staff, UC Davis Medical Center, Sacramento, CA |
| 1998 – 2001 | Medical Staff, Shriners' Hospital, Sacramento, CA |
| 1995 – 1997 | Medical Staff, Department of Veterans Affairs, Northern California Health Care System |

## PROFESSIONAL SERVICE

| | |
|---|---|
| 2021 – 2023 | Education Committee, Forensic Mental Health Association of California |
| 2018 – 2022 | *Ad hoc* Reviewer, *Psychological Services*, Division 18 – Psychologists in Public Service, American Psychological Association |
| 2009 – 2018 | *Ad hoc* Reviewer, American Association of Suicidology, Washington, DC |
| 2003 – 2005 | Preceptor, Second Year Medical Students, UC Davis Medical School |
| 2004 – 2005 | Chair, Department of Psychology, California Medical Facility |
| 2002 – 2005 | Instructor, Psychology Internship Program, California Medical Facility |
| 2002 – 2003 | Vice-Chair, Department of Psychology, California Medical Facility, Vacaville, CA |
| 2001 – 2003 | Bioethics Committee, California Medical Facility, Vacaville, CA |

Robert D. Canning, Ph.D., CCHP                                    Page 8 of 8

| | |
|---|---|
| 2000 – 2001 | Bioethics Consultation Committee, UC Davis Medical Center, Sacramento, CA |
| 1995 – 1997 | Instructor, Psychology Internship, VA Medical Center, Martinez |
| 1998 – 2001 | *Ad hoc* reviewer, *Social Science & Medicine* and *Journal of Clinical & Consulting Psychology* |

## RESEARCH

| | |
|---|---|
| 2016 | Co-Principal Investigator, <u>Machine Learning to Forecast Self-Injury Among Prison Inmates</u>. American Foundation for Suicide Prevention, New York, NY (unfunded). |
| 2014 | Research Training Institute, Injury Control Research Center for Suicide, University of Rochester Medical Center, Rochester, NY. |
| 2008 – 2014 | Consultant, <u>Evaluation of Suicide Risk Among Incarcerated Psychiatric Patients</u>. Vacaville Psychiatric Program, California Department of State Hospitals, Vacaville, CA., Robert Horon, Ph.D., Principal Investigator |
| 2011 – 2012 | Consultant, <u>Screening for Depression and Suicide Risk</u>. UC Davis School of Medicine, Department of Psychiatry & Behavioral Sciences, William Jarrold, PhD, Principal Investigator. |
| 2000 – 2005 | Consultant, <u>Interferon Alpha and Ribavirin Rx for Recurrent HCV in Liver Transplant Patients</u>. UC Davis Transplant Center, Lorenzo Rossarro, MD, Principal Investigator |
| 1999 – 2000 | Consultant, <u>Decreasing Distress Among Newly Diagnosed Cancer Patients</u>. UC Davis Cancer Center, Fred Meyers, MD, Principal Investigator |
| 1998 – 2001 | Medical Education Research Group, Department of Psychiatry, UC Davis Medical Center |

## PUBLIC SERVICE

| | |
|---|---|
| 2021 – 2025 | Member, Police Accountability Commission, City of Davis, California. |
| 2007 – 2016 | Member & Vice-Chair, Mental Health Advisory Board, Yolo County, California. |