ROB BONTA
Attorney General of California
WILLIAM C. KWONG
Supervising Deputy Attorney General
MACKLIN THORNTON
Deputy Attorney General
State Bar No. 327927
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  Telephone:  (619) 321-5166
  Fax:  (916) 732-7920
  E-mail:  Macklin.Thornton@doj.ca.gov
*Attorneys for Defendants*
*E. Heidler and E. Kranz*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| **ROBERT ANTHONY GOINS,**<br><br>Plaintiff,<br><br>v.<br><br>**E. KRANZ, et al.,**<br><br>Defendants. | 2:25-cv-02168-SB-ACCV<br><br>**DECLARATION OF E. KRANZ IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**EXHIBITS 2(a)**<br><br>**Vol. 2 of 2** |

1

# EXHIBIT 2

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2021 REVISION



## Division of Health Care Services

## Department of Corrections & Rehabilitation

EX. 2-1

# TABLE OF CONTENTS

CHAPTER 1 ................................................................. Program Guide Overview

CHAPTER 2 ..................................... Reception Center Mental Health Assessment

CHAPTER 3 ................................ Correctional Clinical Case Management System

CHAPTER 4 ........................................................... Enhanced Outpatient Program

CHAPTER 5 ................................................................... Mental Health Crisis Bed

CHAPTER 6 ................................ Department of Mental Health Inpatient Program

CHAPTER 7 ................................................................. Administrative Segregation

CHAPTER 8 ......................................................................... Security Housing Unit

CHAPTER 9 ................................................................... Psychiatric Services Unit

CHAPTER 10 ...................................................... Suicide Prevention and Response

APPENDIX A ............................................................................ Glossary of Terms

APPENDIX B………………………....Policy Updates to the 2009 Program Guide

APPENDIX C……Crosswalk and Copies of Policies Updating the Program Guide

APPENDIX D………..……...Clarifying Memo to Chapter 6 of the Program Guide

# CHAPTER 1
## Program Guide Overview

The California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) provides inmates access to mental health services. The MHSDS is designed to provide an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both the inmate-patient and the institution.

The intent of the MHSDS is to advance the CDCR's mission to protect the public by providing timely, cost-effective mental health services that optimize the level of individual functioning of seriously mentally disordered inmates and parolees in the least restrictive environment. The MHSDS has been functioning in CDCR since 1994. The MHSDS utilizes a variety of professional clinical, custody, and support staff to provide the best available quality of care to seriously mentally disordered inmates.

Outpatient care is provided in an array of treatment levels and modalities including a day treatment program and an outpatient clinic level of care. The MHSDS is a decentralized, system-wide concept using standardized evaluation and treatment. The MHSDS provides universal screening for all incoming inmates at Reception Centers and direct transfer from the Reception Center to the treatment facility for further evaluation and/or treatment if needed. The MHSDS utilizes case management techniques to manage the majority of mentally disordered inmates in the general population and provides for their access to care as needed. The MHSDS provides a continuum of inpatient care from a contractual relationship with Department of Mental Health (DMH) for acute and intermediate and a short-term crisis inpatient care program within CDCR institutions. The goal is to provide constitutionally appropriate levels of mental health treatment to the incarcerated serious mentally ill inmate in the least restrictive environment. The MHSDS continues to develop a standardized, automated system of records management and case tracking.

Some key concepts are inherent in the design and administration of these services. These concepts are:

1.  To deliver services that promote mental health, by developing and reinforcing individual responsibility. A mental disorder does not necessarily excuse individual responsibility and accountability. The inmate-patient's ability to achieve their clinical goals is enhanced by a therapeutic emphasis on responsibility for one's own behavior.

EX. 2-3

**Program Guide Overview**                    **Mental Health Services Delivery System**

2.   To promote understanding that mental health treatment is a sensible administrative approach to managing inmate-patients when behavioral expressions of their mental disorder disrupt their ability to adequately function and program during confinement.

3.   To provide all services with strict observance of Utilization Management guidelines, as a reminder to fiscal responsibility regarding the use of taxpayer funds, which are a limited resource.

The MHSDS uses a variety of therapeutic strategies.  The goals of treatment in MHSDS are to help inmates adjust to the prison environment, to optimize appropriate personal functioning, and to help inmates accept responsibility for their behavior.  An inmate's offense and institutional behavior, rather than the need for treatment, determine the level of custody placement.

At each institution, the MHSDS operates under the management of the Chief of Mental Health or the Clinical Director.  This individual is typically the Chief Psychiatrist, Chief Psychologist, or Senior Psychologist.  Mental Health staff are under the supervision of the institution's Health Care Manager.  Success of the MHSDS requires that the mental health staff work cooperatively with other Health Care units in the institution, including Health Records, Pharmacy, Lab, and Nursing.  It also requires that mental health staff work cooperatively with the institution's correctional and institution support staff.

A.  <u>REASONABLE ACCOMMODATIONS FOR INMATES</u>

The CDCR provides access to its programs and services to inmates with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests.  No qualified inmate with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the CDCR or be subjected to discrimination.  All institutions housing inmates with disabilities will ensure that housing and programming are reasonable and appropriate in a manner consistent with their mission and CDCR policy.

Reasonable accommodations shall be afforded to inmate-patients with disabilities, e.g., visually impaired, hearing impaired, speech impaired, learning disabled, and developmentally disabled, to ensure equally effective communication during contacts of any kind that occur within the MHSDS.  Auxiliary aids that are reasonable, effective, and appropriate to the needs of the inmate-patient shall be provided when simple written or oral communication is not effective.   Such aids may include qualified sign language interpreters, readers, sound amplification devices, captioned television/video text displays, Telecommunication Devices for the Deaf (TDD), audio taped texts, Braille materials, large print materials, and signage.  For developmentally disabled inmate-patients, equally effective communication may require reviewing the CDCR 128C-2, *Developmental Disability Program Screening Results*, that documents the adaptive support services required by the inmate-patient.

EX. 2-4

| **Program Guide Overview** | **Mental Health Services Delivery System** |

It is the obligation of CDCR staff, including mental health clinicians, to provide effective communication under all circumstances.  The degree of accommodation that is required shall be determined on a case-by-case basis.

In any case in which a question may arise as to the inmate's ability to comprehend, staff shall document the determination that the inmate understood the process during all clinical contacts and shall record the basis for that determination and how the determination was made.  This shall be recorded on the documentation of the clinical contact, such as the CDCR Form 7230-MH, Interdisciplinary Progress Note.  Examples of documentation of effective communication include, "the responsive written notes generated by a hearing impaired inmate indicated that he/she understood the process," "the sign language interpreter appeared to communicate effectively with the hearing impaired inmate as indicated by the inmate's substantive response via sign language," or, "the inmate was able to summarize instructions given to him/her."  To the extent that written notes are used to effectively communicate with an inmate-patient, those notes shall be attached to the documentation of that clinical contact and filed in the Unit Health Record (UHR).

B.  **PRIMARY COMPONENTS**

*Crisis Intervention*  A crisis is defined as a sudden or rapid onset or exacerbation of symptoms of mental illness, which may include suicidality or other aberrant behavior which requires immediate intervention.  Crisis intervention is provided at all institutions to inmate suffering from a situational crisis or an acute episode of mental disorder.  The first step in providing crisis intervention is adequate training for all institutional staff in the recognition of mental health crisis symptoms, a plan for immediate staff response, and procedures for referral to clinical staff.  Custody and clinical staff cooperation is critical to ensure that an inmate in a mental health crisis is treated as soon as possible.

*Comprehensive Services*  The MHSDS offers comprehensive services and a continuum of treatment for all required levels of care.  In addition to standardized screening and evaluation, all levels of care found in a county mental health system are represented in the CDCR MHSDS programs.  All levels of care include treatment services provided by multiple clinical disciplines, and development and update of treatment plans by an Interdisciplinary Treatment Team (IDTT), which includes appropriate custody staff involvement.

*Decentralized Services*  Mental health services are geographically decentralized by making basic services widely available.  All levels of care, except inpatient hospitalization, are available at most geographically-defined Service Areas (see Section E).  Case management and crisis intervention are provided at all institutions.

*Clinical and Administrative Oversight*  In coordination with each institution, the CDCR Division of Correctional Health Care Services (DCHCS) and Division of Adult Institutions

**Program Guide Overview                    Mental Health Services Delivery System**

will continue to update standardized program policy and develop a system for monitoring delivery of program services.  The CDCR shall develop an annual review schedule of the MHSDS Program Guide, according to the Inmate Medical Services Policies and Procedures, *Chapter 8, Implementation and Review of Health Care Policies and Procedures.*  A system-wide automated tracking and records system continues to evolve to support administrative and clinical oversight.

*Standardized Screening*  Access to mental health services is enhanced for all inmates through standardized screening of all admissions at Reception Centers.  Standardized screening ensures that all inmates have equal and reliable access to services.  The data generated by standardized screening provides the CDCR with necessary information to improve the assessment of mental health service needs.  If screening reveals indicators of mental disorder, such as prior psychiatric hospitalization, current psychotropic medication, suicidality or seriously maladaptive behaviors, follow-up evaluation by a clinician shall determine the immediate treatment needs of the inmate.  Early identification of an inmate's mental health needs will provide an appropriate level of treatment and promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both the inmate-patient and the institution.  Avoiding the utilization of more expensive services will aid in budget containment.

*Pre-Release Planning*  This component of service, in conjunction with the Correctional Counselor's preparation of the CDCR 611, *Release Program Study*, focuses on preparing the seriously mentally disordered inmate-patient for parole.  Its objective is to maximize the individual's potential for successful linkage and transition to the Parole Outpatient Clinic, or, if required, to inpatient services in the community or the Mentally Disordered Offender Program operated at the DMH facilities.  In the case of paroling inmate-patients, this includes facilitating the work of the Parole and Community Services Division's Transitional Case Management Program.

C.  **REFERRALS TO MENTAL HEALTH**

Any inmate can be referred for mental health services at any time.  Inmates who are not identified at Reception or upon arrival at an institution as needing mental health services, may develop such needs later.  Any staff members that have concerns about an inmate's mental stability are encouraged to refer that inmate for evaluation by a qualified mental health clinician (psychiatrist[1], psychologist, or clinical social worker).  Under certain circumstances, referral to mental health may be mandatory.  A referral to mental health should be made whenever:

- An inmate demonstrates possible symptoms of mental illness or a worsening of symptoms.

---

[1] CDCR also provides services to patients via Psychiatric Nurse Practitioners (PNP) in lieu of psychiatrists. References to services provided by psychiatrists within the Program Guide also apply to PNPs.

**2009 REVISION**                                                                 12-1-4

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

- An inmate verbalizes thoughts of suicide or self-harm behavior.

- Upon return from court when an inmate has received bad news such as a new sentence that may extend their time.

- An inmate has been identified as a possible victim per the Prison Rape Elimination Act.

- An inmate demonstrates sexually inappropriate behavior as per the Exhibitionism policy.

- An inmate who is written up for a disciplinary infraction was demonstrating bizarre, unusual, or uncharacteristic behavior when committing the infraction.

- An inmate placed into Administrative Segregation indicates suicidal potential on the pre-screening, or rates positive on the mental health screening, or gives staff any reason to be concerned about the inmate's mental stability, such as displaying excessive anxiety.

- Upon arrival to an institution when the inmate indicates prior mental health treatment and medications, especially if not previously documented.

Referrals to mental health may be made on an Emergent, Urgent, or Routine Basis. An inmate deemed to require an Emergent (immediate) referral shall be maintained under continuous staff observation until evaluated by a licensed mental health clinician. An Urgent referral is to be seen within 24 hours. A Routine referral should be seen within five working days.

Referrals are made on the CDCR-MH5, *Mental Health Referral Chrono*, and forwarded to the mental health office. Emergent and Urgent referrals should also be made by phone to facilitate a timely response. The referral chronos, when received at the mental health office, are logged, entered into the data tracking system, and scheduled for follow-up with the appropriate clinician.

Inmates may also self-refer for a clinical interview to discuss their mental health needs. Inmate self-referrals shall be collected daily from each housing unit, and processed the same way as staff referrals.

D. <u>TREATMENT CRITERIA FOR THE LEVELS OF CARE</u>

*<u>Overall Treatment Criteria</u>*

Overall treatment criteria have been developed for the MHSDS. An inmate must meet the criteria in 1, 2, or 3 below, in order to receive MHSDS treatment at any level of care:

---

**2009 REVISION**                                                                 12-1-5

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

1.  Treatment and monitoring are provided to any inmate who has **current** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

> **Schizophrenia (all subtypes)**
> **Delusional Disorder**
> **Schizophreniform Disorder**
> **Schizoaffective Disorder**
> **Brief Psychotic Disorder**
> **Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
> **Psychotic Disorder Due To A General Medical Condition**
> **Psychotic Disorder Not Otherwise Specified**
> **Major Depressive Disorders**
> **Bipolar Disorders I and II**

2.  <u>Medical Necessity</u> Mental health treatment shall be provided as needed.  Treatment is continued as needed, after review by an IDTT, for all cases in which:

> **Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder.  Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

3.  <u>Exhibitionism</u> Treatment is required when an inmate has had at least one episode  of indecent exposure in the six-month period prior to the IDTT that considers the need for exhibitionism treatment and the inmate patient is either:

- Diagnosed with Exhibitionism, or

- Meets the alternate criteria.  (*Alternate Criteria:* An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)

(A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)

### *Specific Treatment Criteria*

In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at a specific level of care:

---

**2009 REVISION**                                                                12-1-6

**Program Guide Overview                    Mental Health Services Delivery System**

1.  Correctional Clinical Case Management System

    • Stable functioning in the general population, Administrative Segregation Unit (ASU) or Security Housing Unit (SHU); and

    • Criteria not met for higher levels of care; and

    • Exhibits symptom control, or is in partial remission as a result of treatment.

    • These conditions usually result in Global Assessment of Functioning (GAF) scores of 50 and above.

    Correctional Clinical Case Management System (CCCMS) is located at all institutions [except California Conservation Center (CCC), Calipatria State Prison (CAL), Centinela State Prison (CEN), Chuckwalla Valley State Prison (CVSP), and Ironwood State Prison (ISP). These prisons provide necessary care until the inmate-patient can be transferred] to provide care, monitoring and follow-up services to inmate-patients whose condition is relatively stable and whose symptoms are largely controlled. This may include a response to symptoms that require only a brief intervention, such as a psychotherapy session or an adjustment in medications. While mentally disordered, these inmate-patients can function in the general population and do not require a clinically structured, therapeutic environment.

    All inmates, including those in SHU or ASU, needing crisis intervention and/or continued treatment also receive services from CCCMS staff. Details for provision of services in ASU and SHU are found in their respective chapters of the Program Guide.

2.  Enhanced Outpatient Program

    • Acute Onset or Significant Decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or

    • Inability to function in General Population based upon:

        a. A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or

---

EX. 2-9

**Program Guide Overview                        Mental Health Services Delivery System**

b.  The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of serious mental disorder; or

c.  An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of serious mental disorder.

- These conditions usually result in a GAF of less than 50.

Enhanced Outpatient Program (EOP) provides care to mentally disordered inmate-patients who would benefit from the structure of a therapeutic environment that is less restrictive than inpatient settings.  This may include response to crisis symptoms which require extensive treatment, but can be managed as outpatient therapy with several psychotherapy sessions or medication adjustment with follow-up visits.

These inmate-patients do not require continuous nursing care.  Often, they are transitioning from inpatient care in a DMH hospital or the Mental Health Crisis Bed (MHCB).  They may also have a serious mental illness that is of long duration with moderate to severe and persistent functional impairments.  The EOP's structured program of treatment and supportive activities will, in many cases, build on therapeutic improvements made in a hospital program or MHCB.  EOP will release cases which have successfully completed treatment to CCCMS.  The EOP is located in a designated living unit at the hub institution.

3.  Mental Health Crisis Bed Placement

- Marked Impairment and Dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or:

- Dangerousness to others as a consequence of a serious mental disorder, and/or dangerousness to self for any reason.

- These conditions usually result in a GAF score of less than 30.

All inmate-patients admitted to a MHCB are discharged within ten days, with scheduled appropriate clinical follow-up, to outpatient care or the general population or are transferred to DMH inpatient care.  Stays of over ten days must be approved by the Chief of Mental Health, or designee. The MHCB also provides short-term inpatient care for seriously mentally disordered inmate-patients awaiting transfer to a hospital program or being stabilized on medication prior to transfer to a less restrictive level of care.  The

EX. 2-10

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

MHCB is a part of a licensed General Acute Care Hospital (GACH), Skilled Nursing Facility (SNF), or a Correctional Treatment Center (CTC) offering 24-hour basic medical, nursing, and other health services.  A Central Health Services building which houses CTC services houses the MHCB beds, staff offices and therapy space.  In the CTC, the MHCB runs its short-term crisis care program under the CTC "optional mental health treatment program" regulations.  In a GACH or SNF, the MHCB are under the "distinct part Psychiatric" licensing regulations.

4.  DMH Inpatient Hospital Care

Referral to inpatient programs provided via contract with the DMH is available for inmate-patients whose conditions cannot be successfully treated in the outpatient setting or in short-term MHCB placements.  Both acute and intermediate care programs are offered in facilities for both male and female inmate-patients.  Specific criteria are noted in
Chapter 6, *Department of Mental Health Inpatient Program.*

The IDTT shall generally be responsible for developing and updating treatment plans.  This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care.  Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefiting from treatment services available at the current level of care.  Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, *Interdisciplinary Progress Notes,* and shall include the justification for maintaining the current level of care or referral to a different level of care.

E.  **SERVICE AREAS**

The principal infrastructure for service delivery is the Service Area.  A mental health Service Area assumes responsibility for mental health services; a medical Service Area, while it generally overlaps with that for mental health, is responsible for medical services.  Several Service Areas report to a Regional Administrator.

Each Service Area consists of a group of two or more institutions in relative geographic proximity that share the full complement of services directly provided by CDCR.  These services include all levels of care, except the Acute and Intermediate inpatient care provided through DMH.  Each mental health Service Area has from one to three MHCB locations and one EOP located at its hub institution.  CCCMS completes the delivery system within a Service Area.  Staff handling CCCMS caseloads are at every institution.

EX. 2-11

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

## F.  CLINICAL PROGRAM GUIDE

MHSDS Program Guide chapters have been developed for the MHCB, EOP, and CCCMS levels of care.  Each chapter is organized into the following sections: Program Objectives, Population Served, Treatment Modalities, Staffing, and Patient Assessment and Case Review Procedures.  Although these chapters define essential program content and delineate system-wide policies, each Service Area is expected to have written policies and specific operational procedures (derived from the Program Guide) articulated in ways that best address the unique needs of the specific Service Area and its institutions.  Written policies and procedures are especially necessary for the MHCB to meet health facility licensing requirements.

## G.  STANDARD PROGRAM STAFFING

Staffing for all programs is based on the Mental Health Staffing Workload Study, completed June 2007, which allocates both clinical and clerical support staff whom perform duties related to the provision of mental health services.  CDCR may utilize contract staff as necessary to fulfill staffing requirements.  Use of unlicensed psychologists and clinical social workers during the period they are gaining qualifying experience for licensure is governed by Section 1277 of the Health and Safety Code, and Section 5068.5 of the Penal Code.

Institutions may use pre-doctoral psychology interns who are trained and supervised by a licensed psychologist according to regulations in Sections 1287, 1287.1, and 1287.2 of Title 16, Division 13.1 of the California Code of Regulations.  Institutions may also use social work interns who are currently enrolled in a master's program in social work according to regulations in Section 4996.15 of the California Business and Professions Code.

All newly hired psychiatrists must meet minimum credentialing criteria as follows:

1.   Current board certification from the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry.

OR

2.   Satisfactorily completed specialized training requirements in psychiatry in programs that, for a psychiatrist, are accredited by the Accreditation Council for Graduate Medical Education (ACGME) or Bureau of Osteopathic Education of the American Osteopathic Association (AOA) or certified by the Royal College of Physicians and Surgeons of Canada.

EX. 2-12

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

a) Two patterns of training are acceptable:

**(i). Training Pattern One: A Three-Year Psychiatry Residency Program**

- A broad-based clinical year of ACGME or Bureau of Osteopathic Education of the AOA-accredited training in internal medicine, family practice, or pediatrics; or

- An ACGME or Bureau of Osteopathic Education of the AOA-accredited transitional year program that included a minimum of four months of primary care; or

- An AGCME or Bureau of Osteopathic Education of the AOA-accredited residency in a clinical specialty requiring comprehensive and continuous patient care.

AND

Three full years of postgraduate, specialized residency training in a psychiatry program accredited by the ACGME or Bureau of Osteopathic Education of the AOA.

OR

**(ii) Training Pattern Two: A Four-Year Psychiatry Residency Program**

Four years of training in an ACGME or Bureau of Osteopathic Education of the AOA-accredited program in psychiatry is acceptable. A psychiatry PGY-1 must include at least four months of internal medicine, family practice, and/or pediatrics. This training must be in a clinical setting that provides comprehensive and continuous patient care. No more than one month of this requirement may be fulfilled by an emergency medicine rotation, as long as the experience predominantly involves medical evaluation and treatment, rather than surgical procedure. Neurology rotations may NOT be used to fulfill this four-month requirement.

(Exception: Any applicant who completed a residency program in psychiatry that was accredited by the ACGME or Bureau of Osteopathic Education of the AOA or certified by the Royal College of Physicians and Surgeons of Canada at the time the applicant completed the residency will qualify under this pattern of training upon CDCR verification that all residency requirements were successfully completed and if all other requirements are met.)

EX. 2-13

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

If the candidate's training program(s) is not currently accredited by the ACGME or the Bureau of Osteopathic Education of the AOA, CDCR shall research the history of the program(s) to determine if it was accredited at the time the candidate attended and completed the training.

All osteopaths hired in the classification of psychiatrist before January, 2006, and presently in that classification must meet the above criteria or must undergo a court-mandated evaluation of their clinical competency for employment in the position of psychiatrist with the CDCR.

## H. PARAMETERS OF CONFIDENTIALITY OF INMATE-PATIENT COMMUNICATIONS AND GUIDELINES FOR DISCLOSURE

CDCR has developed a detailed policy to ensure that confidentiality of inmate-patient communications with mental health clinicians is protected. This policy, issued in a memorandum dated April 18, 2007, is Attachment A to the MHSDS Program Guide. The policy is accompanied by examples for the purpose of staff training. Clinicians, including psychiatrists, physicians, psychologists, clinical social workers, nurse practitioners, registered nurses, licensed vocational nurses, licensed psychiatric technicians, and recreational therapists, shall be trained in this policy. In addition, all staff members who intentionally, accidentally, or inadvertently overhear confidential communications (arising from clinical contacts such as cell front visits) are responsible for maintaining confidentiality of the communication. Custody officers, correctional counselors, and other staff who are members of an IDTT are bound to not discuss health-related inmate-patient information with anyone other than the team members.

Clinicians are responsible for informing inmate-patients of the limits of confidentiality, or ensuring that prior documentation in the UHR indicates that this disclosure has occurred prior to commencement of a clinical encounter. CDCR 7448, *Informed Consent for Mental Health Care*, shall be used for this purpose.

## I. CLINICAL INPUT INTO THE DISCIPLINARY PROCESS

Inmate-patients in the Mental Health program or any inmate showing signs of possible mental illness may require a CDCR 115-MH, *Rules Violation Report – Mental Health Assessment,* when they are charged with a disciplinary action.

All inmates in the EOP, MHCB, and DMH programs who receive a CDCR 115-MH, Rules Violation Report – Mental Health Assessment, shall be referred by the Reviewing Custody Supervisor to Mental Health Services for a Mental Health Assessment. All inmates in CCCMS or non-MHSDS inmates who receive a CDCR 115-MH, *Rules Violation Report* and who exhibit bizarre, unusual, or uncharacteristic behavior shall be referred for a CDCR 115-

EX. 2-14

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

MH *Rules Violation Report:* Mental Health Assessment.  Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for a CDCR 115-MH *Rules Violation Report: Mental Health Assessment.*

A mental health clinician who is not the inmate's Primary Clinician shall review the relevant portions of the inmate's UHR and any other records deemed appropriate and shall evaluate the inmate in a non-confidential interview in a private setting.  The findings shall be reported on a CDCR 115-MH, *Rules Violation Report: Mental Health Assessment.*  The report must be returned to the Reviewing Custody Supervisor within 5 working days for non-MHSDS and CCCMS inmates (to allow time to assign a Staff Assistant) and within 15 calendar days for EOP, MHCB and DMH patients.  The clinician shall determine the following:

1.   Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant?  **Note:  All inmates in the EOP, MHCB, and DMH programs automatically have a Staff Assistant assigned.**

2.   Did the inmate's mental disorder appear to contribute to the behavior that led to the Rules Violation Report?

3.   If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?

Refer to the "Inmate Disciplinary Process, Mental Health Assessment" manual (See Attachment B) and CDCR 115-MH, *Rules Violation Report: Mental Health Assessment*, for detailed instructions on completing this assessment and utilizing the information in the hearing process.

## J.   AUTOMATED TRACKING SYSTEM

The Inmate Mental Health Identifier System (IMHIS) has been designed to track the movement of all inmate-patients receiving care in the MHSDS.  The data entered into the system will be processed daily, so the system will maintain information regarding MHSDS inmate-patients current level of care as well as MHSDS inmate-patients transfers, discharges, and new cases.  All institutions are to conduct a reconciliation of the inmate-patients housed in ASUs who require mental health treatment with the IMHIS codes for this specific population.  It is very important that IMHIS information be as up to date as possible and daily updates to the IMHIS are mandatory.

EX. 2-15

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

### K. MENTAL HEALTH TRACKING SYSTEM

The Mental Health Tracking System (MHTS) is an automated program designed to track and record all pertinent mental health information for inmate-patients from the time they enter the MHSDS until they are released, paroled, or transferred out of the MHSDS and return to the general population. This institutional information management program is capable of tracking an inmate-patient's medication history, level of care changes, mental health staff contacts, current and previous DSM psychiatric diagnoses, latest Abnormal Involuntary Movement Scale score, status and information regarding current or past Keyhea orders, as well as other key data related to an inmate-patient's mental health treatment history. In addition, the MHTS is used to produce the Inmate Profile which documents suicide risk data and accompanies inmates whenever they are transferred between institutions to provide the receiving institution with suicide risk data and other initial MHTS input data. The MHTS is designed to track and aggregate data which serves as a basis for quality assurance and improvement activities at the Institutional and Departmental levels.

### L. MENTAL HEALTH PLACEMENT CHRONO

Each inmate who is assessed as having a serious mental disorder and is accepted into the MHSDS will have a CDCR 128-MH3, *Mental Health Placement Chrono* (MHPC) completed and entered into their UHR and Central File. This chrono indicates the inmate-patient's LOC, medication status, any behavioral alerts, and their GAF score. This information is entered daily into the IMHIS and the MHTS and is a critical component in the overall management of inmate-patients in the MHSDS. As long as an inmate-patient is in the MHSDS, they shall have a MHPC that reflects the inmate-patient's current status.

- At the RC, the MHPC shall be dated within 90 days of the Classification Staff Representative placement action. As inmate-patients usually spend less than 90 days in the RC, updates will not normally be required.

- In all other housing situations, no updates of the MHPC will be required unless there is a change in the level of care, or when the inmate-patient is being referred for transfer to another institution.

### M. LEVEL OF CARE CHANGE /TRANSFER TIMELINES

The following table summarizes the time frames which CDCR must meet for the transfer of MHSDS inmate-patients between levels of care, whether within the same institution or to another institution. More detail on the level of care change/transfer process is provided in the individual level of care sections of the Program Guide.

---

**2009 REVISION**                                                                                   12-1-14

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

The following definitions apply to the Transfer Timelines Table:

- "**Identification**:" The date that the inmate-patient is identified as requiring a higher LOC. The IDTT is responsible for identifying inmate-patients who are appropriate for discharge to a lower LOC, an increase from CCCMS to EOP LOC, or DMH intermediate care.  An individual clinician may identify an inmate-patient as requiring initial admission into MHSDS at CCCMS or EOP LOC.  A credentialed clinician may admit an inmate-patient to MHCB care.  An individual clinician may refer an inmate-patient for DMH acute inpatient care.

  "**Referral**" within CDCR:  The date the LOC change is documented on a Mental Health Placement Chrono, or the time the physician or clinical psychologist orders admission into a CTC.

- "**Referral**" to DMH:  The date the completed referral packet is received by DMH by facsimile or overnight mail.

- "**Acceptance**" at DMH:  The date the Clinical Assessment Team at DMH accepts the inmate-patient for placement at a DMH facility.  Some inmate-patients may be placed on a waitlist pending bed availability after acceptance.

- "**Transfer**:"  The date the inmate-patient is placed into the LOC and program to which s/he was referred.

EX. 2-17

| **Program Guide Overview** | **Mental Health Services Delivery System** |
|---|---|

| From: | To: | |
|---|---|---|
| **Setting/Level of care** | **Setting/Level of Care** | **Timeline for Transfer** |
| RC/CCCMS | Mainline/ CCCMS | Within 90 days of referral; 60 days of referral if clinically indicated |
| RC/EOP | Mainline/EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Any setting/level of care | MHCB | Within 24 hours of referral |
| Any institution/ level of care | Any Acute DMH placement | Within ten days of referral, if accepted to DMH.  (Referral must be completed within two working days of identification. Transport must be completed within 72 hours of bed assignment) |
| Any institution/level of care | Any Intermediate Care DMH placement | Within 30 days of referral, if accepted to DMH.  (Referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required.  Transport must be completed within 72 hours of bed assignment). |
| Mainline (General Population)/ CCCMS | Mainline (General Population) /EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/CCCMS | CCCMS | Within 30 days if inappropriately transferred; otherwise 90 days of referral or 60 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/EOP | EOP | Within 21 days if inappropriately transferred; otherwise 60 days of referral or 30 days of referral if clinically indicated |
| EOP ASU | EOP ASU Hub | Within 30 days of ASU placement or referral to EOP level of care. |
| EOP ASU/ EOP ASU Hub | PSU | Within 60 days of endorsement to PSU |
| Outpatient Housing Unit | EOP | Within 30 days of endorsement to EOP |

EX. 2-18

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

## N. <u>PROGRAM GUIDE REVISION POLICY AND PROCEDURE</u>

The MHSDS Program Guide revisions shall occur annually.  The revisions shall be presented to the Mental Health Program Subcommittee (MHPS) by January 31 of each year.  The MHPS shall forward revisions to the appropriate authorities for approval.

All proposed revisions to the MHSDS Program Guide shall be submitted to the DCHCS Program Guide Coordinator (PGC).  The PGC shall be designated by the DCHCS Chief of the Mental Health Program.

The PGC shall distribute proposed revisions to the Program Guide Focused Improvement Team (PG-FIT).  The PG-FIT shall include at minimum:

- Program Guide Coordinator

- Chief Psychiatrist, Clinical Policy and Programs, DCHCS

- Chief Psychologist, Clinical Policy and Programs, DCHCS

- Assistant Deputy Director, or designee, DAI

- Supervising Attorney, or designee, Office of Legal Affairs

The PG-FIT shall be responsible for involving appropriate representatives from other CDCR Divisions and other appropriate consultants (e.g. representatives from field institutions) in decisions regarding any proposed revisions.

Where revisions may impact resources, the PG-FIT shall initiate evaluation of resource impact and/or request submission of a budget change proposal.

The PG-FIT shall meet as needed with the MHPS to make recommendations regarding revisions.  The MHPS shall present the proposed revisions to the Quality Management Committee (QMC).  The QMC will approve or disapprove each proposed revision.  Approvals will be forwarded to the DCHCS Governing Body (GB). The PGC will record all changes approved by the GB.

Memoranda signed by the Deputy Director, DCHCS, shall implement emergent or court-ordered substantive changes to the MHSDS Program Guide throughout the year.  These memoranda shall be integrated into the annual revision of the MHSDS Program Guide document.

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

The PGC shall maintain a project file to include original input submitted by those persons who provided review and or revisions of the MHSDS Program Guide, along with a tracking log of approved revisions of the MHSDS Program Guide.  Revised portions of the MHSDS Program Guide shall be marked "SUPERCEDED" with the date it was superceded, and revised portions shall be filed by revision date.

This tracking log of approved revisions, along with revised MHSDS Program Guide pages shall be distributed to the Warden, Health Care Manager, Chief of Mental Health, and Correctional Health Services Administrator and/or Standards Compliance Coordinator at each institution no later than 30 days after final approval.  The distribution shall include direction that copies of relevant sections are to be shared with appropriate staff.  The Chief of the Mental Health Program at each institution shall ensure that the revisions are integrated into **ALL** existing copies of the MHSDS Program Guide according to Inmate Medical Services Policies and Procedures Chapter 8 "Implementation and Review of Health Care Policies and Procedures" section regarding Proof of Practice Documentation.   Current DCHCS Policies and Procedures manuals shall be readily available to all mental health staff in each program and work area.  The Chief of Mental Health shall be responsible to ensure that all staff are trained regarding revised Program Guide requirements.

EX. 2-20

# CHAPTER 4
## Enhanced Outpatient Program

### A. <u>INTRODUCTION</u>

The Enhanced Outpatient Program (EOP) provides the most intensive level of outpatient mental health care within the Mental Health Services Delivery System (MHSDS). The program is characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care. Inmate-patients who, because of a mental disorder, do not function well in EOP may be referred for higher levels of care including: Mental Health Crisis Bed (MHCB); or Department of Mental Health (DMH) Day Treatment Program, Intermediate Care Program, or Acute Psychiatric Program.

Critical components include:

1.   A comprehensive array of mental health services delivered within the framework of an Interdisciplinary Treatment Team (IDTT), which is composed of representatives from a cross-section of clinical disciplines as well as prison custodial and counseling staff. Treatment is focused on resolution of institutional adjustment problems which impede functioning within the GP. Services include management of activities of daily living, group and individual psychotherapy, medication management, recreational therapy, and clinical pre-release planning.

2.   A designated housing unit with restricted access and alternative educational, work, and recreational opportunities specifically provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs.

3.   Active interface with custodial staff, including Correctional Counselors (CC), which enhances the assessment and treatment process and optimizes the inmate-patient functioning within the prison environment.

### B. <u>PROGRAM OBJECTIVES</u>

The goal of the EOP is to provide focused evaluation and treatment of mental health conditions which are limiting an inmate's ability to adjust to a GP placement. The overall objective is to provide clinical intervention to return the individual to the least restrictive clinical and custodial environment.
More specific objectives include:

EX. 2-21

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

1. Provide short to intermediate term (a range of 3 to 12 months for most cases) focused care for inmate-patients who do not require 24-hour inpatient care. Short term treatment goals are primarily directed at developing constructive coping mechanisms, achieving treatment compliance, and further stabilization of psychiatric symptoms that are necessary for transition to the Correctional Clinical Case Management System (CCCMS) level of care.

2. Provide longer-term placement for inmate-patients with chronic mental illness whose symptoms have stabilized but whose level of functioning is insufficient to allow GP placement. Supportive care, assistance with activities of daily living, recreational therapy, anger management, reality therapy, and programs related to symptom management and clinical pre-release planning are offered.

3. Provide short-term secure custodial placements with clinical resources which address behavioral problems for mentally ill EOP inmate-patients who are transitioning from Security Housing Units or Psychiatric Services Units (PSU). Treatment for these inmate-patients focuses on achieving behavioral control and the development of socially acceptable behavior within the institution.

C. **POPULATION SERVED**

Overall Treatment Criteria

Overall treatment criteria have been developed for the MHSDS. An inmate must meet the criteria in 1, 2, or 3 below in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate-patient who has *current* symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional Disorder**
   **Schizophreniform Disorder**
   **Schizoaffective Disorder**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
   **Psychotic Disorder Due To A General Medical Condition**
   **Psychotic Disorder Not Otherwise Specified**
   **Major Depressive Disorders**
   **Bipolar Disorders I and II**

EX. 2-22

**Enhanced Outpatient Program          Mental Health Services Delivery System**

2.  Medical Necessity: Mental health treatment shall be provided as needed.  Treatment is continued as needed, after review by an IDTT, for all cases in which:

**Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder.  Treatment is continued for these cases only upon reassessment and determination by the IDTT committee that the significant or life threatening disability/dysfunction continues or regularly recurs**.

3.  Exhibitionism: Treatment is required when an inmate has had at least one episode of indecent exposure in the six-month period prior to the IDTT that considers the need for exhibitionism treatment, and the inmate-patient is either:

- Diagnosed with Exhibitionism, or

- Meets the alternate criteria (*Alternate Criteria*: An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)

(A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)

Specific Treatment Criteria for EOP

In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at the EOP level of care:

- Acute Onset or Significant Decompensation of a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or

- Inability to Function in General Population Based Upon:

   a.  A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or

   b.  The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability

**2009 REVISION**                                                                                    12-4-3

**Enhanced Outpatient Program                Mental Health Services Delivery System**

to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of a serious mental disorder; or

    c.   An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.

- These conditions usually result in Global Assessment Functioning (GAF) Scores of less than 50.

Enhanced Outpatient Care (Designated Housing Unit)

Participants in the MHSDS EOP are placed in designated housing units that provide increased clinical and custodial support and limit contact with members of the institution's GP inmates.

## D. ADMISSION TO PROGRAM

Referral Process

1. Mental Health clinicians may initiate an EOP referral. This referral decision is documented on a CDCR 128-MH3, *Mental Health Placement Chrono*, and clinically supported in an original or updated CDCR 7386, *Mental Health Evaluation*. Both forms are placed in the Unit Health Record (UHR) and the CDCR 128-MH-3, *Mental Health Placement Chrono*, is placed in the Central File.

2. If the referral is generated for an inmate-patient at a GP institution without an EOP, the clinician at the referring institution may consult with the Chief of Mental Health at the closest EOP site regarding the need for EOP level of care, prior to initiating the referral process. In situations where there is a disagreement between the conferring clinicians, the inmate-patient will be referred to an EOP treatment setting for further onsite evaluation.

3. EOP placements do not require prior clinical approval from the receiving institution.

4. Referral documentation is prepared by the referring clinician. The documentation includes the chronological CDCR 7230, *Interdisciplinary Progress Note*, containing circumstances, symptoms, and behaviors justifying the need for EOP level of care. This document is placed in the UHR. The documentation also includes a CDCR 128-MH3, *Mental Health Placement Chrono*, containing a brief description of behavioral alerts. The original of this document is forwarded to classification staff for processing and

| **Enhanced Outpatient Program** | **Mental Health Services Delivery System** |

Classification Staff Representative (CSR) endorsement for institutional placement.  A copy of the CDCR 128-MH3, *Mental Health Placement Chrono,* is placed in the UHR.

5.  EOP placements from within the same institution are accomplished with the approval of the IDTT, placed in an available EOP bed, and documented on a CDCR 128-MH3, *Mental Health Placement Chrono*.  For inmates not currently participating in the MHSDS program, the classification committee will refer the case to the CSR for EOP endorsement.  For those currently participating in the MHSDS program, the classification committee will refer the case to the Classification and Parole Representative (C&PR) for EOP endorsement.  Subsequent placements of the same individual into the EOP require only C&PR approval.  A weekly count of filled and vacant EOP beds is provided to Division of Correctional Health Care Services (DCHCS) and Division of Adult Institutions to facilitate the use of available beds by population management staff.

6.  The classification and transportation systems are designed to ensure placement within 60 days of level of care designation, or 30 days of level of care designation, if clinically indicated.  Transfers within the same institution of inmate-patients previously identified and treated as EOP or from the institution's MHCB should occur on the same day, or within 24 hours of referral.

7.  EOP inmate-patients who are inappropriately transferred via CSR endorsement action to a non-EOP institution shall be transferred to an EOP institution within 21 days of arrival.

8.  Inmate-patients who are determined to require EOP level of care while in a non-EOP institution, shall be transferred to an appropriate EOP treatment setting within 60 days of the EOP designation, or 30 days of the designation, if clinically indicated.

9.  Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

- CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*

- A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication.  The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,

- For inmate-patients included in the MHSDS, to the inmate-patient's Primary Clinician (PC)

NOTE: When an IDTT determines that an inmate requires treatment of exhibitionism, that inmate's level of care shall be changed to CCCMS, Medical Necessity (or higher if appropriate), bypassing the standard referral process.

EX. 2-25

| **Enhanced Outpatient Program** | **Mental Health Services Delivery System** |
|---|---|

Interdisciplinary Treatment Team

The responsibilities for overall treatment planning within the EOP rest with the IDTT. These responsibilities include:

- Program admission decisions for individual case

- Formulation and approval of initial and updated individual treatment plans

- Periodic case reviews and re-justifications of treatment

- Discharge decisions

- Overall utilization review of available beds

- Overall program quality improvement

The IDTT is composed of, at a minimum:

- Assigned Primary Clinician (PC)

- Assigned Psychiatrist

- Correctional Counselor

- Inmate-patient

Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information:

- Licensed Psychiatric Technicians (LPT)

- Custody Officers

Recreation Therapists (RT), Registered Nurses (RN), Licensed Vocational Nurses, LPT, and the housing custody officer will also normally participate. Each member of the team will provide input into the overall treatment plan. Input from additional staff, including vocational and educational personnel, is strongly encouraged. A representative from the IDTT (the assigned PC or designee) should be present in all classification hearings regarding inmate-patients in treatment to provide mental health input into the classification decision-making process. The inmate-patient shall be included in the IDTT, unless the inmate-patient refuses to participate. If the inmate-patient refuses to

**2009 REVISION**                                                                 12-4-6

EX. 2-26

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

participate in the IDTT, the inmate-patient shall indicate the refusal and the reason for the refusal. The PC shall document this information on the treatment plan, CDCR 7388, *Mental Health Treatment Plan*, and in the progress notes, CDCR 7230-MH, *Mental Health Progress Note*. Inmate-patients shall not be disciplined for not participating in IDTT. The PC is responsible for presenting the inmate-patient's concerns to the IDTT.

The Chief of Mental Health shall designate the IDTT leader.

**Initial Evaluation Process**

The initial clinical assessment involves an interview with the inmate-patient and a review of available clinical records, the Central File, the evaluation of the referring clinician, and records from prior institutional placements. A review of these evaluations and an observation period are utilized to establish a functional baseline and working clinical diagnosis. This process shall be completed within 14 calendar days from arrival at the EOP.

If the inmate-patient states that he or she had significant prior treatment or the file review indicates history of such treatment, the clinician shall obtain a signed *Release of Information* and forward it to the Institutional Health Record Services to obtain previous records. The referring clinician, custodial staff, work supervisors, teachers, chaplains, and family members are excellent sources of patient collateral information and should be utilized whenever possible (with appropriate release of information when required).

At the conclusion of the evaluation process and within 14 calendar days from arrival at the EOP, the IDTT will review all relevant clinical, institutional, and criminal history data, interview the inmate-patient and make one of the following determinations:

1.  Admit to the program and develop a treatment plan on the CDCR 7388, *Mental Health Treatment Plan*.

2.  Decline admission (indicate clinical options).

3.  Extend evaluation process for an additional 14 calendar days.

All decisions regarding change of treatment level made by the IDTT shall be documented with a CDCR 128-MH3, *Mental Health Placement Chrono*. This chrono shall be forwarded to classification for review and central file update. One copy of the chrono is placed in the UHR and another copy forwarded for entry into the MHTS. An individualized treatment plan, CDCR 7388, *Mental Health Treatment Plan*, shall include the recommendations of the IDTT and specifics such as type of therapeutic activities (schedule, duration, outcome expectations) and anticipated length of stay. The

EX. 2-27

**Enhanced Outpatient Program                   Mental Health Services Delivery System**

prescription of treatment activities should consider the commitment offenses and current institutional maladjustment.

Inmate-patients who are released from Administrative Segregation Unit (ASU) or the PSU to a GP EOP for continuing mental health treatment may require mental health services related to adjustment to the GP environment.  The ASU or PSU PC shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to GP. The receiving EOP IDTT will consider documentation by the ASU or PSU clinician in developing the inmate-patient's treatment plan.  The treatment plan for inmate-patients transferred from ASU or PSU to GP-EOP shall include services provided to aid in the transition to the GP environment.  Inmate-patients referred from the ASU or PSU to a GP-EOP Unit shall be retained at EOP level of care for a minimum of 90 days.

**Release after Initial Evaluation**

If, at the conclusion of the initial evaluation process, the IDTT determines that EOP placement is inappropriate, documentation to this effect is placed in the UHR using CDCR 7388, *Mental Health Treatment Plan*.  A CDCR 128-MH3, *Mental Health Placement Chrono*, noting the decision and recommending more appropriate placement shall be prepared for classification processing and transfer (if appropriate).  If inpatient care is indicated, the assigned PC is responsible for initiating and completing the placement process.

E.  **EOP INMATE-PATIENT TREATMENT SERVICES**

Each EOP inmate-patient will have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs.  The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan*.  Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT.  It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services.  For some inmate-patients, ten hours per week may be clinically contraindicated.  For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval.  The CDCR 7388, *Mental Health Treatment Plan,* must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours.  For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated.

| **Enhanced Outpatient Program** | **Mental Health Services Delivery System** |

### *Categories of Treatment Services*

REQUIRED TREATMENT

1. Individual Treatment Planning involves a meeting of the IDTT and the inmate-patient at least every 90 days for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress.

2. Weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week.

3. Medication Evaluation and Management

   a) A psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues.

   b) Refer to Health Care Department Operations Manual, *Medication Management* and *Pharmacy,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, medication adherence, and other aspects of medication administration.

   c) Refer to MHSDS Program Guide, *Chapter 5, Mental Health Crisis Bed*, for information on involuntary medication administration.

4. Ten hours per week of scheduled structured therapeutic activities. See below for list of treatment activities.

OTHER TREATMENT ACTIVITIES

1. Group therapy and psycho-educational groups provide inmate-patients with an opportunity to express, explore, and resolve issues with the assistance of clinical staff and other inmate-patient group participants who have similar problems or experiences. Psycho-educational groups focus on cognitive/behavioral skill building as a means of improving inmate-patient interpersonal skills and problem solving abilities.

2. Individual therapy provides inmate-patients with the opportunity to discuss personal problems that may not be adequately addressed in a group setting.

3. Recreational and occupational therapies provide inmate-patients with supervised recreational activities or exercise programs designed to reduce stress, improve self-esteem and physical health, foster positive interpersonal interactions, and promote the constructive use of leisure time. Occupational or recreational therapy is counted as

EX. 2-29

| **Enhanced Outpatient Program** | **Mental Health Services Delivery System** |
|---|---|

structured activity only if an appropriate clinician (an occupational therapist, recreational therapist, LPT, or other qualified professional) is present and supervising the activity. Unsupervised routine exercise is available for all inmate-patients and is not counted as a therapeutic activity.

4.   Work and educational programs may provide rehabilitative services through institutional programming designed to help inmate-patients improve vocational and educational functioning.   Work and education assignments can constitute up to four hours of structured activity per week if they are identified as such in the inmate-patient's treatment plan.   The treatment plan must indicate how it is believed the inmate-patient benefits from particular vocational and/or educational activities.

**Examples of Treatment Activities**

The EOP may offer some or all of the following treatment activities, depending on the needs of the inmate-patient population and the resources available.

1.   Daily Living Skills - train and assist inmate-patients in developing or improving skills in maintaining appropriate personal hygiene and grooming habits.  These activities include demonstrating and prompting inmate-patients in bathing, dressing, and the maintenance of a clean living environment.  These activities promote personal responsibility and initiative for self-care, enhance self-esteem, and provide a predictable daily routine.

2.   Medication Education - educate inmate-patients regarding the importance and benefits of regularly taking their prescribed medications.  It discusses medication, interaction with alcohol and drugs, and teaches how to correctly take medication.  It explains side effects and when they need to be brought to the attention of clinical staff.  It stresses the importance of effective doctor/patient communication in obtaining and maintaining medication compliance.

3.   Symptom Management - help inmate-patients with chronic mental disorders become more effective in managing their psychiatric symptoms by teaching them how to identify warning signs of relapse, persistent symptoms, and medication side effects.  Inmates learn how to cope with symptoms and seek professional help.

4.   Specific Mental Health Issues - provides focused clinical support for inmate-patients experiencing specific mental health issues, such as depression, or who have a history of being a victim.

5.   Social Skills/Communication - focus on activities which allow inmate-patients to interact in a positive manner with other individuals, both staff and inmates.  It promotes the development of communication skills that are appropriate and socially acceptable.

---

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

6.   Anger Management - teaches inmate-patients the socially acceptable and appropriate ways of handling anger and expressing feelings.  This module is geared towards reducing aggressive/assaultive behavior toward self or others or by developing self-control skills. It teaches inmate-patients processes that can be used within the institution setting to resolve conflicts and handle problems appropriately without resorting to violence.

7.   Stress Management - teaches inmate-patients how to identify recurring prison stressors and provides specific stress reduction techniques to minimize the negative effects of stress on their behavior and mental health.

8.   Substance Abuse Group - teaches inmate-patients about the relationship between substance abuse and criminality and emphasizes the effects of chemical abuse on inmate-patients with mental illness.  The group offers supportive interactions and explores issues of chronic abuse and the development of alternatives.

9.   Health Issues - provides education regarding basic physical, emotional, and mental health issues, including human sexuality and sexually transmitted diseases.

10. Offense Specific Therapy - provides clinical support for insight-oriented treatment related to causative factors in criminal behavior, emphasizing the development of alternative courses of conduct.

11. Rational Behavior/Reality and Decision-making - emphasizes the assumption of responsibility for one's actions, accepting the reality of their living environment, the development of more productive and pragmatic life scripts, as well as developing strategies to identify and achieve attainable goals.

12. Family Issues - focus on stressful experiences associated with spousal abuse, childhood physical and sexual abuse, separation from offspring and loved ones, dysfunctional relationships, pregnancy issues, etc.

13. Therapeutic Community Meeting - all inmate-patients in the program are involved in regularly scheduled community meetings to discuss issues that commonly affect their treatment and living environment.  Inmate-patients learn through active interaction with peers and staff how to build a therapeutic community.

14. Clinical Pre-Release group - inmate-patients nearing parole to the community are seen weekly in group and discuss issues related to community living arrangements, continued outpatient care, financial, educational, and vocational needs.  The skills necessary to successfully meet the general conditions of parole in the community are discussed. Clinical Pre-Release groups involve coordination with the Parole and Community

**2009 REVISION**                                                            12-4-11

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

Services Division Transitional Case Management Program (TCMP) staff and Parole Outpatient Clinic (POC) clinical staff.

**Daily Activity Schedules**

Utilizing the above treatment descriptions (and additional optional activities as may be developed at the institutional level), each inmate-patient has a weekly activity schedule incorporated into the individual treatment plan drawn from a schedule of treatment activities available on the unit.  Development of, and adherence to, the schedule is the joint responsibility of the inmate-patient and PC.  The establishment of additional unit activities, available to all inmate-patients, is the responsibility of EOP staff.

**Nursing and Supportive Care**

Although 24-hour nursing care is not required for inmate-patients within the EOP, services expanded from those offered to GP inmate-patients are provided by RNs and/or LPTs.  These services include:

1.   Administration of all medications.  Refer to the Health Care Department Operations Manual, *Medication Management* and *Pharmacy* .

2.   Regular monitoring of medication compliance, and notification of medication non-compliance to treating psychiatrist, consistent with DCHCS policy.

3.   Provision of nursing services as ordered by a physician.

4.   Supervision and assistance in the activities of daily living, including maintenance of living quarters, personal hygiene, and eating habits.

5.   Coordination and support of out-of-cell activities with program staff.

**Documentation**

Clinical staff shall document the progress of an inmate-patient on a CDCR 7230, *Interdisciplinary Progress Note*, at least monthly.  Additionally, individual clinical contacts and significant changes in the inmate-patient's level of functioning shall be documented. The monthly progress note shall include:

•   Record of attendance at treatment activities.

•   Description of participation in treatment activities.

**Enhanced Outpatient Program         Mental Health Services Delivery System**

- Progress in resolving identified problems and symptoms.

- Current mental status.

**Aftercare Planning and Referral**

Planning for follow-up services is a critical component of care that inmate-patients need upon release from the EOP. The PC or the IDTT leader is responsible for ensuring that this is accomplished prior to an inmate-patient's discharge from the program. Such planning includes referrals to other levels of care, other programs, or other appropriate therapeutic placement to ensure continuity of care. Inmate-patients whose level of functioning has improved shall be referred to the CCCMS. Inmate-patients who require a higher level of care are referred to the MHCB or the DMH Inpatient Program.

Aftercare plans should describe:

1. The inmate-patient's diagnosis and the psychiatric problems continuing to require treatment.

2. Any other pertinent mental health or medical conditions (e.g., allergies, special dietary needs, chronic diseases), criminal and legal history, and cognitive or functional impairment (e.g., developmental problems, insufficient education and/or language barriers) that could affect adjustment and treatment.

3. Recommendations for follow-up treatment, including medications and recommendations for specific scheduled structured therapeutic activities.

4. Referrals to appropriate programs and other institutional services, including chaplain services, substance abuse programs, education, and job programs.

**Clinical Pre-Release Program**

This is designed to provide systematic planning, support and education to inmate-patients who are approaching their date of release/parole to the community and who are not expected to transition to another level of care before departure. This service is designed to maximize the inmate-patient's opportunities for successful transition into community living. The service coordinates its activities with the TCMP and POC staff to facilitate community outpatient care and support services. The PC shall prepare a discharge summary, which includes a diagnosis, current medications, and placement needs. The discharge summary shall be sent to the regional POC office prior to release.

**2009 REVISION**                                          **12-4-13**

**Enhanced Outpatient Program            Mental Health Services Delivery System**

## F.  STAFFING AND CASE MANAGEMENT

The EOP staffing structure is based on clinical needs for this level of care and the staffing ratios developed to meet these needs.  EOP staff includes psychiatrists, psychologists, clinical social workers (CSW), RNs, LPTs, and RTs.  In addition to interdisciplinary clinical staff, the EOP staffing provides enhanced correctional officer support.

**Chief of Mental Health**

The Chief of Mental Health (or designee) assigns the IDTT leaders and PCs, and reviews the overall quality of assessment and treatment plans, including aftercare plans for each inmate-patient.

**Primary Clinician**

One clinical staff member of the team (a psychiatrist, a psychologist, or a CSW) is identified as the PC for each inmate-patient.  This individual assumes overall responsibilities for the treatment services provided to inmate-patients by maintaining active therapeutic involvement with the inmate-patient and coordinating services provided by other treatment providers involved in implementing the treatment plan.  Specific responsibilities of the PC include:

1.  Completion of initial clinical intake assessment (CDCR 7386, *Mental Health Evaluation*).

2.  Documentation of:

    - All individual PC contacts;

    - Initial and updated treatment plans (CDCR 7388, *Mental Health Treatment Plan*);

    - Treatment progress or lack thereof, at least monthly (CDCR 7230-MH, *Mental Health Progress Note*);

    - Specific reasons when the inmate-patient is unable to attend or participate in group therapy;

    - Reasons for weekly individual PC contact when indicated;

    - Degree of participation in treatment activities;

    - Contact log for MHTS input.

**2009 REVISION**                                                                                 12-4-14

| **Enhanced Outpatient Program** | **Mental Health Services Delivery System** |
|---|---|

3.   Weekly clinical contacts (either individual or group psychotherapy) with assigned inmate-patients.  Individual clinical contacts must occur at least every other week.  Individual clinical contacts shall be held in a private setting out of cell, or cell-front if an inmate-patient refuses.

4.   Provision of group therapy.

5.   Scheduling for regular and special IDTT reviews.  (Special IDTT reviews are held for inmate-patients who require a change in level of care or if otherwise clinically indicated.)

6.   Response to inquiries regarding clinical status of inmate-patient.

7.   When an inmate-patient is discharged to the CCCMS, notification to the PC at the receiving program/institution.

## G.  <u>CASE REVIEW</u>

The IDTT is responsible for conducting a structured process of case review.  The review occurs quarterly or more often if clinically indicated.  The purpose of the review is to ensure optimal progress toward achieving resolution of symptomatology sufficient for placement in the least restrictive clinical and custodial environment.  Proper case review maximizes the utilization of the limited beds available for EOP placements.

The IDTT shall generally be responsible for developing and updating treatment plans.  This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care.  Referrals to higher   levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefiting from treatment services available at the current level of care.  Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, *Interdisciplinary Progress Note,* and shall include the justification for maintaining the current level of care or referral to a different level of care.

The PC for each inmate-patient shall prepare a case summary on a CDCR 7230-MH, *Mental Health Progress Note*, for quarterly IDTT review, which will consist of the following:

1.   Clinical diagnosis and brief history of previous clinical interventions with emphasis on interventions implemented since the last team review.

2.   Current length of stay in EOP.

3.   Assessment of current status and progress or lack of progress in achieving treatment goals.

---

**2009 REVISION**                                                                 12-4-15

**Enhanced Outpatient Program                 Mental Health Services Delivery System**

4.   Assessment of willingness and ability to participate in the program and description of attempts to improve treatment participation.

5.   Recommendations for modifications to treatment plan, including diagnosis, level of care, problems, medications, and treatment intervention.

6.   If applicable, input from the previous CCCMS PC when a reduction in level of care is considered.

7.   Discharge planning, including a tentative discharge date, anticipated level of care, specific follow-up recommendations, and perceived impediments to discharge.

Pertinent information from IDTT reviews shall be documented on a CDCR 7230-MH, *Mental Health Progress Note*, and filed in the UHR.  Any modifications to the individualized treatment plan shall be documented on an updated CDCR Form 7388, *Mental Health Treatment Plan*, and also filed in the UHR.  A full case summary, with a recommendation for either continued placement or transfer to an alternative level of care, shall be completed on an annual basis, for placement in the UHR.  If there is a change in the level of care, formal notification will be provided to the inmate-patient's Correctional Counselor via a CDCR 128-MH3, *Mental Health Placement Chrono*.

## H.  <u>DISCHARGE</u>

Discharge from the EOP will be based upon a decision utilizing the IDTT process when the inmate-patient satisfies any of the following conditions:

1.   Is able to function in a GP setting with CCCMS support.

2.   Has clinically decompensated to the extent that placement into 24-hour inpatient care (either MHCB or DMH hospitalization) is required.

3.   Has reached his/her parole date, and clinical services will be transferred to a POC.

Note: Inmate-patients who are placed in ASU or SHU and continue to require EOP level of care shall not be discharged, but shall be transferred to the appropriate setting (see Chapters 7 and 9).

**2009 REVISION**                                                               **12-4-16**

EX. 2-36

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

### I.  ENHANCED OUTPATIENT PROGRAM FOR CONDEMNED INMATE-PATIENTS

1. **EOP Housing for Condemned Inmate-Patients**

   Per Penal Code Section 3600, male inmates who have received a death sentence are incarcerated at California State Prison - San Quentin (SQ).  Female inmates who have received a death sentence are incarcerated at Central California Women's Facility (CCWF).  Therefore, these two institutions are charged with the responsibility to provide mental health treatment services at the EOP level of care to condemned inmate-patients identified as needing this level of care.

   Housing for condemned inmates is determined by the inmate's behavioral adaptation to the correctional setting.  Upon arrival, each condemned inmate completes an orientation period.  At SQ, the orientation period is generally completed in the Adjustment Center housing unit.  During the orientation period, inmate-patients are identified as either a Grade A Condemned (housing and program closely related to a GP setting), or Grade B Condemned (housing and program closely related to an administrative segregation setting).  Additionally, the initial medical evaluation identifies the inmate-patient's medical needs including any serious mental health needs that require treatment.  Therefore, Grade A or Grade B Condemned inmates identified as requiring EOP level of care are housed according to institutional custody determination, and appropriate mental health treatment services are then provided.  A condemned inmate's grade level determination is subject to review and change on an annual basis or more often if determined appropriate.

   At CCWF, due to the few female inmates sentenced to the death penalty, all female condemned inmates are housed and programmed in a designated housing unit, separate from other GP inmates.  The female condemned program at CCWF *does* currently classify condemned inmates into "grades" as referenced above.  All programs including any required mental health treatment services for EOP female condemned inmate-patients are provided within this housing unit.

2. **Condemned EOP Inmate-Patient Treatment Plan**

   All condemned EOP inmate-patients housed at SQ or CCWF shall have an individual treatment plan documented on a CDCR 7388, *Mental Health Treatment Plan,* that provides for treatment consistent with the inmate-patient's clinical needs.

   The development of the individual treatment plan by the assigned IDTT must take into account the unique security operations and procedures necessary to effectively manage this condemned population during a period when the institution is locked down for an execution.  At SQ, programs and services (excluding delivery of medication and

---

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

emergency services) are curtailed prior to, during, and after the actual execution of a condemned inmate, as determined by the Warden. Out-of-cell activities do not occur during the period that the institution is locked down pending or following an execution; however, LPTs shall continue daily rounds. These procedures are mandatory and are required due to the sensitive and potentially volatile atmosphere at the institution when carrying out an imposed death penalty.

Additionally, the recommended individualized treatment plan for Grade B Condemned EOP inmate-patients at SQ may require modification due to the heightened safety concerns associated with this population's required placement in the Adjustment Center. Out-of-cell activities for this population specifically require intensive staff resources to ensure the safety and security for all involved: inmates, clinical staff, as well as, correctional staff.

The individualized treatment plan for the condemned EOP inmate-patient, as for all EOP inmate-patients, provides the "blue print" for the course of mental health treatment that is intended to address the diagnosed condition. The initial plan provides the treatment foundation by prescribing services, activities, and medication that will be attempted and monitored. Frequent clinical and custody staff involvement provide ongoing assessment of progress and effectiveness of the applied plan. The ongoing assessment provides the impetus for the modification and/or change for the treatment services contained in the individualized treatment plan.

3. **EOP Condemned Inmate-Patient Treatment Services**

The Condemned EOP Inmate-patient will receive treatment services commensurate with their demonstrated ability to safely participate in the offered services. All condemned EOP inmate-patients will be offered ten hours per week of scheduled structured therapeutic activities identified and approved by the IDTT as part of the individualized treatment plan. It is recognized that not all condemned EOP inmate-patients can or will participate in and/or would benefit from this amount of treatment time. The ten hours per week for certain diagnosed condemned EOP inmate-patients may be clinically contraindicated. However, for condemned EOP inmate-patients scheduled for less than ten hours, the PC shall present the case to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan*, shall include a detailed description of the diagnoses, inmate-patient's problem list, level of functioning, medication compliance, and clinical reasons for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly to review and increase the treatment activities or refer to a higher level of care, as clinically indicated.

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

REQUIRED TREATMENT ACTIVITIES

The Condemned EOP inmate-patient shall be offered the following treatment services:

1.  Individual Treatment Planning involves a meeting of the IDTT and the inmate-patient for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress.  Refer to *Section D. Admission to Program, Interdisciplinary Treatment Team,* of this document for a complete description of the functions of the EOP IDTT and membership.

2.  Weekly PC contact (either individual or group psychotherapy) with assigned inmate-patients.  Individual clinical contacts must occur at least every other week.

3.  Daily LPT contact for Grade B Condemned EOP inmate-patients.

4.  Medication Evaluation and Management

    a)  A psychiatrist shall evaluate each Condemned EOP inmate-patient at least monthly to address psychiatric medication issues.

    b)  Refer to Health Care Department Operations Manual, *Medication Management* and *Pharmacy,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, medication adherence, and other aspects of medication administration.

    c)  Refer to MHSDS Program Guides, *Chapter 5, Mental Health Crisis Bed*, for information on involuntary medication administration.

5.  Crisis Intervention

6.  Ten hours per week of scheduled structured therapeutic activities.  See below for list of treatment activities.

TREATMENT ACTIVITIES

Specific treatment services offered include the following:

1.  Group Therapy provides inmate-patients with an opportunity to express, explore, and resolve issues with the assistance of clinical staff, as well as supportive interactions with inmate-patients who have similar problems or experiences.

**Enhanced Outpatient Program          Mental Health Services Delivery System**

2.  Individual Therapy provides inmate-patients with the opportunity to discuss personal problems that may not be adequately addressed in a group setting.

3.  Recreational Therapy provides inmate-patients with supervised recreational activities or exercise programs designed to reduce stress, improve self-esteem and physical health, foster positive interpersonal interactions, and promote constructive use of leisure time. Recreational therapy is counted as structured activity only if a recreational therapist is present and supervising the activity.  Unsupervised routine exercise is available for all inmate-patients and is not counted as a therapeutic activity.  No inmate-patient in SQ's Adjustment Center will be permitted out of his cell for the purposes of recreational therapy, but in-cell treatment activities (therapy) may be permitted, subject to the heightened safety and security concerns present in the Adjustment Center.

4.  Monitoring and Assistance with daily living skills.

5.  Nursing and Supportive Care: Although 24-hour nursing care is not required for inmate-patients within the EOP, expanded services from those offered to non-EOP Condemned inmate-patients are provided by RN and/or LPTs.  These services include:

    a)  Administration of all medications.  Refer to the Health Care Department Operations Manual, *Medication Management* and *Pharmacy*.

    b)  Regular monitoring of medication compliance and notification of medication non-compliance to treating psychiatrist, consistent with DCHCS policy.

    c)  Provision of nursing procedures as ordered by a physician.

    d)  Supervision and assistance of activities of daily living, including maintenance of living quarters, personal hygiene, and eating habits.

    e)  Coordination and support of activities with recreational therapy staff.

    f)  Provision of clinical escorts, when needed.

6.  Aftercare Planning and Referral: Planning for follow-up services is a critical component of care that inmate-patients need upon release from the EOP.  The PC or the IDTT Leader is responsible for ensuring that this is accomplished prior to an inmate-patient's discharge from the program.  It includes referrals to other levels of care, programs, or other appropriate therapeutic placement to ensure continuity of care.  Inmate-patients whose level of functioning has improved significantly to the point where the structure of the EOP therapeutic and housing environment is no longer needed shall be referred to the CCCMS services available in Condemned Housing.  Condemned male inmate-patients

**2009 REVISION**                                                          12-4-20

| Enhanced Outpatient Program | Mental Health Services Delivery System |
|---|---|

who experience decompensation in the form of crisis shall be referred to the DMH Inpatient Program at CMF for a MHCB level of care or DMH inpatient level of care. Female inmate-patients shall be referred to Patton State Hospital.

## J. MENTAL HEALTH QUALITY MANAGEMENT SYSTEM

Ongoing assessment of the quality of clinical services will follow the Mental Health Quality Management System procedures.

## K. TRACKING ATTENDANCE AT TREATMENT ACTIVITIES

Attendance at treatment activities, psychiatrist and PC appointments, and scheduling of IDTTs, among other information, will be tracked by the MHTS.

## L. GROUP/PRIVILEGE GROUP A1A DESIGNATION

All EOP inmate-patients who are actively participating in structured therapeutic activities as determined by the IDTT shall be assigned to work Group/Privilege Group A-1-A.

EOP inmates-patients may be assigned to established work or education programs if participation will be therapeutically beneficial. In these situations, a job description and timekeeping log shall be maintained by the work supervisor.

Inmates-patients not assigned to a credit qualifying work or education assignment, who refuse to participate in therapeutic activities and are returned to CCCMS level of care, shall be reassigned to Work Group/Privilege Group A-2-B.

# CHAPTER 5
## Mental Health Crisis Bed

### A.   INTRODUCTION

The goal of the Mental Health Crisis Bed (MHCB) program is to provide services for conditions which require an inpatient setting to ameliorate mental health symptoms in the least restrictive environment.   MHCB programs are located in California Department of Corrections and Rehabilitation (CDCR) institutions with facilities licensed as a Correctional Treatment Center (CTC) [California Code of Regulations (CCR), Title XXII, Division 5, Chapter 12, Article 4, Section 79739, Mental Health Treatment Program], General Acute Care Hospital (GACH), or Skilled Nursing Facility (SNF).  The MHCB program operates 24 hours a day, 7 days a week.  An inmate-patient admitted to the MHCB for mental health treatment may have acute symptoms of a serious mental disorder or may be suffering from a significant or life threatening disability.  Refer also to the Correctional Treatment Center Policy and Procedure Manual, Volume VIII, Mental Health, for more detailed procedures.

Many conditions may precipitate a mental health crisis during institution confinement.  At reception, the loss of the existing support system the individual had on the outside and/or the stress of initial imprisonment may lead to suicidal behavior, self-harm, or other symptoms. In mainline settings within institutions, stress factors unique to imprisonment may cause a pronounced degree of emotional strain and/or physical and interactive tension, and often compound existing stress factors inherent in everyday life.  Such factors as the restrictions of confinement, pressures to conform to the prison lifestyle, and fear of more predatory inmates may disrupt an inmate's coping abilities.  An inmate with no known mental health history may suffer acute symptoms, while another with mental illness in remission may have recurring symptoms.  Prior to release, fears of delayed release or inability to cope with the outside world or loss of the institution support system of food, shelter, clothing, and structure of time may lead to crisis reactions.

The MHCB has a length of stay of up to ten days.  The Chief Psychiatrist or designee, must approve exceptions to the length of stay.  Not all crises require admission to the MHCB. Crisis episodes for some inmate-patients may be handled on an outpatient basis.  Other inmate-patients, even if stabilized on medications, may require placement in a structured therapeutic environment for ongoing treatment and monitoring.  This may necessitate a referral to an Enhanced Outpatient Program (EOP), or if longer-term intensive care is needed, to an inpatient facility operated by the Department of Mental Health (DMH).

Presenting problems may require continuous observation or monitoring before an inmate-patient's treatment needs can be fully assessed or the crisis brought under control.  Where 24-

EX. 2-42

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

hour care is needed, an inmate-patient shall be placed in a MHCB for continuous nursing care.

B.   **PROGRAM OBJECTIVES**

The primary objective of the MHCB is to evaluate the symptoms associated with the crisis and provide initial stabilization and recommendations for follow-up care, post discharge. More specific objectives include:

1.   To observe, monitor, and provide continuous nursing assistance to inmate-patients whose condition requires 24 hours or more to achieve stabilization.

2.   To assess the inmate-patient's symptoms, formulate a provisional or differential diagnosis, and develop an initial treatment plan.   This may include a medical/neurological evaluation or an initiation of referral for such.

3.   To control symptoms of serious mental illness, using emergency medication when necessary.

4.   To alleviate psychiatric distress with appropriate therapy or counseling.

5.   To refer the inmate-patient for placement in an appropriate level of care.

6.   To provide an alternative to hospitalization for inmate-patients whose condition allows placement within ten calendar days to a less intensive level of care.

C.   **POPULATION SERVED**

**Overall Treatment Criteria**

Overall treatment criteria have been developed for the Mental Health Services Delivery System (MHSDS).   An inmate must meet the criteria in either 1 or 2 below in order to receive MHSDS treatment at any level of care:

1.   Treatment and monitoring are provided to any inmate who has ***current*** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual (DSM) diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional Disorder**
   **Schizophreniform Disorder**
   **Schizoaffective Disorder**

EX. 2-43

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

**Brief Psychotic Disorder**
**Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
**Psychotic Disorder Due To A General Medical Condition**
**Psychotic Disorder Not Otherwise Specified**
**Major Depressive Disorders**
**Bipolar Disorders I and II**

2.  Medical Necessity:  Mental health treatment shall be provided as needed.  Treatment is continued as needed, after review by the Interdisciplinary Treatment Team (IDTT), for all cases in which:

**Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with, or suspected of having, a mental disorder.  Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

**Specific Treatment Criteria for MHCB**

In addition to the overall treatment criteria above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

•   Marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or

•   Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

•   These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

**D.   REFERRAL AND TRANSFER**

**Referrals**

An inmate-patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, shall be referred to a MHCB.

**MHCB Transfer**

If the institution does not have a MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be

EX. 2-44

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

transferred to a designated MHCB institution.  The inmate-patient shall be transferred within 24 hours of referral.

(See Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 3, Health Care Transfer Process* and *Volume 6, Chapter 18, Transfer of Patient Health Records Within CDCR; Institution to Institution*, for specific requirements concerning transfers and Unit Health Records)

If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security.  In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours.  On weekends and after normal business hours, the mental health clinician on call or the physician on call at the referring institution shall contact the mental health clinician on call or the physician on call at other institutions to locate a vacant MHCB bed.  **The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed.**

MHCB transfers shall be done under authority as "Emergency Medical Transfers" (Department Operations Manual [DOM] 62080.17).  Since MHCB transfers are typically viewed as emergency moves, they do not require classification committee action or Classification Staff Representative (CSR) endorsement.  MHCB transfers shall be done on a "Psychiatric and Return" basis.

Generally, the transfer process shall be initiated by the inmate-patient's psychiatrist, psychologist, or the Chief of Mental Health.

The transferring psychiatrist, psychologist, or Chief of Mental Health shall determine whether the inmate-patient is "medically cleared" to transfer.  State law provides that, before a patient may be transferred to a health facility, the patient must be sufficiently stabilized to be safely transported.  The transferring physician is responsible for determining whether the inmate-patient's condition will allow transfer.  The CCR provides, in part, that a transfer or discharge may not be carried out if, in the opinion of the inmate-patient's physician, such transfer or discharge would create a medical hazard.  The transferring physician must initially evaluate the relative benefits and risks associated with transporting the inmate-patient.  The determination of whether the transfer creates an unacceptable risk or a "medical hazard" will depend upon the inmate-patient's condition, the expected benefits to the inmate-patient if he or she is transferred, and whether the risks to the inmate-patient's health are outweighed by the benefits.

The receiving facility must consent to the transfer.  CCR, Title XXII, licensing standards provide that a patient shall not be transferred unless and until the receiving facility has

EX. 2-45

**Mental Health Crisis Bed**          **Mental Health Services Delivery System**

consented to accept the patient. Specifically, the CCR provides, in part, that no patient shall be transferred, or discharged for purposes of transferring, unless arrangements have been made in advance for admission to a health facility. Therefore, the transferring clinician must secure the receiving health facility's approval in advance for the inmate-patient's admission. The transferring clinician shall document in the inmate-patient's Unit Health Record (UHR) that approval was obtained and from whom.

Appropriate housing of inmate-patients pending MHCB transfer shall be determined by the sending institution and in the following order of preferred locations:

1.  Inpatient beds

2.  Outpatient Housing Unit

3.  Outpatient Housing Unit overflow cells

4.  Large holding cells with water/toilets including, but not limited to, "ZZ cells," "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.

5.  Large holding cells without water/toilets such as "Contraband Cells" (not in a CTC licensed area)

6.  Triage and Treatment Area or other clinic physical examining room

7.  Other unit-housing where complete and constant visibility can be maintained

8.  When none of the above are available, small holding cells (not in a CTC licensed bed area) that are designed for the inmate-patient to sit or stand may be used for up to four hours by which time consideration of a rotation to one of the above listed options shall have been considered and the outcome of such consideration documented. Inmate-patients shall be retained in sit/stand cells only with approval of the watch commander and notification of on-call clinical staff.

9.  Holding cells within the licensed bed area of the CTC building (notification to Department of Health Services of an unusual occurrence is required)

All inmates-patients housed in one of the above sites while pending transfer to a MHCB shall be provided, at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock. If the inmate-patient subsequently attempts to use any or all of these items

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

to harm him or herself, a clinician may then order that one or more of these items be removed. Inmate-patients who are subsequently returned to their housing units shall receive appropriate clinical follow-up, which may include five-day custody and clinical wellness checks.

When an inmate-patient, identified as requiring MHCB care, is housed in an Outpatient Housing Unit, Administrative Segregation Unit, or any of the above sites, the HCPOP shall be notified of the need for MHCB placement.

**Procedure**

The Chief of Mental Health or designee at the sending institution shall contact the MHCB Clinical Director or designee at the receiving institution to obtain approval for the transfer.

In cases where the Clinical Director or designee at the receiving institution does not agree to the transfer, and the Chief of Mental Health at the sending institution believes the clinical need for transfer remains, the case shall be referred to the HCPOP and/or Mental Health Services at headquarters central office for assistance. If an agreement cannot be reached, the inmate shall be admitted and evaluated.

Upon receipt of approval to transfer, from the MHCB Clinical Director or designee at the receiving institution, the Chief of Mental Health or designee at the sending institution shall complete a CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance. Copies of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental,* shall be forwarded to the MHCB Clinical Director or designee at the receiving institution and the Classification & Parole Representative (C&PR) at the sending institution.

The C&PR at the sending institution shall forward a copy of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, to the C&PR at the receiving institution.

The Chief of Mental Health or designee, MHCB Clinical Director or designee, and the C&PRs at both the sending and receiving institutions shall communicate to ensure all health care/classification/transportation aspects are addressed. The escort needs for each transport are different given the variation of custody and health care concerns that may arise. At times, the transportation may be accomplished with just custody staff. However, occasions do arise when a combination of custody and clinical staff are needed to accompany an escort. This may occur when the inmate-patient has highly sensitive and varying medication needs or when the presence of a clinical staff member may substantially reduce decompensating or disruptive inmate-patient behavior during transportation.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

The C&PR at the receiving institution shall contact the Classification Services Unit (CSU) for teletype transfer approval.  The transfer approval shall be obtained from a CSR if available on site.

Documentation and classification of inmate-patients accepted for transfer to another institution shall be consistent with procedures outlined in the DOM.  The sending institution shall clearly indicate on CDCR 135, *Inmate Transfer Record*, that the purpose of the transfer is for psychiatric treatment.
The inmate-patient shall be informed of the reasons for and destination of the transfer.

The Receiving and Release sergeant at the receiving institution shall notify the MHCB when the inmate-patient arrives.  An inmate-patient who arrives by special transport because of urgent acuity shall be screened by a physician.  If immediate admission is not possible, an inmate-patient shall be housed in an appropriate medical setting until a bed is available (CCR, Title XXII, Section 79789).

## E.   ADMISSION

### Pre-admission Screening

All inmate-patients referred to the MHCB shall receive a pre-admission screening for the purpose of determining the appropriateness of the admission to the MHCB program.  During regular working hours, the screening shall be performed by a psychiatrist or a licensed psychologist privileged to practice in the MHCB, and documented in the Progress Notes.  During weekends, holidays, and after normal business hours, the screening shall be performed by an on-site physician on duty or any other licensed health care staff.  The pre-admission screening may be performed via telephone prior to transfer when the inmate-patient is at an institution without an available MHCB.  An inmate-patient in crisis may be screened where the crisis occurs (such as in the cell), or in the emergency service area of the CTC/GACH/SNF, prior to admission to the MHCB.

All inmates attempting suicide and those having suicidal ideation or showing signs and symptoms of suicide potential will be evaluated by a mental health clinician (psychiatrist, psychologist, or Clinical Social Worker) on an emergency basis.  Inmates referred to health care by custody because of suicide concerns, shall be immediately evaluated for suicide risk by a mental health clinician, which shall include a Suicide Risk Assessment Checklist (SRAC).  On weekends, evenings, and holidays, the SRAC shall be performed by the Physician on Call (POC), Medical Officer of the Day (MOD), or Registered Nurse (RN) trained to administer the SRAC if mental health clinicians are not available.  It is the responsibility of the Health Care Manager to establish procedures for suicide risk assessment by clinical staff outside of normal work hours.  All SRACs shall be filed in the inmate-patient's UHR whether or not the inmate-patient is admitted to the MHCB.  An inmate

EX. 2-48

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

showing suicidal potential cannot be refused admission until there is a face-to-face evaluation and SRAC completed by a clinician trained to conduct suicide risk assessments.

All inmates who are screened positive for possible admission to the MHCB on a weekend, holiday, or after normal business hours shall be referred to a MHCB psychiatrist or psychologist with admitting privileges (On Call or On Duty) for admission. The clinician facilitates the admission based on the admission criteria indicated in Section C above. The actual admission may be done by the MOD or POC in consultation with the psychiatrist or psychologist (On Call or On Duty). For all inmates not admitted, the psychiatrist or psychologist (On Call or On Duty) shall prepare a detailed Progress Note explaining the reason for the decision. A log shall be kept by the referring institution, and shall include the following information for all inmates referred to the MHCB and evaluated but not admitted:

- Date of referral

- Inmate-patient identification

- Reason for referral

- Reason for not being admitted

- Referring clinician

**Admission/Transfer Log**

Each mental health program with a MHCB unit shall develop and maintain a log of all MHCB admissions/transfers. This log shall include at least the following information:

- Date of referral

- Inmate identification

- Reason for referral to MHCB

- Current level of care

- Date of Admission to MHCB

- Whether a suicide risk assessment (including a SRAC) was performed upon admission (for suicidal inmates)

- Discharge diagnosis

**Mental Health Crisis Bed**         **Mental Health Services Delivery System**

- Whether a suicide risk assessment (including a SRAC) was performed upon discharge (for suicidal inmates)

- Date of clinical discharge from the MHCB

- Date of physical discharge from the MHCB

- Date of referral to new location/program

- Date of transfer to new location/program

- Location/program to which the inmate-patient has been transferred

All inmate-patients who receive a pre-admission evaluation for suicide potential, but who are not admitted, will be tracked in a separate log. The log shall be kept by the MHCB that did not admit the inmate-patient, and will include at least the following information:

- Date of referral

- Inmate-patient identification

- Reason for referral

- Reason for not being admitted

- Deciding clinician

**Procedure**

The MHCB shall accept inmates who meet the criteria for care and treatment and shall continue to house only those inmates for whom care is appropriate. No inmate shall be admitted to the MHCB until a provisional diagnosis or valid reason for admission has been stated and the appropriateness determined. When clinical differences of opinion exist regarding the appropriateness for admission and the clinicians involved cannot reach an agreement at the institutional level, the cases shall be referred to the HCPOP and/or Mental Health Services at headquarters central office for assistance.

Admissions to the MHCB shall be made on a "Psychiatric and Return" basis. A psychiatrist or a psychologist with admitting privileges in the MHCB may admit an inmate to the MHCB. Inmates shall be admitted only upon the written or verbal order of a MHCB psychiatrist or a psychologist.

EX. 2-50

**Mental Health Crisis Bed                    Mental Health Services Delivery System**

Occasionally, crisis referrals require emergency and involuntary admission to the MHCB. An inmate-patient may, because of a psychotic episode, be confused, disoriented, disorganized and/or gravely disabled, or because of acute depression, may be dangerously suicidal. An inmate-patient in crisis who is explosive and assaultive may also be admitted involuntarily if a serious mental disorder also exists. Assaultiveness that is assessed by the clinician as resulting from an antisocial behavior, and not as a result of a serious mental disorder, is more appropriately dealt with by custody staff, per general institution policies.

Any inmate-patient admitted to the MHCB program because of suicidal threats or behavior shall receive a suicide risk assessment (including a SRAC) from a clinician, upon admission and prior to discharge.

After hours, weekends, and holidays, the Administrative Officers of the Day, MODs, POCs, and Watch Commanders shall be notified of an inmate who makes a serious suicide attempt or engages in self-injurious behavior requiring medical treatment.

Inmate-patients with multiple admissions to MHCB (three or more within a six-month period) shall be evaluated for referral to DMH.

An admission note shall be completed within 24 hours of admission to the MHCB by the admitting clinician and shall include the inmate-patient's condition at the time of admission, provisional diagnosis, and an initial treatment plan. This shall be documented on a CDCR 7230, *Interdisciplinary Progress Notes*, and filed in the UHR.

**MHCB Nursing Evaluation**

The nurse shall:

a.   Interview and give an orientation to the inmate-patient.

b.   Assess the inmate-patient and take vital signs.

c.   Notify the physician of admission status including any admission problems.

d.   Assemble the chart.

e.   Initiate the Patient Care Plan.

f.   Note and implement any admission orders, such as laboratory tests (for details refer to the Correctional Treatment Center Policy and Procedure Manual, Volume VIII, Mental Health), X-rays, medications, etc.

**Mental Health Crisis Bed**                     **Mental Health Services Delivery System**

**Physical Examination**

For immediate care planning, a history and physical examination, including neurological screening, shall be completed, to the extent clinically possible, immediately before or within 24 hours of admission.  If the inmate-patient is uncooperative or otherwise cannot be fully examined, a description of all possible observations and findings of the physical examination shall be documented.  The complete physical examination shall be conducted as soon as clinically possible and documented in the UHR.

**F. ASSESSMENT AND TREATMENT SERVICES**

**Intake Assessment**

Upon admission to the MHCB unit, an assessment shall immediately be made on how best to meet the critical needs of the seriously mentally disordered inmate-patient.  This is accomplished by reviewing and updating the CDCR 7386, *Mental Health Evaluation*, completed by the referring clinician at the time of referral.  At a minimum, a provisional diagnosis is determined and an initial plan in the "Recommended Follow Up/Initial Treatment Plan" section of the CDCR 7386, *Mental Health Evaluation*, shall be formulated within 24 hours for immediate care planning and to rule out medical conditions that may be a cause of presenting symptoms.  Serious medical conditions that are a significant cause of the crisis may warrant acute care medical hospitalization.

**Interdisciplinary Treatment Team and Individualized Treatment Planning**

The IDTT is composed of, at a minimum:

- Assigned MHCB psychiatrist

- Assigned MHCB Primary Clinician (PC)

- Nursing staff

- Correctional Counselor

- Inmate-patient (if clinically and custodially appropriate)

Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information, such as:

- Custody officers

---

**2009 REVISION**                                                    **12-5-11**

**Mental Health Crisis Bed**                    **Mental Health Services Delivery System**

- RNs

- Licensed Vocational Nurses (LVN)

- Recreational Therapists

The IDTT is chaired by a licensed mental health clinician.  The inmate-patient shall be included in the IDTT, if clinically and custodially appropriate as determined by the IDTT, unless the inmate-patient refuses to participate.  If the inmate-patient refuses to participate, the PC shall document the reason for refusal on the CDCR 7230, *Interdisciplinary Progress Notes*.  Inmate-patients shall not be disciplined for refusing to participate in IDTT.  Attempts shall be made to gather input from the inmate-patient, such as talking to and observing the inmate-patient at the cell door.

The IDTT shall meet within 72 hours of an inmate-patient's admission and at least weekly thereafter.  The IDTT shall begin discharge planning at the initial IDTT meeting.

An individual treatment plan shall be developed and implemented at the initial IDTT meeting**.**  The treatment plan, which is to be filed in the inmate-patient's UHR, shall be individualized and based on a comprehensive assessment, including, at a minimum, a mental status exam and the inmate-patient's legal, criminal, psychiatric, medical, and developmental history, and psychosocial evaluations.  Psychosocial evaluations shall include personal and family history, inmate-patient's strengths and weaknesses, and evaluation of support system.

The individualized treatment plan shall:

1.  Provide a primary diagnosis and identify the main presenting problems targeted for treatment.  The diagnosis may be provisional.

2.  For every identified target problem, document the goals, interventions, and measurable objectives of treatment.

3.  Specify the types, frequencies and providers of prescribed therapies and adjunct activities.

4.  Document the success or failure in achieving stated objectives

5.  Evaluate the factors contributing to the inmate-patient's progress or lack of progress toward recovery.

| **Mental Health Crisis Bed** | **Mental Health Services Delivery System** |

6.  Document prescribed medication, dosage, and frequency of administration, as well as medication compliance.

7.  Be reviewed at each IDTT meeting, at least weekly, and updated accordingly.

8.  Designate appropriate medications, therapies, and custody follow-up in an aftercare plan to be followed after the inmate-patient's release from the MHCB.  See MHSDS Program Guide, *Chapter 10, Suicide Prevention and Response*, for specific follow-up requirements for inmate-patients admitted for suicide prevention.

**Case Reviews And Treatment Plan Update (CCR, Title XXII, Section 79747)**

An inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist.  On weekends or holidays, a mental health clinician on call or the MOD shall make daily rounds.  The Chief of Mental Health is responsible to ensure that all physicians serving as MOD or POC are trained in the use of the SRAC.

Documentation of daily contacts shall be made within 24 hours in the UHR by the updating clinician.

The IDTT shall review each crisis case as often as necessary, but at least every seven days, and update the treatment plan accordingly.  Each treatment plan update shall include the following:

1.  Documentation of the inmate-patient's response to treatment and his/her progress or lack of progress towards the goals of treatment.

2.  Evaluation of factors that hinder progress and the interventions planned by the team to facilitate progress.

3.  The most recent diagnoses and descriptions of the main presenting problems.

4.  Evaluation of risk factors.

5.  Review of release or discharge plans.

**Treatment Services**

The MHCB Clinical Director or designee shall be responsible for the prompt care and treatment of each inmate-patient admitted to the MHCB, development and implementation of a treatment plan, completeness and accuracy of the UHR, necessary special instructions, and transmitting reports of the inmate-patient's condition.  Whenever these responsibilities are

EX. 2-54

**Mental Health Crisis Bed                    Mental Health Services Delivery System**

delegated to another staff member, continuity shall be ensured [CCR, Title XXII, Section 79741 (b)] by the MHCB Clinical Director.

An inmate-patient admitted to the MHCB shall be provided the following services and treatment:

Medication Evaluation and Management

The assigned psychiatrist shall evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues.

Refer to Health Care Department Operations Manual, *Medication Management* and *Pharmacy,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.

Nursing Care

Twenty-four hour nursing care is provided in the MHCB to administer and supervise medication, provide assistance for activities of daily living, observe and monitor inmate-patients, obtain all physician-ordered laboratory studies, and provide counseling or inmate-patient supervision as needed.

Therapy and Counseling

One-to-one intervention is often necessary in a crisis case. Usually, brief, intensive therapy is helpful if it focuses on issues that precipitated the admission and explores changes in behaviors, perceptions and expectations that facilitate coping with the crisis. Group therapy may be provided to MHCB inmate-patients, consistent with clinical needs.

Rehabilitation Therapy

Inmate-patients may participate in rehabilitation therapy activities, consistent with clinical needs. Rehabilitation therapy may include activities such as indoor or outdoor recreation. These activities provide a setting for additional observation of inmate-patients, allowing for the evaluation of exaggerated symptoms or severe symptoms that are masked [see CCR, Title XXII, Section 79749 (c) (1) for Rehabilitation Treatment Plan requirements].

Inmate-patients who are awaiting transfer to DMH and remain in a MHCB beyond ten days, shall be offered additional rehabilitation therapy and other treatment activities, as clinically indicated.

**2009 REVISION**                                                                      12-5-14

**Mental Health Crisis Bed                    Mental Health Services Delivery System**

**Aftercare Planning and Referral**

Planning for follow-up services is a critical component of the care an inmate-patient needs upon release from the MHCB.  This planning may lead to a referral to a program or other appropriate placement to ensure continuity of care.  An inmate-patient who clearly requires longer-term hospital care may be referred and transferred to an inpatient hospital program operated by the DMH.  Aftercare plans shall include:

1.   The diagnosis and psychiatric problems continuing to require treatment.

2.   Any other unique mental health or physical conditions that could affect treatment (e.g., allergies, special dietary needs, chronic diseases).

3.   Recommendations for follow-up treatment, including medications and specific psychotherapies.

4.   Referrals to other treatment programs and institutional services, including vocational or educational programs, substance abuse programs and job programs (CCR, Title XXII, Section 79749 [d]).

5.   The aftercare plan shall consider the inmate-patient's potential in-custody housing, proximity to release from incarceration, probable need for community treatment and social services, and the need for continued mental health care.  If an inmate-patient requires continued care upon paroling, the Parole Outpatient Clinic shall be contacted.

## G.  INVOLUNTARY TREATMENT

An inmate-patient in crisis who does not consent for treatment with medication may be involuntarily treated to control symptoms which constitute:

- A danger to self, or

- A danger to others, or

- Grave disability on the basis of a serious mental disorder.

Involuntary medication administration refers to the administration of any psychotropic or antipsychotic medication or drug by use of force, or restraint.
The reasoning for the determination that an inmate-patient is a danger to self or others, or is gravely disabled, and is incompetent to render an informed consent shall be documented in the inmate-patient's UHR.

**2009 REVISION**                                                              **12-5-15**

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

If in the clinical judgment of a psychiatrist or other physician, an emergency exists, the physician or psychiatrist may order involuntary medication for a period not to exceed 72 hours. An emergency exists when there is a sudden marked change in the inmate-patient's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate-patient or others and it is impractical to first obtain consent.

An inmate-patient shall be afforded due process rights if involuntary treatment is necessary beyond 72 hours.

Refer to Correctional Treatment Center Policy Manual, Volume VIII, Section 16, Involuntary Treatment, for detailed procedures.

## H. CLINICAL RESTRAINT AND SECLUSION

Restraint and/or seclusion are special treatment procedures used to protect the safety of inmate-patients who pose an immediate danger to themselves or others, by restricting their ability to inflict injury by limiting body movement or by containing them in a safe environment. While utilization of restraint and/or seclusion is clearly effective in saving lives and preventing serious injury, it is also a procedure with inherent risks. In rare cases inmate-patients who have been restrained or secluded have suffered injury or death as a result of improper procedure or monitoring.

Restraints and/or seclusion shall be used only as a last resort and in response to an emergency to protect the inmate-patient and/or others from imminent harm, after less-intrusive and non-physical interventions have been attempted or ruled out. Staff shall strive to minimize or eliminate the use of seclusion or restraint whenever possible, through proper training, thorough assessment, effective treatment planning, and continuous quality improvement efforts. This policy restricts the use of restraints for mental health purposes generally to MHCBs. The use of restraints, for mental health purposes, in areas other than a MHCB unit shall be restricted to the amount of time required for transfer to a MHCB unit. Inmate-patients in need of restraints shall be transferred, in an expedited timeframe, to a MHCB unit.

The form of restraint and/or seclusion selected shall be the least restrictive level necessary to contain the emerging crisis/dangerous behavior. The determination of the presence of an emergent situation rests upon the clinical judgment of staff. It does not require the staff to defer restraint or seclusion until dangerous behavior occurs but may be based upon knowledge of the inmate-patient and its predictive value.

Restraint and/or seclusion shall never be used as punishment or for the convenience of staff. Threatening inmate-patients with restraint and/or seclusion is considered psychological abuse

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

and is prohibited.  It may be appropriate to inform an inmate-patient when behavior may necessitate the use of restraints or placement into seclusion.

This policy expressly prohibits any form of as needed (PRN) or standing order for restraint or seclusion.

For the purpose of this policy, authorized clinician means a psychiatrist, licensed psychologist, (and at Pelican Bay State Prison only, a psychiatric nurse practitioner) or (on weekends or after normal business hours) the POC or psychiatrist on call, or the POD or MOD.

Per Title 22 Regulations, a "qualified RN" is a RN who has received training in the administration of restraints and placement into seclusion, and who has passed a competency examination, which includes assessment of clinical issues relevant to the use of restraint and/or seclusion.

RESTRAINT

**Initial and Subsequent Orders**

Restraints shall only be used on a written or verbal order of an authorized clinician.  When an authorized clinician is present, the authorized clinician shall evaluate the need for restraints, and if appropriate, write an order and provide sufficient and adequate justification in the inmate-patient's UHR.

In an emergency circumstance, when no authorized clinician is available, a qualified RN may authorize initiation of restraints.  An emergency circumstance exists when there is a sudden marked change in the inmate-patient's behavior so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to self or others, and it is impractical to first obtain an order from an authorized clinician.

When no authorized clinician is present, a qualified RN shall evaluate the need for restraints and implement restraints if appropriate.  If a RN is not present, a RN shall be notified immediately and shall respond within 15 minutes of notification to evaluate the need for restraints and initiate restraints, if appropriate.  When a RN initiates restraints, an authorized clinician shall immediately be notified.  Within one hour of notification, an authorized clinician shall give a verbal or written orders (with justification) to either continue or discontinue restraints.

If the authorized clinician is not available for the initial assessment, a phone order will be secured to cover the restraint use and the nurse will do an initial assessment within one hour.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

The initial order for restraint shall not exceed four hours.  Subsequent orders for continuation of restraint shall not exceed four hours.  Each order must specify the behavioral conduct requiring restraint and the type of restraint used.  While a restraint order is valid for four hours, no inmate-patient shall be in restraint for longer than the time necessary to contain the dangerous behavior.  Removal from restraints is an authorized clinician or RN determination, and does not require a physician's order unless otherwise specified.

Assessment by Authorized Clinicians and Qualified RNs

Prior to expiration of the initial order, an authorized clinician or qualified RN shall conduct a face-to-face evaluation to determine whether continued placement into restraints is clinically justified.   If  the  clinician  performing  the  initial  face-to-face  assessment  is  not  a psychiatrist/physician, within four hours of the initial order a psychiatrist/physician shall be contacted/consulted by the RN to review current medications and any contraindications to continued restraint.

An authorized clinician or a qualified RN shall conduct a face-to-face evaluation at least every 8 hours during the period an inmate-patient is in restraints.  An authorized clinician shall evaluate the inmate-patient face-to-face at least every 24 after the first four hours.  If the authorized clinician is not a physician, the authorized clinician should consult with a physician after the face-to-face assessment.  A psychiatrist shall conduct a face-to face evaluation at least every 24 hours while the inmate-patient is in clinical restraint.

A physician or nurse practitioner shall perform a brief physical examination of the inmate-patient as soon as possible but no more than four hours after the initiation of restraint use and document the evaluation on a progress note in the UHR.  The physician/nurse practitioner's assessment will include inquiring into any history of physical disability or any other condition which would place the inmate-patient at greater physical or psychological risk during the restraint procedure.  If the use of restraints is discontinued prior to the physician's arrival, the physician shall conduct a brief physical examination no more than 24 hours after the episode of restraint use.

**Documentation**

Documentation of an order for the use of restraints shall include the name of the authorized clinician giving the order, the time the order was received, the duration of the order, which is not to exceed four hours, the type of restraint to be used, and the name and signature of the RN receiving the order.

The Initial Telephone orders for restraint shall be received only by licensed nursing staff, who shall record them immediately.  The ordering authorized clinician shall sign them within

**2009 REVISION**                                                                                    12-5-18

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

24 hours.  Likewise, subsequent telephone orders for restraint shall be signed within 24 hours of the time the orders were given.

This policy requires the clinician ordering the restraint to provide a written order authorizing the use of restraint even if such use is discontinued prior to the authorized clinician's arrival.

Each time a verbal order for restraint is written, the nurse shall complete a CDCR 7230, *Interdisciplinary Progress Note,* documenting the need for initiation/continuation of restraint and shall specify the elements for the emergency that necessitated the use of restraint and behavior changes that may indicate the inmate-patient no longer presents a danger to self or others.  The note shall describe any less restrictive measures that were implemented prior to this order.

Results of face-to-face evaluations shall be documented on CDCR 7316, *Restraints/Seclusion Record.*

When a qualified RN initiates restraint, the RN shall document the need for the initiation of restraint on a CDCR 7316, *Restraint/Seclusion Record.*  The documentation shall include a description of the inmate-patient's behavior including any precursor/antecedent behaviors and other relevant factors upon which the inmate-patient was determined to be a danger to self or others, staff actions taken to utilize alternatives to restraint, information given to the inmate-patient about the reasons for restraint, the conditions of release, the inmate-patient's response, and injuries to the inmate-patient.

The use of restraints requires the inmate-patient's treatment plan be modified to include a sufficiently detailed description of the emergency and the rationale for the use of the specific degree of restraint.  The inmate-patient's nursing care plan shall be modified to provide for the special needs of the inmate-patient while in restraint and/or seclusion.  The criteria for establishing termination should be described in operational, objective terms comprehensible to the inmate-patient.

**Types of Restraint**

- Five-point: All four extremities and waist (note below on use of five-point restraints)

- Four-point: All four extremities

- Two-point: Upper extremities only

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

**Application**

The inmate-patient shall be protected from injury during restraint application and use. Staff shall use the least physical force necessary to protect inmate-patient and yet exercise sufficient force to control the inmate-patient.

The dignity and well-being of the inmate-patient shall be preserved at all times during the period of restraint.

Inmate-patients shall be placed on their backs when restraints are applied unless clinically contraindicated. When an inmate-patient is medically compromised or disabled, all necessary steps to safeguard the inmate-patient during the procedure need to be taken. Inmate-patients who are considered medically compromised/disabled consist of, but are not limited to, the following: morbidly obese, known history of cardiac or respiratory disease, history of spinal injury, amputee, fractured or injured extremity, recent history of emesis, pregnancy, or seizure disorder. RNs must contact a physician either prior to, or immediately after, the placement of a medically compromised inmate-patient in restraints to notify the physician of the restraint and the inmate-patient's medical condition. Upon notification of the restraint of a medically compromised/disabled inmate-patient, the physician will either order the RN to discontinue the restraint or order the restraint as well as any special measures/treatments that need to be taken to safeguard the inmate-patient's medical condition. If the inmate-patient is an amputee or otherwise lacks one or more limbs, two or three point restraints should be used. Generally, restraints should be applied to the upper extremities first.

Four-, five-, or two-point leather restraints shall be used by clinical staff when ordered by an authorized clinician. Inmate-patients shall only be restrained with the least amount of restraints necessary to contain the unsafe behavior. Each period of restraint must be assessed individually to determine the level of restraint required at the time of the application of the restraint. Five-point restraints will only be used after the inmate-patient has been unsuccessfully restrained in four-point restraints or a determination is made by the RN that a fifth restraint is needed to ensure the safety of the inmate-patient. The physician on-call and the Nursing Supervisor must be notified anytime five-point restraints are utilized. The restraint key shall be carried by nursing staff after restraints have been applied to an inmate-patient until the procedure is discontinued.

Generally, four-point restraints should be used unless there are compelling reasons to the contrary.

A soft cloth or bandage shall be applied to the extremity before applying the leather restraints to protect the skin.

| **Mental Health Crisis Bed** | **Mental Health Services Delivery System** |
|---|---|

Nursing staff shall notify the watch commander and Chief Psychiatrist or designee of an order to place an inmate-patient in restraints.  When restraints are applied to an inmate-patient, CTC staff shall have at least three custody personnel present for the application of these restraints, but the RN shall be in charge of the actual application of restraints.  The RN is responsible to ensure that the restraints are applied properly, and are not restricting the inmate-patient's circulation.

In emergency situations, custody staff may use metal restraints (handcuffs) on inmates in order to gain control.  Metal restraints shall be replaced with leather restraints by the RN as soon as possible.

## Monitoring and Evaluation by Nursing Staff

All inmate-patients placed into restraint shall remain under constant direct**,** in-person visual observation by trained nursing staff (CNA, psychiatric technician, LVN, or RN) until restraint is discontinued**.**

### Immediate Nursing Evaluation

A RN shall perform a mental status and physical assessment of the inmate-patient immediately upon the initiation of restraint use.  The RN assessment will include the identification of techniques, methods and tools which can help the inmate-patient control their behavior, and will identify pre-existing medical conditions and physical disabilities that place the inmate-patient at greater risk during the restraint procedure.

Assessment at 15 minute Intervals

In order to continue adequate circulation, nursing staff monitoring the inmate-patient shall physically check each extremity every 15 minutes.  Each 15 minute assessment period shall be documented on the CDCR 7316, *Restraint/Seclusion Record.*

The nursing staff shall provide fluids and nourishments every 15 minutes as needed and as practicable except during hours of sleep.  The inmate-patient's head and shoulders shall be elevated, if needed, while being fed or receiving fluids to reduce the risk of aspiration.  The nurse shall document meals and fluids on CDCR 7316, *Restrain/Seclusion Record.*

Hourly Assessments

The RN will conduct hourly assessments of the inmate-patient during the entire period of restraints.  Subsequent to the initial assessment conducted by the RN, the hourly assessments will document current physical, mental, and behavioral status of the inmate-patient, any indicated interventions performed, and the inmate-patient's readiness for release from

---

| **Mental Health Crisis Bed** | **Mental Health Services Delivery System** |

restraints.  The assessment includes noting the condition of skin and circulation, need for toileting, personal hygiene procedures, and proper application of restraint.  Documentation of the one hour evaluations shall summarize the inmate-patient's overall physical condition, general behavior, and response to counseling/interviews.

Every hour the nursing staff, with the assistance of custody staff, shall perform 2 minute range of motion exercises on each limb unless the inmate-patient is too agitated or assaultive to safely remove the restraints.  For range of motion exercises, restraints on each extremity shall be removed, one at a time.  Performance of range of motion exercises shall be clearly documented on the CDCR 7316, *Restraint/Seclusion Record,* and shall include the inmate-patient's behavior, respiration, and responsiveness.  If range of motion exercises are not performed, nursing staff shall clearly document the reason on the CDCR 7316, *Restraint/Seclusion Record.*

A RN may suspend restraints for short periods of time in order to transfer inmate-patients from place to place to attend to necessary or personal needs (i.e., feeding, bathing, or other treatment needs as necessary).  A RN shall decide whether release from restraint is necessary in order to attend to necessary nursing or personal needs.  Custody staff shall provide adequate security to prevent assaults or self-injurious behavior during suspension of restraints.  If an inmate-patient has been released from restraints for more than one hour, a new order shall be obtained.  Inmate-patients shall not be returned to the previous, or any state of restraint without continuing evidence of dangerousness to self or others.

**Restraint Renewal**

The RN shall contact an authorized clinician and provide a description of current behavior, attitudes, or other indicators of present dangerousness; PRN/emergency medication usage; change in vital signs, including pain assessment; changes in mental or physical status; and side effects (e.g., confusion, akathisia, or extrapyramidal) at least every four hours.  The authorized clinician shall then either give an order to discontinue restraint or give an order to continue or modify restraint for a period not to exceed four hours.

Termination

Restraint shall be terminated when:

1.   The emergency or dangerous behavior no longer exists based on previously established criteria for release; or

2.   The inmate-patient's identified precursor behaviors indicating imminent danger to self or others are not longer present; or

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

3.  Due to the presence of medical contraindications, it would be harmful for the inmate-patient to remain in restraints.

Removal from restraints is an authorized clinician or RN determination that the inmate-patient has reached the behavioral criteria for release and no longer presents an imminent danger.  Release does not require a physician's order unless otherwise specified.

Upon termination of the restraint use, an entry shall be made in the CDCR 7230, *Interdisciplinary Progress Note,* describing the condition and response of the inmate-patient.

In accordance with Health and Safety Code 1180, a clinical and quality review shall be conducted for each episode of the use of restraints.

**Seclusion**

Seclusion is a behavioral treatment procedure used to prevent injury to self or others by containment of the inmate-patient in a specially designed room.  Seclusion will typically take place in safety cells in a MHCB facility.  Seclusion rooms shall be designed or modified to: provide for sufficient space for freedom of movement of staff; be free from hazardous objects or fixtures; have adequate light and ventilation; be maintained at an appropriate temperature; have secure, lockable doors; and have windows that permit visual observation of the inmate-patient by staff.  Each MHCB facility shall set aside and equip a specific room to be used for the purpose of seclusion.

Placement of inmate-patients in single cells located in housing units, CTC's, or MHCB's for custodial reasons does not constitute seclusion for the purposes of this section.

**Initial and Subsequent Orders**

Seclusion shall only be used on a written or verbal order of an authorized clinician.  When an authorized clinician is present, the authorized clinician shall evaluate the need for seclusion and if appropriate, write an order and provide sufficient and adequate justification in the inmate-patient's UHR.  The initial order for seclusion shall not exceed four hours.

In an emergency circumstance when there is no authorized clinician present, a qualified RN may authorize initiation of seclusion after evaluating the need for seclusion.  An emergency circumstance exists when there is a sudden marked change in the inmate-patient's behavior so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to self or others, and it is impractical to first obtain an order from an authorized clinician.  If a RN is not present, a RN shall be notified immediately and shall respond within 15 minutes of notification to evaluate the need for seclusion and initiate seclusion, if appropriate.   When a RN initiates seclusion, an authorized clinician shall

**Mental Health Crisis Bed**                          **Mental Health Services Delivery System**

immediately be notified, and within one hour of notification write or give a verbal order with justification to either continue or discontinue seclusion.

Subsequent orders for continuation of seclusion shall not exceed four hours.

Documentation

Documentation of an order for seclusion shall include the name of the authorized clinician giving the order, the time the order was received, the duration of the order, and the name and signature of the RN receiving the order.
Telephone orders for seclusion shall be received only by licensed nursing staff, shall be recorded immediately, and shall be signed within 24 hours.  Initial telephone orders for seclusion shall be followed with written orders within 24 hours of the time the seclusion was first ordered.  The ordering clinician will follow subsequent telephone orders for seclusion with written orders within 24 hours.

A written order authorizing the use of seclusion is required even if such use is discontinued prior to the authorized clinician's arrival.

Each time an order for seclusion is written, the authorized clinician or RN shall complete a CDCR 7230, *Interdisciplinary Progress Note,* documenting the need for initiation/continuation of seclusion and shall specify the elements of the emergency that necessitated the use of seclusion and behavior changes that may indicate the inmate-patient no longer presents a danger to self or others.  The note shall describe what least restrictive measures were tried prior to this order.

Results of face-to-face evaluations shall be documented on CDCR 7316, *Restraint/Seclusion Record.*

When a qualified RN initiates seclusion, the RN shall document the need for the initiation of seclusion on a CDCR 7316, *Restraint/Seclusion Record.*  The documentation shall include a description of the inmate-patient's behavior including any precursor/antecedent behaviors and other relevant factors upon which the inmate-patient was determined to be a danger to self or others, staff actions taken to utilize alternatives to seclusion, information given to the inmate-patient about the reasons for seclusion, the conditions of release**,** the inmate-patient's response, and injuries to the inmate-patient.

The inmate-patient's treatment plan must be modified to include a sufficiently detailed description of the emergency and the rationale for the use of seclusion.  The inmate-patient's nursing care plan shall be modified to provide for the special needs of the inmate-patient while in seclusion.  The criteria for establishing termination should be described in operational, objective terms comprehensible to the inmate-patient.

**2009 REVISION**                                                                                    12-5-24

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

### Monitoring and Evaluation by Nursing Staff

During the entire period of seclusion, the inmate-patient shall remain on direct one on one nursing observation.  Nursing staff will document their observations at least every 15 minutes on a CDCR 7316, *Restraints/Seclusion Record.*  Nursing staff shall ensure that the inmate-patient is safely secluded.  The direct one on one nursing observation shall also include verbal interaction when the inmate-patient is awake.

A RN shall perform a mental status and physical assessment of the inmate-patient within 15 minutes of the initiation of seclusion.  A physician or nurse practitioner shall perform a brief physical examination of the inmate-patient as soon as possible but no more than four hours after the initiation of seclusion and document the evaluation in the patient's UHR.  If seclusion is discontinued prior to the physician's arrival, the physician shall conduct a brief physical examination no more than 24 hours after the episode of seclusion.

Prior to the expiration of the initial order an authorized clinician or qualified RN shall conduct a face-to-face evaluation to determine whether continued placement in seclusion is clinically justified.  If the clinician performing the initial face-to-face assessment is not a psychiatrist/physician, within four hours of the initial order a psychiatrist/physician shall be consulted by the RN to review current medications and any contraindications to continued seclusion.  The authorized clinician shall either give an order to discontinue seclusion or give an order to continue seclusion for a period not to exceed four hours.

After the initial face-to-face evaluation, an authorized clinician or a qualified RN shall conduct a face-to-face evaluation at least every eight hours during the period an inmate-patient is in seclusion and evaluated for continued dangerousness by an authorized clinician at least daily.  The authorized clinician shall then either give an order to discontinue seclusion or give an order to continue seclusion for a period not to exceed four hours.

An authorized clinician shall evaluate the inmate-patient face-to-face at least every 24 after the first four hours.  If the authorized clinician is not a physician, the authorized clinician should consult with a physician after the face-to-face assessment.  A psychiatrist shall conduct a face-to-face evaluation at least every 24 hours while the inmate-patient is in clinical seclusion.

Every hour the RN will perform an assessment of the inmate-patient including need for toileting; exercise; personal hygiene procedures; and room environment, temperature, and cleanliness.  Fluids and nourishment shall be offered every 15 minutes by the nursing staff assigned to the direct observation of the inmate-patient, except during hours of sleep.  In documentation of hourly evaluations, the nurse shall summarize the inmate-patient's overall physical condition, general behavior, and response to counseling/interviews.

| **Mental Health Crisis Bed** | **Mental Health Services Delivery System** |

A RN may suspend seclusion for short periods of time in order to transfer inmate-patients from place to place to attend to necessary nursing or personal needs (i.e., feeding, bathing, or other treatment needs as necessary). A RN shall decide whether release from seclusion is necessary in order to attend to necessary nursing or personal needs. Custody staff shall provide adequate security to prevent assaults or self-injurious behavior during suspension of seclusion. If an inmate-patient has been released from seclusion for more than one hour, a new order shall be obtained. Inmate-patients shall not be returned to the previous, or any state of seclusion without continuing evidence of dangerousness to self or others.

Termination

Seclusion shall be terminated when:

1. The emergency or dangerous behavior no longer exists based on previously established criteria for release; or

2. The inmate-patient's identified precursor behaviors indicating imminent danger to self or others are no longer present; or

3. Due to the presence of medical contraindications, it would be harmful for the inmate-patient to remain in restraints.

Removal from the seclusion is an authorized clinician or RN determination that the inmate-patient has reached the behavioral criteria for release and no longer presents an imminent danger. Release does not require a physician's order unless otherwise specified.

Upon termination of the seclusion use, an entry shall be made on a CDCR 7230, *Interdisciplinary Progress Note,* describing the condition and response of the inmate-patient.

In accordance with Health and Safety Code 1180, a clinical and quality review shall be conducted for each episode of the use of seclusion.

## I. DISCHARGE

It is the responsibility of the MHCB to provide for continuity of inmate-patient care upon discharge to another level of care, another facility, or self-care.

The inmate-patient has a right to information regarding discharge on an ongoing basis during his or her stay in the MHCB.

**Discharge Plan**

a. The discharge plan is initiated at the time of admission.

---

**2009 REVISION**                                                                                     12-5-26

**Mental Health Crisis Bed**             **Mental Health Services Delivery System**

b.  The IDTT shall assess the inmate-patient's need for further medical, psychiatric, psychological, social work, and rehabilitative services; nursing services; education services; and transportation when developing the discharge plan.  The plan ensures that needed services are available at the appropriate level of care.

c.  The plan shall include participation by the inmate-patient to facilitate inmate-patient responsibility for his or her care and treatment.

d.  The plan reflects appropriate coordination with and utilization of MHCB custody staff.

e.  The plan includes documentation of contact with the Chief of Mental Health at the institution where the inmate-patient is being transferred.

f.  Once the discharge plan is completed, referrals for appropriate aftercare placement shall be documented by an MHCB clinical staff member in the inmate-patient's treatment plan.

g.  The assigned CCM or PC at the institution where the inmate-patient is being transferred is responsible for implementing the discharge plan.

h.  Treatment shall continue for all inmate-patients clinically discharged until transferred.

**Discharge Criteria**

Criteria for discharge from the MHCB to an EOP or CCCMS program include:

•   stabilization of the crisis behavior; and

•   the ability to function in a less clinically structured environment.

Discharge criteria do <u>not</u> necessarily include <u>complete</u> resolution of symptoms but a resolution sufficient to allow continuation of treatment at a less intensive level of care.

Discharge to DMH inpatient care requires the clinical need for inpatient services of a duration greater than ten days.

**Procedure**

a.  Upon completion of MHCB inpatient treatment, cases transferred to the MHCB as "Psychiatric and Return" shall be returned to the sending institution, unless the sending institution does not provide the level of care that the inmate-patient currently requires or the inmate-patient has any other case factor(s) that preclude return to the sending

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

institution.  In those cases, the MHCB will transfer the inmate-patient to an institution that provides the appropriate level of care and security.

b.  The MHCB discharge summary shall be completed by the attending psychiatrist or psychologist prior to release from the MHCB.  This should include specific recommendations regarding follow-up visits with the CCM or PC and custody staff.  The discharge summary, either handwritten or dictated, includes, but is not limited to, the MHCB course of treatment, current medications, response to treatment, condition at time of discharge, and detailed information regarding follow-up care needs.  The inmate-patient's participation, which supports inmate-patient responsibility, shall also be included.

c.  An inmate-patient shall be discharged only on the written order of the MHCB psychiatrist or psychologist.

d.  Each institution with an MHCB shall appoint a Discharge Coordinator who is responsible for notifying the Chief of Mental Health or designee at the institution where the inmate-patient is being transferred of the pending discharge.  The notification shall occur prior to discharge and shall include the inmate-patient's discharge summary, custody level, treatment needs, and any significant medical conditions.  The Discharge Coordinator shall document the notification in the inmate-patient's discharge plan.

e. The Chief of Mental Health or designee at the institution where the inmate-patient is being transferred shall notify the assigned CCM or PC.  If the inmate-patient does not have an assigned CCM or PC, one shall be assigned.  If the inmate-patient was admitted to the MHCB for Suicide Precaution or Watch, the Chief of Mental Health shall also notify the mental health clerical staff responsible for the tracking system, clinical staff responsible for weekend or holiday coverage, and the Facility Captain of the housing unit to which the inmate-patient is being transferred so that the required clinical and custody evaluation can be scheduled.

f. No inmate-patient shall be discharged from the MHCB without an IDTT review, or in the event a new IDTT cannot be convened, a consultation with an IDTT member, such as a nurse.

g. At the time of discharge, the original inpatient record is retained at the MHCB institution. The inmate-patient's UHR shall be transferred to the receiving institution at the time of discharge.  Certain documents from the Inpatient Record are copied and filed in the Inpatient section of the UHR.  This includes copies of the Admission Record, History and Physical, Operative Reports, Physician Orders, Discharge Summary, Consultations, Progress Notes, and Diagnostic Reports.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

h. Prior to discharge from the MHCB, a nurse shall advise the inmate-patient regarding medications and follow-up visits, and clear the inmate-patient for MHCB discharge.

i. Any inmate-patient admitted to the MHCB program because of suicidal threats or behavior shall not be discharged to their housing unit until a Suicide Risk Assessment Checklist has been completed and a follow-up plan developed.

- The PC shall provide follow-up treatment on an outpatient basis. This shall include daily contact with the inmate-patient for five consecutive days following discharge. On weekends and holidays, a Licensed Psychiatric Technician or mental health clinician other than the PC may conduct the daily contact; however, the PC is responsible for ensuring the contacts occur. The daily contact shall be documented on a CDCR 7230, *Interdisciplinary Progress Note,* or a CDCR 7230B-MH, *Follow Up to MHCB/MH-OHU Discharge for Suicidal Issues* template. The note shall include the inmate-patient's current mental status and suicide risk.

- The contact shall occur in the inmate-patient's regular housing unit.

- Custody staff shall conduct an hourly check of inmate-patients admitted to the MHCB for suicidality for the first 24 hours after discharge. A mental health clinician shall then discuss the inmate-patient's behavior with the custody staff and evaluate the inmate-patient to determine if the custody checks should be continued or discontinued. If the custody checks are retained, the mental health clinician shall determine whether the checks are to be every hour, every 2 hours, or every 4 hours for the next 24 - 48 hours. Custody staff shall maintain a log of checks on inmates.

- If after any evaluation the mental health clinician believes the inmate-patient has not stabilized, the inmate-patient shall be returned to the MHCB for further treatment. Careful consideration by the IDTT should be given to releasing inmates on a Friday, during the weekend, or the day before a holiday. The mental status and stability of the inmate-patient should be documented in detail on a CDCR 7230, *Interdisciplinary Progress Note.* A mental health clinician must be available every day (including weekends and holidays), either on duty or on call, to monitor inmate-patients who are discharged from a MHCB.

**Quality Management for Implementation of Discharge Planning**

Concurrent with the implementation of the discharge plan or within 21 days of the inmate-patient's discharge from the MHCB, the Chief of Mental Health at the institution where the inmate-patient was transferred will audit the implementation of the discharge plan and follow-up care.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

For inmate-patients who were admitted to the MHCB for Suicide Precaution or Watch, the Chief of Mental Health shall review the SRAC that was completed prior to discharge from the MHCB to ensure the discharge plan is appropriate.  The Chief of Mental Health shall document the review in the UHR and forward a copy of the SRAC to the local Suicide Prevention Committee.  A copy will also be retained by the mental health clerical staff.

**J.    MENTAL HEALTH PATIENTS IN OUTPATIENT HOUSING UNITS**

When an inmate-patient requires observation and evaluation of behaviors that may be indicative of mental illness, a licensed mental health professional may document the need for placement of the inmate-patient into an Outpatient Housing Unit (OHU).

A physician, psychiatrist, or licensed psychologist shall order placement and release of inmate-patients into and out of the OHU for mental health care and shall be in charge of the inmate-patients' care while housed there.  The placement into the OHU shall be made using the CDCR 7221, *Physician's Order*.

Psychologists ordering placement of inmate-patients into the OHU shall refer the inmate-patient to a physician for a physical examination and to a psychiatrist for a medication evaluation.

The physician's or psychologist's placement orders may be transmitted verbally or by telephone to the RN or LVN.  The ordering physician or psychologist shall sign all verbal placement orders within 24 hours.

A physician or psychologist shall document the need for placement on a CDCR 7230, *Interdisciplinary Progress Note*, within 24 hours of placement.  Within 24 hours after placement each inmate-patient shall have an evaluation, including admission history and physical examination, for immediate care planning.  The Mental Health Evaluation shall be documented on a CDCR 7386, *Mental Health Evaluation*.

The patient shall receive an additional face-to-face evaluation by a mental health clinician or other qualified medical staff within 48 hours.  This contact shall be documented on a CDCR 7230, *Interdisciplinary Progress Note*.  If at any time during this observation/evaluation period it is determined that the inmate-patient requires inpatient care, arrangements shall be made to transfer the inmate-patient within 24 hours of the determination to a MHCB.  If evaluation of the inmate-patient's mental health need continues beyond 48 hours, arrangements shall be made to transfer the inmate-patient to a MHCB or inpatient facility.  Inmate-patients shall not remain in OHU for more than 72 hours.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

The only exception to this 72-hour limit shall occur, on a case-by-case basis, only if both of the following criteria are met:

1.  The inmate-patient has been determined to need EOP level of care and is awaiting placement, and

2.  An IDTT determines that the inmate-patient may be at risk if returned to any of the housing units available at that institution while awaiting transfer.

When both of the above criteria are met, the inmate-patient may be held in OHU until transferred to an EOP level of care program.  The timeline for transfer from OHU to EOP shall not exceed 30 days from EOP endorsement.   This timeline for transfer shall include any days that the inmate-patient is in a MHCB following endorsement, and shall not be restarted if the inmate-patient returns to the OHU.

When it is determined that inpatient care is necessary and the institution staff are unable to expeditiously find a MHCB, they will contact the HCPOP for assistance to ensure placement within the required timelines.  If it is determined that an order for Suicide Precaution or Watch is necessary, observation by clinical and/or custody staff, consistent with the MHSDS Suicide Prevention policy (see Chapter 10 for details), shall be provided.

When an inmate is placed in the OHU for being potentially suicidal, a mental health clinician shall administer a SRAC at the times of placement and release.  On weekends, holidays, or after hours, the SRAC shall be administered by the MOD, POD, or RN trained on administration of the SRAC.  Inmate-patients housed in OHU for suicide observation, who do not require MHCB level of care and who were discharged from the OHU before 24-hours, may be seen by clinicians and custody staff for follow-up care utilizing the process and timeframes described for MHCB suicide discharges, if clinically indicated.

When emergency circumstances exist, clinical restraint or clinical seclusion may be applied in OHU, subject to the requirements for clinical restraint or clinical seclusion in the MHCB. Emergency circumstances exist when there is a sudden marked change in the inmate-patient's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate-patient or others, and it is impractical to first transfer the inmate-patient to a MHCB.  The MHCB transfer process (See Section D, *Referral and Transfer, MHCB Transfer*) shall be immediately initiated upon determination that an inmate-patient requires clinical restraint or clinical seclusion, and transported when clinically safe to do so.

HCPOP shall be notified  when an inmate-patient has been placed in clinical restraint or clinical seclusion.  HCPOP shall expedite MHCB placement of inmate-patients in clinical restraint or clinical seclusion.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

### *Mental Health Conditions Appropriate for Placement into an OHU*

1.    Observation for Suicide Precaution or Suicide Watch consistent with the CDCR Suicide Prevention and Response Project.

2.    Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation.

3.    Inmate-patients who have been referred to an EOP or MHCB who are too ill or too vulnerable to be placed in the general population while waiting for transfer.

If at any time the mental health clinician determines that the inmate-patient has improved and does not require a higher level of care, the clinician may discharge the inmate-patient back to the General Population at the appropriate level of care.

## K.  STAFFING

The MHCB is designed to provide 24-hour care and is subject to State licensing requirements (CCR, Title XXII, Section 79739).  Consequently, it must comply with the staffing standards of the CTC license under which it operates.  MHCB staff shall provide acute mental health services for inmate-patients admitted to MHCB.  In programs with six or fewer beds, acute mental health services may be provided by the MHCB Clinical Director.  Through contracts or temporary reassignment of mental health staff from other program areas, staffing shall be augmented as needed.

The MHCB shall have a Clinical Director who shall direct the clinical program and be responsible for the quality of clinical services (CCR, Title XXII, Section 79741 (b)).  The Clinical Director shall be a psychiatrist, licensed clinical psychologist, licensed clinical social worker,  or a psychiatric mental health nurse operating within his or her scope of licensure with at least three years of direct clinical experience with seriously mentally disordered individuals after completion of his or her last year of graduate education (CCR, Title XXII, Section 79755 (a)).  Each inmate-patient admitted as a patient to the MHCB is under the treatment of Staff Psychiatrists, Psychologists and/or Licensed Clinical Social Workers.  Nursing services are provided by RN, LVN, Recreational or Occupational Therapists or Licensed Psychiatric Technicians.  Clerical services are provided by an Office Technician and a Medical Transcriber.

**Administrative Staff**

The MHCB is subject to the same medical staff organization, bylaws, and policies and procedures that govern the other licensed beds of the facility (CCR, Title XXII, Sections 79775, 79777).  Staff serving in these positions shall meet the minimum

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

qualifications specified in the CCR, Title XXII.  All MHCB staff are responsible to the Clinical Director.

**Clinical Staff**

Individual therapy or counseling, aftercare planning and referral services, and the clinical lead role in treatment plan development and modification shall be performed by the Staff Psychiatrist, Staff Psychologist, or Licensed Clinical Social Worker.  A Chief or Senior Psychiatrist or a Chief or Senior Psychologist may also provide these clinical services in addition to his or her other supervisory or management responsibilities, as directed. Supervising clinical staff may assist in these services if required by workload, staffing considerations or unusual complexity of an individual case. Staff Psychiatrists, Staff Psychologists, Licensed Clinical Social Workers, Senior Psychiatrists and Senior Psychologists serve as PCs and report to the Clinical Director.

**Nursing Staff** (CCR, Title XXII, Section 79629)

Two Supervising RNs positions oversee all nursing services delivered in the CTC:  one for medical services and one for mental health services (CCR, Title XXII, Section 79755 (d)). Although the latter includes the MHCB, the use of one Supervising RN per shift may mean that MHCB nursing functions may be supervised by the medical Supervising RN for part of each 24-hour day.

Supervising RN are responsible for functional supervision of CTC line nursing staff and nursing administration, which includes the MHCB.  Twenty-four hour registered nursing coverage and availability of a Supervising Psychiatric RN forty hours a week are necessary in the MHCB.  There are sufficient nurses within a 24-hour period to provide at least 2.5 hours per inmate-patient (CCR, Title XXII, Section 79759).  An inmate-patient with higher acuity needs receives additional nursing and professional care as symptoms require.  RNs may co-manage selected inmate-patients assisting PCs with group therapies but will not function independently as PCs.

**Mental Health Rehabilitation Services Staff**

Mental health rehabilitation therapy services shall evaluate social, recreational, and vocational needs in accordance with the interests, abilities and needs of the inmate-patient; shall develop and prepare related therapies; and shall include such evaluation, and documentation of therapy development and preparation, in the inmate-patient's treatment plan (CCR, Title XXII, Section 79749).

**Mental Health Crisis Bed**         **Mental Health Services Delivery System**

Mental health rehabilitation therapy services shall be designed by and provided under the direction of a licensed mental health professional, a Recreational Therapist, an Occupational Therapist, or a Licensed Psychiatric Technician (CCR, Title XXII, Section 79749 (c) (2)).

In the Department, appropriately trained Correctional Officers (COs) and Correctional Counselors may be counted to meet licensing ratios. COs also assist in managing, observing and escorting the assaultive or suicidal inmate-patients.

**Clerical Staff**

Clerical support in the MHCB is provided by an Office Technician, who reports to the Clinical Director, and a Medical Transcriber, who is placed in the institutional transcriber pool and reports to the pool's Supervising Medical Transcriber.

L. **UNIT HEALTH RECORDS**

1. Confidentiality

   Mental health records generally have a higher standard of confidentiality than other medical records. All staff with possible access to such records shall sign an oath of confidentiality to keep any information they learn from the records strictly confidential (CCR, Title XXII, Section 79807).

2. Access

   All MHCB clinicians and nursing staff must have access to the inmate-patient's records 24 hours per day. Records shall be brought as needed from the records storage area, kept in the MHCB treatment area or clinician offices while needed, and returned to the storage area when no longer needed. If records are required outside the MHCB treatment area or clinician's offices, the records shall be hand carried by escorting staff and returned to the MHCB with escorting staff as soon as the outside business is completed (CCR, Title XXII, Section 79807).

3. The Clinical Director shall:

   a. Ensure the History and Physical is transcribed and delivered to the MHCB as soon as possible.

   b. Ensure that previous medical records are provided to the MHCB [Title XXII, Section 79803 (d)].

**2009 REVISION**                                                    12-5-34

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

**M. <u>MENTAL HEALTH QUALITY MANAGEMENT SYSTEM</u>**

Ongoing assessment of the quality of clinical services will follow the Mental Health Quality Management System procedures.

# CHAPTER 10
## Suicide Prevention and Response

### A. <u>INTRODUCTION</u>

It is the goal of the California Department of Corrections and Rehabilitation (CDCR) Suicide Prevention and Response Focused Improvement Team (SPR FIT) to prevent inmate deaths due to suicide.  Suicide is defined as an intentional self-injurious behavior that causes or leads to one's own death.  CDCR recognizes that prevention of suicide involves a team effort by every employee regardless of professional discipline or job title.

To accomplish this goal, each institution shall implement CDCR Division of Correctional Health Care Services (DCHCS) policies, described herein, regarding suicide prevention and response, via written operating procedures.  The purpose of the policies is to:

- Establish standards of intervention and care

- Establish ongoing education and training for clinical, custodial, and administrative staff.

- Provide instructions and guidance for establishment and maintenance of the SPR FIT.

- Review suicide deaths regarding systems issues, clinical care issues, and custody response.

- Ensure that quality improvement (also known as corrective action) plans are drafted and implemented, when indicated, to reduce the incidence of preventable suicides, improve the delivery of quality care, improve the involvement of non-healthcare staff, and contribute to the ongoing education and training.

This chapter of the Mental Health Services Delivery System (MHSDS) Program Guide is divided into the following subsections:

**B.  Suicide Prevention and Response Project**

**C.  Training for Staff**

**D.  Clinical Care Services**

    1.  Suicide Risk Assessment

---

EX. 2-77

| Suicide Prevention and Response | Mental Health Services Delivery System |
|---|---|

2.   Interventions for Suicidal Ideation and Threats, Self-Injurious Behaviors and Suicide Attempts

    a.   Procedures for Suicide Precautions

    b.   Procedures for Suicide Watch

    c.   Response to Self-Injurious Behaviors and Suicide Attempts

**E.   Suicide Reporting**

**F.   Suicide Death Review**

**G.   Mental Health Evaluation Component for a Rules Violation Report**

**B. <u>SUICIDE PREVENTION AND RESPONSE PROJECT</u>**

*Policy*

<u>CDCR DCHCS</u>

The CDCR DCHCS Quality Management Committee (QMC) shall maintain a DCHCS Mental Health Program (MHP) Subcommittee that provides oversight to and coordination of the statewide mental health program to achieve statewide strategic objectives.  The DCHCS MHP Subcommittee shall plan, develop, manage and improve timely access to and effectiveness of clinical services related to the mental health program.  The DCHCS MHP Subcommittee shall also cooperate with, and respond in a timely manner to, any requests from the DCHCS Emergency Response & Death Review (ERDR) Subcommittee following a suicide.

The DCHCS MHP Subcommittee shall establish and maintain a statewide SPR FIT.  The DCHCS MHP Subcommittee shall appoint a DCHCS SPR FIT Coordinator.  The Coordinator shall be a licensed physician, psychologist, social worker, nurse practitioner, or registered nurse (RN).

<u>Local Institutions</u>

Each Local QMC shall maintain a Local MHP Subcommittee that provides oversight to and coordination of the local mental health program to achieve statewide strategic objectives.  Each Local MHP Subcommittee shall plan, develop, manage and improve timely access to and effectiveness of clinical services related to the mental health program.  Each Local MHP Subcommittee shall also cooperate with, and respond in a timely manner to, any requests from the Local ERDR Subcommittee following a suicide.

**2009 REVISION**                                                                                                          12-10-2

**Suicide Prevention and Response          Mental Health Services Delivery System**

Each Local MHP Subcommittee shall establish and maintain a Local SPR FIT.  Each Local MHP Subcommittee shall appoint a Local SPR FIT Coordinator.  The Coordinator shall be a licensed physician, psychologist, social worker, nurse practitioner, or RN.

### *Purpose*

The DCHCS SPR FIT and each Local SPR FIT shall provide employees with training and guidance with regard to suicide prevention, response, reporting, and review for the purpose of reducing the risk of inmate suicides.

### *Procedure*

1.  **Reporting Relationships**

    The DCHCS SPR FIT shall:

    - Send a management report, at least once a month, to the DCHCS MHP Subcommittee.
    - Receive formal communication, at least once a month, from the DCHCS MHP Subcommittee.
    - Each local SPR FIT shall:
    - Send a management report, at least once a month, to the local MHP Subcommittee.
    - Receive formal communication, at least once a month, from the local MHP Subcommittee.

2.  **Responsibilities**

    a. **The DCHCS SPR FIT shall:**

    1).   Provide oversight and guidance for each Local SPR FIT regarding time sensitive due dates.

    2).   Monitor implementation and compliance with all CDCR policies and procedures relating to suicide prevention and response.

    3).   Provide for the planning, development, and implementation of statewide training, in collaboration with the DCHCS Training Department, regarding the issue of suicide prevention and response.

    4).   Monitor and track all suicides statewide.

    5).   Provide for the selection and dispatch of a mental health suicide reviewer (MHSR) after a suicide occurs.

---

**Suicide Prevention and Response          Mental Health Services Delivery System**

6).    Provide oversight, assistance, coordination, and supervision of MHSR activities and reports.

7).    Track and analyze demographic and clinical information received from the DCHCS ERDR Subcommittee for improving suicide prevention and response processes.

b.    **Each Local SPR FIT shall:**

1).    Ensure implementation and compliance with all CDCR policies and procedures, relating to suicide prevention and response, at their institution.

2).    Be responsible for updating local operating procedures (LOP) to ensure consistency with DCHCS policies regarding suicide prevention and response. The institution's Suicide Prevention and Response LOP shall be updated at least annually and sent to the DCHCS through the standard Quality Management process for review and approval.

3).    Implement training, in collaboration with the local In-Service Training (IST) unit, regarding the issue of suicide prevention and response.

4).    Review Suicide Watch and precaution procedures, including use of video cameras (used as a supplement to direct visual observation), to ensure they are being carried out consistent with operating procedures.

5).    Work with the Local ERDR Subcommittee to review all suicides and those suicide attempts, in which Cardiopulmonary Resuscitation (CPR) and/or other medical procedures were performed, as well as custody cell entry and cut-down procedures.

6).    Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths.  Monitoring and tracking of suicide attempts should include a review of the appropriateness of treatment plans and five-day follow-ups.

7).    Review and track all 5-day clinical follow-up treatment plans and custody wellness check procedures. The Mental Health Tracking System (MHTS) shall be used to track all clinical five-day follow-ups.

8).    Ensure all required documentation for suicide death reporting is forwarded to DCHCS in adherence with time-sensitive due dates.

9).    Provide assistance for the activities of the visiting MHSR.

10).    Provide oversight for the implementation of DCHCS-issued quality improvement plans (QIP) with input and assistance from the Local MHP and Local ERDR Subcommittees.

**Suicide Prevention and Response          Mental Health Services Delivery System**

3. **SPR FIT Membership**

DCHCS shall include:
- SPR FIT Coordinator (Chairperson)
- Chief Psychiatrist
- Chief Psychologist
- Nurse Consultant
- Designated Facility Captain

Local shall include:
- SPR FIT Coordinator (Chairperson)
- Chief Psychiatrist*
- Chief Psychologist*
- Supervising RN
- Sr. Licensed Psychiatric Technician (LPT) or LPT (preferably from Administrative Segregated Unit (ASU)
- Health Program Coordinator
- Correctional Health Services Administrator
- DMH Coordinator

DCHCS may also include, but is not limited to:
- Senior Psychiatrist
- Senior Psychologist
- Administrative/Clerical Support

- Analyst Support

Local may also include, but is not limited to:
- Senior Psychiatrist
- Senior Psychologists
- Staff Psychiatrist: Mental Health Crisis Bed (MHCB)/Outpatient Housing Unit (OHU)
- Staff Psychologist: MHCB/OHU
- Standards and Compliance Coordinator
- Litigation Coordinator
- Facility Captain
- ASU Lieutenant/Sergeant
- Reception Center Lieutenant/Sergeant
- Classification and Parole Representative
- In Service Training Lieutenant
- Administrative/Clerical Support
- Keyhea Coordinator

*Senior Psychiatrist/Senior Psychologist attendance shall meet quorum requirement in institutions without Chief Psychiatrist/Chief Psychologist positions.

4. **Frequency of Meetings**

The DCHCS SPR FIT shall meet at least, but is not limited to, once a month.

**2009 REVISION**                                                                12-10-5

| Suicide Prevention and Response | Mental Health Services Delivery System |
|---|---|

Each Local SPR FIT shall meet at least, but is not limited to, once a month.

**5. Attendance Requirements**

A quorum consists of the above listed mandatory members.

**6. Management Reports**

The DCHCS SPR FIT shall submit a complete, standardized management report to the DCHCS MHP Subcommittee by the 5th day of each month.

Each Local SPR FIT shall submit a complete, standardized management report to the Local MHP Subcommittee by the 5th day of each month.

## C. TRAINING FOR STAFF

*Definitions*

| | |
|---|---|
| Suicidal ideation: | Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing suicide or the passive desire to be dead. |
| Suicidal intent: | The intention to deliberately end one's own life. |
| Self-injurious behavior: | A behavior that causes, or is likely to cause, physical self-injury. |
| Self-mutilation: | An intentional self-injurious behavior without suicidal intent. The purpose of the behavior may be to gain attention, relieve stress, or experience pain. Self-mutilation can result in serious injury or accidental death. |
| Suicide gesture: | An intentional self-injurious behavior, accompanied by suicidal ideation and/or intent, which is unlikely to cause death. The purpose of the behavior may be to gain attention and/or experiment with the possibility of suicide. Suicide gestures may indicate increased suicide risk. |
| Suicide attempt: | An intentional self-injurious behavior, which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury. |
| Suicide: | An intentional self-injurious behavior that causes or leads to one's own death. |

All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually. Suicide Prevention and

| | |
|---|---|
| **Suicide Prevention and Response** | **Mental Health Services Delivery System** |

Response training shall be part of the new employee orientation provided by mental health staff in collaboration with the IST unit at each local institution.  New correctional officers shall receive this training at the Basic Correctional Officer Academy.

The suicide prevention and response training shall include the following elements:

- Suicide risk assessment

- Suicide methods awareness

- Interventions for suicidal ideation, threats, gestures, and attempts

- Suicide reporting and reviews

- Mental health evaluations for rules violation reports

Clinical and custody staff shall receive specialized training with respect to their particular roles in responding to self-injurious behaviors, suicide attempts, and suicides.

## D. CLINICAL CARE SERVICES

This subsection addresses the various clinical care services for inmates regarding suicide prevention and response.  Included are the assessment of risk for suicide, the utilization of a form for documenting the risk factors, and clinical interventions such as procedures for Suicide Precaution and Suicide Watch, and responses to suicide attempts and to suicide. Education regarding the methods utilized by inmates when attempting suicide shall be taught as part of the suicide prevention and response training.

Employee strategies for maintaining a safe environment, and for ensuring that other policies and procedures relative to suicide prevention and response, such as regarding medication distribution and inmate-patient compliance, are detailed in the relevant chapters and sections of the complete Health Care Department Operations Manual.

**Any CDCR employee who becomes aware of an inmate's current suicidal ideation, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff.  The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation.**

1. **Suicide Risk Assessment**

    All inmates are observed for suicide risk.  Suicide risk assessment is critical to successful suicide prevention.  Inmate-patients enrolled in the MHSDS shall be regularly monitored

---

**Suicide Prevention and Response          Mental Health Services Delivery System**

for risk of suicide as clinically appropriate.  When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by utilizing the CDCR standardized Suicide Risk Assessment Checklist (SRAC) and by clinician notation in the Unit Health Record (UHR).  When an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRAC, instead of completing a new SRAC.

**These clinicians shall be trained to perform a suicide risk assessment and complete the SRAC:**

- psychiatrists
- psychologists
- clinical social workers
- primary care physicians
- nurse practitioners
- RNs

This shall occur during the specialized training provided for clinical staff who are receiving either the new employee orientation or completing the required annual training module, or when determined necessary by supervisory and/or management staff.

When a primary clinician is scheduled to be available on-site, he or she shall be responsible for completing a SRAC.  When a mental health clinician is not available, any other staff member who has been trained by CDCR in suicide risk assessment may complete the SRAC.

A RN completing the SRAC shall collect data related to suicide risk and protective factors and refer the patient and data collected to a mental health clinician for further evaluation to determine level of risk.

**At a minimum, a written suicide risk assessment using a SRAC shall be completed:**

- Every time an inmate has an initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRAC.

- By the referring clinician prior to placement of an inmate-patient into an OHU for continued suicide risk assessment or into a MHCB for suicidal ideation, threats, or attempt.

- After hours, on weekends and holidays, on call clinicians shall conduct a face-to-face assessment of suicide risk prior to releasing an inmate to any housing without suicide watch or precaution.

**2009 REVISION**                                                                          12-10-8

| Suicide Prevention and Response | Mental Health Services Delivery System |

- After hours, on weekends and holidays, when the referring clinician has not completed an SRAC, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB.

- By the associated Interdisciplinary Treatment Team (IDTT) and/or clinician for all inmate-patients placed into an OHU, for mental health reasons, or MHCB, for any reason, upon decision to release or discharge.

- Subsequent to release from an OHU placement that was for the purpose of continued suicide risk assessment, or a MHCB placement for the reason of suicidal ideation, threats, or attempts, at a minimum of every 90 days for a twelve month period, by a mental health clinician.

- Within 72 hours of return from a Department of Mental Health (DMH) facility, or within 24 hours if clinically indicated based on new arrival screening.

- Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.

- Pursuant to Department Operating Manual (DOM), Article 41, Prison Rape Elimination Act Policy, for victims of sexual assault, within four hours after the required sexual assault forensic examination.

**The clinician shall use the SRAC when documenting a suicide risk assessment, in addition to making a notation in the UHR.  At a minimum, the following categories shall be used to assess potential risk:**

a.  Static Risk Factors (unchanging, historical):

- Ethnicity

- History of lewd and lascivious acts with a child and/or killed a child

- History of violence

- History of substance abuse

- Suicide ideation and/or threats in past (when and method)

- Previous suicide attempts (when and method)

- Family history of suicide

- History of mental illness with Axis I diagnosis

- High profile case

**Suicide Prevention and Response          Mental Health Services Delivery System**

    b.   Slowly Changing Risk Factors (long-term risk factors):

- First prison term
- Long or life sentence; three strikes
- History of poor impulse control and/or poor coping skills
- Early in prison term
- Known new court proceedings and/or disciplinary actions
- Current term in ASU, Security Housing Unit, or Psychiatric Services Unit
- Level IV custody score
- Chronic, serious or terminal illness

    c.   Dynamic Risk Factors (short-term risk factors that require ongoing assessment):

- Recent suicidal ideation - acute or chronic
- Recent rejection and/or loss
- Recent release from psychiatric hospital
- Single-cell placement
- Sudden calm following ideation or attempt
- Significant current impulsivity
- Anxious and/or agitated and/or fearful
- Recent suicide attempt or self-injury
- Disturbance of mood (depression or mania)
- Well-planned, highly lethal, attempt or ideation
- Unstable or labile affect
- Hoarding and/or cheeking medication
- Current insomnia and/or poor appetite
- Poor compliance with treatment and/or medication
- Lack of perceived support system
- Recent trauma and/or threat to self-esteem
- Hopelessness and/or helplessness
- Recently assaultive or violent
- Feelings of guilt and/or worthlessness
- Pre-death behavior: note, gives things away
- Fearful for safety
- Disclosure of adverse court hearings
- Anniversary of important loss

---

**2009 REVISION**                                                                                    **12-10-10**

| **Suicide Prevention and Response** | **Mental Health Services Delivery System** |

d.   Protective Factors:

- Family support
- Children at home
- Religious support
- Spousal support
- Supportive friends
- Helping others

- Adequate insight
- Realistic life plan
- Exercises regularly
- Group activities
- Job assignment
- Other noted protective factors

Clinicians shall utilize their best clinical judgment and make a summary of the relative risk for suicide via an appropriate descriptor, such as "No apparent significant risk, Low Risk, Moderate Risk, High Risk, or Conditional Risk" based on a combination of the above factors, an interview of the inmate, and all other relevant information available to them.  Peer consultation is encouraged when information collected for making a suicide risk assessment is ambiguous.  The clinician shall then make a recommendation regarding the appropriate level of care required.  They shall document their summary, recommendations, and plan on the SRAC and with appropriate notation in UHR. Treatment recommendations should be as specific as possible, leaving as little room as possible for misinterpretation or confusion.  A brief rationale for each recommendation shall be provided.  They shall also address how the treatment plan will be implemented and any required follow-up procedures.

Peer Consultation

Peer consultation can be one of the most important clinical and legal safeguards a practitioner has at his or her disposal, especially when dealing with ambiguous cases.

Sources of peer consultation include, but are not limited to:

- Other clinical members of an IDTT
- Other colleagues working at the institution
- Clinical supervisors

When evaluating for suicide risk, peer consultation is not always necessary.  However, in those cases where there is clinical uncertainty about ambiguous issues, it can be of benefit for validating or challenging ideas and assumptions.  Another clinician's opinion may also uncover important additional information.  Peer consultation does not absolve a clinician of responsibility for any decision that he or she ultimately makes, nor does it require the