FILED
CLERK, U.S. DISTRICT COURT
09/04/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: DC DEPUTY

CALIFORNIA MENS COLONY
ROBERT R.GOINS BL-8291
P.O.Box 8101
San luis Obispo,Ca.93409

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| ROBERT GOINS, )<br>Plaintiff, )<br>v. )<br>E.Kranz,et.al., )<br>Defendants. ) | Case No.: 25-cv-02168-SB-ACCV<br><br>Plaintiffs Memorandum OF Points and Authorities In Support Of Plaintiffs Opposition To:Defendants Motion For Summary Judgement |

I. JUDGE:THE HONORABLE ANGELA CATHERINE CLAIRE VIRAMONTES

ACTION FILED: MARCH 10TH,2025

II.

## INTRODUCTION

Plaintiff R.Goins,a inmate proceeding pro se,submits this action in opposition to Defendants E.Kranz;and E.Heidlers';motion to dismiss Plaintiffs 42 U.S.C. 1983 'Prisoner Complaint'.

On March 26th,2023;Plaintiff Goins was experiencing suicidal ideation and alerted custody of his need to speak with mental health personnel at the Restrictive Housing Unit,located at the California Nens Colony.[ECF 1[]

Initaially,upon arriving at the RHU Defendant Senior Supervisor E.Heidler determined Plaintiff needed an higher level of care after interviewing the Plaintiff on January 2023.Defendant Heidler referred the Plaintiff to the mental health crisis bed facility at C.M.C.

It was then determineed that the Plaintiff would be given an higher level of care and placed into the Enhanced Outpatient Program,after meeting with the Inter-Disciplinary Treatment Team.

While being housed at the E.O.P. level of care facility on March 26th,2023;Plaintiff became overwhelmed from the more than two months of being housed at the RHU.

Then,Plaintiff received news that his son was severely injured at school,and needed emergency medical treatment from the injuries. [ECF 1]

Evenmore,Plaintiffs prescribed medication 'Naltrexone' includes a rare side effect of suicidal behaviors.Plaintiff suffers from Severe Alcohol use disorder,and was given this medication in an effort to address this addiction.[ECF 1]

Defendant E.Kranz was notified on March 26,2023;that the Plaintiff required 'Crisis Intervention'by Correctioaal Officer J.Rizzo. Upon arriving at the RHU Defendant E.Kranz,it appears was pre-disposed to deny the Plaintiff 'Crisis Intervention'.Defendant E. Kranzwa totally unaware the Plaintiff suffered from'Major Depress-ve Disorder'.This failure violates 'Crisis Intervention'protocols. Defendant was required to reveiw the Plaintiffs mental health care file before the 'Crisis Intervention'interveiw took place on 3/26/2023. [Ex.A]

Defendant E.Kranz,was required to determine if the Plaintiff had 'any previous CIT contacts'.This reqirement would have alerted the Defendant Kranz that the Plaintiff R.Goins suffers from'Major Depressive Disorder Severe'.This disorder accounts for the majority of all suicides for AD-Seg. inmates.[AGO 3538;Ex.I]

Plaintiffs feelings of hopelessness is congruent with the Plaintiffs diagnosis.

However,Defendant Kranz minimized the Plaintiffs suicidal ideations in effect denied the Plaintiff 'Crisis Intervention';on 3/26/2023. Then,the following day after the Plaintiffs suicide attempt the Defendant E.Kranz,apologized for his conduct on the previous day and asked the Plaintiff if they 'could start over' from their previous interaction.Plaintiff believed that the Defendant regreted returning the Plaintiff to his assigned housing unit after the Plaintiff explained that he would harm himself if no one was willing to address his suicidal ideations.

Plaintiff was mistaken,Defendant E.Kranz filed an inherently false report concerning the Plaintiff suicide attempt on the same day that the incident occured as if the Defendant E.Kranz had personal knowledge of the facts surrounding the Plaintiffs suicide attempt. DefendantE. Kranz determined the Plaintiff suffered no injuries from the attempted suicide,dispite the undisputed fact that the Plaintiff sustained a 'stretch' injury from the attempted suicide. It appears as if the Defendant E.Kranz attempted to cover-up the fact that the Defendant denied the Plaintiff 'Crisis Intervention' on 3/26/2023.Defendant chose to minimize the Plaintiffs crisis in order to justify returning the Plaintiff back to his assigned housing unit after the Plaintiff explained that he would harm himself.This fact is most glaringly apparent by the submission of the false 'Mental Health Documentation Report' by'Kranz,Eugene Licensed Psychologist(3/26/2023 @ 20:03 PDT)';at the California Mens Colony.[see Plaintiffs 'Renewed Request for the Limited Purpose of Cousel;Exhibits' :Specialty Consult Physical Therpy Treatment Reports 1/4;2/4;3/4;stating "I/P attempted suicide on 3/26/2023 by hanging. Subsequently I/P has had numbness w/pin-and-needles in the posterior neck area...."]

Finally,Defendant E.Kranz was effectively thrown under the proverbial bus when the Defendants conceded that the Defendant E.Kranz should be made to answer to the Plaintiffs Eighth Amendment claim during their motion to dismiss under Federal Rule of Civil Procedure 12(b)(6);Failure to state a claim.

The Central District Court agreed that the Defendant E.Kranz;must answer to the Plaintiffs claim that his right to adequate medical/ mental health care was violated on 3/26/2023;by the Defendant E. Kranz on August 22,2025.[ECF 25]

Defendants concession on this issue militates against their claim and/or position that this Defendant is somehow entitled to Qualified Immunity.

Defendants cannot argue both sides of the same issue.
Plaintiff is unaware of any case law that would entitrle tyhe Defendants to this type of tacticle advantage in this instant proceeding

All parties agree that the Defendant E.Kranz should answer to the Plaintiffs Eighth Amendment Claim.
It is left for a jury to determine if the Plaintiff has proven this claim under the preponderence of evidence standard.
A genuine issue of material fact exists by the Defendants own admissions.[see ECF 16]
Therefore it would be improper at this stage to dismiss the Plainffs Prisoner Complaint under 42 U.S.C. 1983;while these facts are at issue.

Defendants motion for summary judgement should be denied in its entirety.

III. STATEMENT OF DISPUTED FACTS

Defendants position through out these proceedings has been that the Plaintiffs suicide attempt was staged.However,Defendants have repeatedly failed to define a 'suicide attempt' for the court in these proceedings.

Plaintiff therefore submits the following in an effort to assist the CENTRAL DISTRICT COURT in determining the matter.

According to the California Department of Corrections and Rehabilitation '2022Annual Report on Suicides and Suicide Prevention Efforts in the CDCR(AGO 3520)'a suicide attempt is defind as follows:'an

> intentional self-injurious behavior which is apparently designed to ends ones life and may requireð medical and/or custody intervention to reduce the likelihood of death or serious injury......'[Exhibit B;Report on Suicides]

Then the report defines suicidal ideation for the court by defining 'suicidal ideation:'Thoughts of suicide or death,which can be

> specific or vague,and can include active thoughts of committing suicide or the passive desire to be dead......'(AGO 3520)

Defendants submitted Exhibits 1 and two in support of their motion for summary judgement[ECF 79pgs. 2-11(ex.1)and ECF 80 pgs.3-89]; absolutely not once does the Defendant attempt to define the forgoing terms which represent the central issues as they are presented for the Honorable Central District Court to determine. Defendants could have done so but it appears as if they only intended for the Central District to take their word that the Plaintiffs suicide attempt was staged,without any substaintiating evidence in support of this misrepresentation of the facts.

Furthermore the Central District Court is under no obligation to defer to the determination of the Defendant Eugene Kranz,when this Defendant has repeatedly failed to offer any evidence in support of the determination this Defendant arrived at on 3/26/2023. Defendant E.Kranzs' position rests on the false claim that the Plaintiff R. Goins did not suffer any injury following his suicide attempt therefore the attempt was staged.[see Ex.H:MHDocument] Nevertheless, Plaintiff has submitted evidence that he did in fact suffer injury,tyhis evidence would necessarily suport the Plaintiffs position that the Defendant minimized the Plaintiffs issues.[Ex.J]

On October 13th,2025;Defendant E.Kranz admits to 'reading' that the Plaintiffs suicide attempt was staged.[see ECF 34 pg.5;øpara. 32;in response to Plaintiffs com,plaint at paragraph 22;ECF 1] However not once does the DEfendant offer proof that this reding even exists.The court is therefore left to take the Defendants word for it,and that somewhere there exists some type of report that states that the Plaintiffs suicide attempt was staged.

The Honorable Central District Court should not adopt the Defendants version of the events of 3/26/2023;without any ewvidence to support the Defendants position.

Defendants have had multiple opportunities to offer evidence surrounding the Plaointiffs Eighth Amendment Claim and to dispute the facts as they are presented in the Plaintiffs initial complaint and have repeatedly failed to do so.

Defendants motion for summary judgement has failed to offer any substantial proof of its position surrounding the Plaintiffs suicide attempt on March 26th,2023;at theResticted Housing Unit at the California Mens Colony.

It would be improper to grant the Defendants motion for summary judgement when these factors are present in the instant matter.

Evenmore,Defendant E.Kranz had no personal knowledge of the events suroundin the Plaintiffs suicide attempt and yet on 3/26/2023;this Defendant submitted a 'Mental Health Documentation Report'as if it were being written based on personal knowlege and/or observation.[see ECF 78-3 pg.23 of 31 thru 28 of 31]

This report was written in violation of Title 15 section 3999.330 (e);and cannot be relied on as proof due to its inherent falsity.

Finally,it cannot be disputed that thePlaintiff is entitled to adequate mental health treatment while under the jurisdiction of the California Department of Corrections and Rehabilitation. This right was denied to the Plaintiff R.Goins while under the jureisdiction of CDCR,at the California Mens Col,ony.In violation of the Plaintiffs Federal Constitutional Rights to be Free of Cruel and Unusual Punishment.



PBSP 2022

Defendant Elizabeth Heidler Senior Supervisor Psychologist;cannot be said to escape liability on the issues complained about in the Plaintiffs initail petition,filed on March 10tyh,2025.[ECF 1] Defendant Heidler had the authority to order corretive action if it were determined that subordinate employees were in fact jeopardizing inmates constitutional rights while being housed at the Restrictive Housing Unit at the California Mens Colony.

RHU inmates made the Defendant E.Heidler aware that the Defendant E.Kranz would often deny RHU inmates crisis intervention if they were experiencing suicidal ideation.

Inmate J.Riggs,ES-7337;declared on March 7th,2025;that the Defendant E.Heidler was made aware of the Defendants misconduct as it were concerning Crisis Intervention.[see ECF 1;alsoExhibit C:herein] then see[Exhibit D:Plaintiffs Request for Admissions no.10:'Admit that you Defendant E.Heidler,knew that RHU inmates complained about Defendant E.Kranz'

Defendants Response:'Defendant admits that she knew incarcerated persons submitted a formal complaint or grievance about Kranz's provision of mental healthcare....']

The risk to the Plaintiffs health and safety were in fact known to the Defendant E.Heidler and the Defendant did nothing to abate the risk,the harm to the Plaintiff was forseeable based on the known case factors surounding the Plaintiffs incarceration.

It has been clearly established within the mental health program that 84% percent of inmates with violenty offenses are more likely to commit suicide.Then the fact that the Plaintiff is housed at a level three institution increases the likelyhood that the Plaintffs suicide ideations could lead to an suicide while being housed at the RHU facility at the California Mens Colony.[ex.B]

The Defendants should be made to answer to the constitutional violations complained about heretofore and its motion for summary judgement should be deied.



PBSP 2022

IV.

## LEGAL STANDARD

A.) Initially,the Central District Court must review the Plaintiffs pleadings liberrally and afford the Plaintiff the benefit of the doubt.[Erickson v.Pardus,551 U.S. 89,94(2007)

Defendants have submitted a(n) 'Affirmative Defense' for Qualified Immunity based primarily on the false premise that the Plaintiff Robert Goins mental health crisis,on March 26th,2023; did not rise to the level of intervention based on the Defendants determination that:'.......IP was VAGE about "stressors"...

> except that he was "mentally exhausted" from being in ASU.....'(excerpt from ECF 75,pg ID #417)

Upon scrutiny the Central District Court should determine that the Defendants conclusion was in error.

Plaintiff Goins is entitled to adquate mental healthcare while under the jurisdiction of the California Department of Corrections and Rehabilitation.

Furthermore,the Federal Constitution Prohibits 'Cruel and Unusual Punishment' under the Eighth Amendment.

Plaintiffs constitutional rights have been clearly established on this issue.[see Coleman v Wilson,1282-1316,912 F.Supp.Eastern Dist. Cal.(1995) *at 1315 stating:"Plaintiffs consist of a

> group of inmates who have serious mental disorders, it is undisputed that failure to provide treatment for these disorders could result in further significant injury or the unnecessary and wanton infliction of pain.. it is apparent that due to a systematic failure to provide adequate mental health care thousands of class members suffer present injury and are threatened with great injury in the future......."

Defendants very own documentation demonstrates that the Plaintiff explained in clear concise detail his feelings of hopelessness.

[see ecerpt from ECF 75,pg.ID #416:'I heard bad news about my

> son today....but also I've been here for two and (a) half months and I'm mentally exhausted...I'm thinking about wrapping a sheet around my neck'

Even still the Defendant concluded that the 'IP was VAGE' about stressors.

Defendant E.Kranz deliberately failed to follow 'Crisis Intervention' check list policy.Which requires that the Defendant review the Plaintiffs 'mental health history in EHRS,including any previous CIT contacts...'[see Exhibit A:CIT Review Checklist] This inquiry would have alerted the Defendant to the poignant fact that the Plaintiffs diagnosis included:'Major Depressive Disorder Severe';this diagnosis accounts for the majority of all suicides within CDCR.It should also be noted that CDCR has determined that '...extended stays(greater than 30 days) can also lead to a deterioration of an individual's mental well being...' (AGO 3530;herein)[EX.B]

Plaintiff R.Goins was able to determine on discovery proceedings at 'Request for Admission No.6;Defendant Kranz was totally unaware that the Plaintiff had been diagnosed with'Major Depressive Disorder Severe';during the Crisis Intervention Interview.[see Ex.C; herein]

The Defendant E.Kranz seems to relie heavily on the Plaintiffs prior encounters with mental health care personnel;(refer to Def. MTN.Summ. JUDG. ECF 76-2,ID #456;457) This may be another disingenuous act by the Defendant E.Kranz to appear diligent and responsible as this Defendant totally disregarded the risks to the Plaintiffs health and safety on March 26th,2023;during the Plaintiffs Crisis Intervention and on Summary Judgement.

Defendant E.Heidler admits that she was aware of thePlaintiffs 'Major Depressive Disorder Severe' on 1/10/2023;during the Defendants Crisis Intervention Interview.[see ExhibitD;herein]

Defendant E.Kranz was required to review any and all previous Crisis Interventions for the Plaintiff prior to interviewing the Plaintiff on 3/26/2023;at the RHU facility and it is obvious that the Defendant failed to even afford the Plaintiff this most basic of mental health protocol before arbitrarily dening the Plaintiff Crisis Intervention.[see ECF 1]

Defendants conduct may have risen to the level of incompetence the Cenral District Court is therefore able to deny the Defendants "Affirmative Defense" on the grounds for Qualified Immunity.



PLSP 2022

Defendant E.Kranz was required to place the Plaintiff into the Alternative Housing Facility located on D Facility at Housing Unit 7;as an precuational measure until it could be determined if the Pliantiff needed Crisis Bed housing and the Defendant failed in this duty to the Plaintiff as a result Plaintiff suffered injuries through and by self injuriuous behavior as predicted by the Coleman Court more than 30 years prior to this proceeding.[at pg. IV.Legal Standard [10](herein)

The Central District Court should also be aware that the common practice at the California Mens Colony is that an inmate who presents suicidal ideations they are routinely housed overnight at the Alternative Housing Unit.[Exhibit F:Memo 12/12/2012] Plaintiff R.Goins is/was aware of this practice,it should be noted that the Plaintiff had noexpectation of being sent immediately to theC.M.C. crisis bed facility on 3/26/2023.

Any argument by the Defendants that the Plaintiff Goins had intent on being sent to the Mental Health Crisis is misleading and made to confuse the issues.[see Plaintiffs Declaration;herein] Defendants own exhibits show that the Plaintiff was given 'Naltre-xone',this medication has a rare side effect that increases Cognitive Suicidal Behaviors.Soon after the Plaintiffs attempted suicide this medication was discontinued for the Plaintiff.[see Exhibit E:ECF 75,pg.#396]

The Central District Court should also be aware that the Plaintiffs constitutional right to adequte mental health care have/has been found to be constitutionally infirm violating the Plaintiffs Eighth Amendment Right against cruel and Unusual Punishment.The California Department of Corrections is under Receivership for already being in violation of the Plaintiffs constitutional right to adequate medical/mental health care.[Coleman supra. at*1308; id.at*HN26] then[seeBrown v Plata,563 U.S.493,at* 506]

There exisits a genuine issue of material facts surounding the incident that occured on 3/26/2023;at the RHU facility,located at the California Mens Colony.It is improper to grant the Defendants motion on the grounds stated for Qualified Immunity.



PBSP 2022

The Central District Court should look to the ruling by thecourt in 'Harlow v. Fitzgerald,457,U.S. 800(1982) holding:'Qualified Imunity is defeated if an official 'knew or reasonalbly should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the Plaintiff,or if he took the action with the malicious intent to cause deprivation of con stitutional rights or other injury....(Harlow at*457 U.S. 815)'

'If the law was/is clearly established the immunity defense ordinarily should fail,since a reasonably competent public official should know the law governing his conduct....(Harlow at*457 U.S. 819)'

Furthermore,the Central District Court should draw all reasonable inferences in the non-moving parties favor;'Anderson vLiberty Lobby,INC.477 U.S.242,247--48;at*255.'

see also 'Jones v Blanas,393 f.3d 918,923(9th cir. 2004):

'Evidence where the Plaintiff is pro se the court must consider as evidence in his opposition to Summary Judgement all of Plaintiffs contentions offered in motions and pleadings,where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence and where Plaintiff attested under penalty of perjury that the contents of the motions or pleadings are true and correct.....'[at Jones* 923]'

B.) Defendants submits that the Plaintiffs suicide attempt was not credible.[ECf 76-2 ID #466'at*II.]

Plaintiff R.Goins was given the medication 'Naltrexone'for his alchol use disorder severe dependence[see ECF 75,pg.#396] Defendant was keenly aware that the Plaintiff had this diagnosis [see ECF 75,pg. #420];Defendant documented this fact on 3/26/2023.

The medication 'Naltrexone' oral Tablet 50 mg-100 mg includes anadverse effects that exacerbates depression,suicidal ideations, and an increase risk of suicide.[see Exhibit G:CCHCS Care Guide] This evidence would support the Plaintiffs 'Prisoner Complaint'at ECF 1;and create an issue for a jury to decide Summary Judgement should be denied.

The Northern District Court declared in the matter:Reyes v. Horel, 2012 U.S. Dist. Ct. Northern Dist. Lexis 30787,*at HN4:'.....

> at the summary judgement stage,the court must view the evidence in the light most favorable to the non- moving party.If evidence produced by the non-moving party conflicts with evidence produced by the moving party the court must assume the truth of the evidence set forth by the non-moving party with respect to that fact....'

Plaintiff was denied crisis intervention on 3/26/2023;while being housed at the RHU facility located at the California Mens Colony. Defendant Eugene Kranz was deliberately indifferent to a known risk to the Plaintiffs health and safety.Defendant failed to abate the risk to the Plaintiffs health and safety,the harm to the Plain tiff was forseeable.Defendant Eugene Kranz recklessly denied the Plaintiff Robert Goins suicidal prevention protocols and incited the Plaintiff to follow through on the suicidal ideations he was experiencing on March 26th,2023;at the RHU facility,located at the California mens colony.

Defendant Eugene Kranzs' reckless conduct violated Plaintiffs constitutional right to be 'Free of Cruel and Unusual Punishment' while under the jurisdiction of the California Department of Corrections and Rehabilitation;at the CaliforniMens Colony Defendant Eugene Kranz then attempted to cover-up his malfeasance and filed false reports to justify the misconduct complained about heretofore.[see Exhibit J:AGO 84,*86;treatment documentations]

The egregiousness of the Defendant Eugene Kranzs' malfeasance is most glaringly apparent by the failure to adequatly document its position that the Plaintiff suicide attempt was staged.At no time did the Defendant submit a Serious Rules Violation Report against the Plaintiff for violating 'TITLE 15 section3315(2)(W):'Self Mutilation or Attempted Suicide for the purpose of manipulation. [IMPRESSION MANAGEMENT HIS TERMINOLOGY].This ommission is fatal on Summary Judgement.

C.) Defendants Have Not Established The Absence Of a Genuine Dispute Of Material Fact For Summary Judgement Purposes

The record demonstrates that the Defendant Eugene Kranz recklessly disregarded Plaintiffs obvious suicide risk.Plaintiff has submitted admissible evidence specifically informed the Defendant that he was experiencing decompensation from the lengthly stay at the Restrictive Housing unit,and related to the Defendant of his desire to harm himself by 'wrapping a sheet around my neck'.Plaintiff also reported:severe depression;mental exhaustion;emotional distress;and recently receiving bad news.

Rather than treating those statements as an psychiatric emergency Defendant Eugene Kranz concluded Plaintiff was manipulating staff.A reasonable jury acting dewligently may conclude that the Defendant consciously disregarded an obvious risk to the Plaintiffs health and safety.

A Crisis Intervention member acting diligently would not have concluded that the Plaintiff was manipulating staff.A Crisis Intervention member acting diligently would have investigated the Plaintiffs mental health history in EHRS,including any previous CIT contacts and learned that the Plaintiffs diagnosis for his alcohol use disorder severe dependance was being treated with 'Naltrexone',which includes a rare side effect of 'suicidal ideation'and behaviors.[see ex.G:AGO 1926]

Soon after the incident on 3/26/2023;Plaintiffs 'Naltrexone' perscription was discontinued as a direct result of the suicide attempt.[see Exhibit K:Progress notes]

A jury acting diligently and given this evidence may return a verdict in the favor of the Plaintiff R.Goins.

A genuine material factual dispute exists on these issues currently before the Central District Court;these disputes cannot be decided on summary judgement.

Defendants motion for summary judgement depends upon accepting Defendants credibility while rejecting the Plaintiffs evidence. It would be improper under rule 56;impermissible.

[see Anderson supra.;'a material fact that might affect the outcome of the suit under governing law constitutes a genuinedispute']

'On summary judgement the opposing party need not establish a material issue of fact conclusively in its favor.It is sufficient that the claimed factual dispute be shown to require a jury..to resolve the parties differing versions of the truth at trial....' [T.W.Electrict Serv.,Inc. v.Pacific Elec. Contractors Ass!n,809 F2d 626,630(9th cir.1987)]

Walls v Cent.Contra Costa Transit Authority,653 F3d 963, 966 (9th cir.2011) declaring:'In evaluating the evidence

to determine whether there is a genuine issue of fact,[the Court] draws all inferences supported by the evidence in favor of the non-moving party...'

The record here taken as a whole could lead a rational trier of fact to find for the Plaintiff R.Goins at trial.

## V. CONCLUSION

DEFEDANT Eugene Kranz had an affirmative duty to address the Plaintiffs self harm ideations on 3/26/2023;at the Restrictive Housing U nit located at the California Mens Colony,and deliberately failed to do so;causing harm that was forseeable after the Plaintiff acted on his suicidal thoughts.

The course of treatment the Defendant chose was unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to the Plaintiff R.Goins health and safety.[see Campbell v Herrera,2025 WL 1525311(9th cir. no.24-3296;2025;*at 1)]

Defendants Kranzs' version of events is blatantly contradicted by the record contained within thePlaintiffs 'Opposition to Defendants Motion for Summary Judgement';the Central District Court should not adopt its version and deny its moving papers in thier entirty.



FBSP 2022

In closing the Plaintiff submits that the Defendants attempts to somehow blame the Plaintiff for engaging in protected conduct should be dismissed as an sophomoric attempt by the Defendants agents to demonstate and/or mount a defense for conduct that is indefensible,reprehensible in its attempt/intent to cause harm;demonstrating a lack of diligence outside the scope of this Defendants chosen profession.Then its agents have the unmitigated gall to petition the court seeking approval to excuse this deliberate misconduct goes beyond the pale in its baseness.

Defendant Eugene Kranzs' motion for summary judgement should therefore be denied in its entirety.

August 26th,2026

RESPECTFULLY SUBMITTED,

EXHibit

AGO 5682
AGO 5683

# A

Docusign Envelope ID: 6D298297-1986-40A9-BC88-FFE140E022DD

# CIT REVIEW CHECKLIST: MENTAL HEALTH

## STEPS

- ✓ Obtain Inmate-Patient's name, CDCR #, location of the CIT
- ✓ Identify type of crisis – SI, DTS, DTO or SIDDMI
- ✓ Review mental health history in EHRS, including any previous CIT contacts; share the information related to these CIT contacts with the rest of the team
- ✓ Review required Adaptive Supports
- ✓ Gather information and collaborate with Nursing and Custody
- ✓ Perform a Mental Status Exam
- ✓ Assess for suicide and homicide, complete SRASHE as required per policy
- ✓ Assess current problem using de-escalation
- ✓ Attempt to resolve the crisis with motivational techniques and problem solving with the support of Nursing and Custody
- ✓ Determine whether or not a referral to Alternative Housing is required for safety
- ✓ When clinically indicated, and for every MHCB referral, contact psychiatry to address clinical considerations related to psychiatric concerns
- ✓ Inquire with the patient if he/she would like to referred to the psychiatrist for urgent or emergent psychiatric medication issues, such as a PRN
- ✓ Complete the required orders and documentation

## REVIEW

- ☐ Discuss case with primary clinician and/or primary psychiatrist for additional info, if possible.

Docusign Envelope ID: 6D298297-1986-40A9-BC88-FFE140E022DD

# CIT REVIEW CHECKLIST: CUSTODY

## TIPS

- ✓ Interview building officers.
- ✓ Consider collateral information from SOMS, ERMS, interviews and other sources.
- ✓ Consider possible non-mental health motivations.
- ✓ Consider specific motivations related to safety concerns.

## REVIEW

- ❑ Sentence length.
- ❑ Commitment offense or new offense.
- ❑ Any relevant observations made by custody staff.
- ❑ Changes in behavior/RVRs.
- ❑ Recent changes in support network (e.g., death in family).
- ❑ Safety/enemy concerns.
- ❑ If in ASU, reason for housing and length of stay.

EXHibit

AGO 3508

AGO 3514 – 3532

# B

California Department of Corrections and Rehabilitation

# 2022 Annual Report on Suicides and Suicide Prevention Efforts in the CDCR

## Executive Summary

In 2022, 128,209 discrete individuals spent at least one night confined in the California Department of Corrections and Rehabilitation (CDCR). Out of that population, 19 individuals died by suicide during their time in confinement. This was an increase from the previous year of 15 deaths by suicide. The 2022 rate is 19.6 suicides per 100,000 inmates.

This report, submitted pursuant to Penal Code Section 2064.1, provides information about suicide prevention initiatives and improvements in suicide prevention efforts made during calendar year 2022. This report describes CDCR's efforts, identifies successes in preventing suicides over the prior calendar year, and includes a section that provides a more in-depth look at notable key trends from the suicide-related deaths that occurred that same year.

Seventeen (89%) of the 19 suicide decedents were patients in the statewide mental health program, and 8 of these decedents had a previous suicide attempt in the community or in CDCR. In 2022, Hispanics had the highest number of suicides with 11 decedents. This is similar to 2021 where Hispanics were the highest number of suicides however differs from 2020 where Caucasians were the highest number of deaths by suicide. The rest of the decedents in 2022 were five Caucasians and three African Americans. The age group with the highest number of deaths by suicide was 25-34 in 2022 and 2020 while 2021 was evenly distributed between age groups 25-34, 35-44, and 45-54 with four in each of those groups. In 2022, there were 12 decedents in Level III or Level IV, 5 decedents in Level I or Level II, and 1 decedent in a Reception Center, consistent with previous years. Additionally, the vast majority of self-harm incidents were non-suicidal, consistent with prior years.

Each suicide in prison is a devastating tragedy that takes a profound toll on family and friends separated from their loved ones by distance and incarceration. Each suicide also significantly impacts staff and other incarcerated people within CDCR. Each and every suicide within CDCR is one too many and must be carefully examined for lessons and insights on how to prevent similar tragedies in the future. For over thirty years, CDCR has dedicated tens of millions of dollars to developing a robust suicide prevention program employing nationally established best practices and a comprehensive system of quality mental health care for patients that few other state correctional systems can match. CDCR provides ***all*** CDCR staff members suicide prevention training every year and ensures all potential first responders to suicides in progress are trained in emergency procedures and lifesaving skills, such as cardiopulmonary resuscitation and basic life support. CDCR offers extensive training to the talented and dedicated mental health clinicians in suicide risk assessment and has systems in place for identifying individuals at risk of suicide and referring them to proper care. CDCR provides special care for individuals who are placed in higher-risk administrative segregation settings and regularly offers individuals suicide prevention information through videos, posters and pamphlets, and institutional suicide prevention events.

Since 1995, the *Coleman* Special Master has monitored CDCR's mental health care system and reports his findings and recommendations to the *Coleman* court. The *Coleman* Special Master's team, referred to as the Office of Special Master (OSM), includes dozens of experts, consultants, and attorneys. Of that team, the Special Master has a subset of experts who provide oversight to CDCR's suicide prevention program. CDCR has implemented numerous recommendations from five separate audit reports by the OSM's suicide prevention expert. CDCR has a comprehensive suicide prevention program in place, which includes suicide risk assessment, safety planning, screenings, and other components. Many of the policies and procedures aimed at suicide prevention and response are compiled in the court-ordered Mental Health Services Delivery System (MHSDS) Program Guide.

The COVID-19 pandemic affected all aspects of medical and mental health care in CDCR. Despite changes necessitated by the COVID-19 emergency, which continued throughout the 2022 calendar year, CDCR's mental health program was able to continue providing services to patients in need of mental health treatment. CDCR worked closely with the *Coleman* parties and the federal Receiver, who oversees the medical operations of CDCR, and is appointed under *Plata v. Newsom*, to develop and implement appropriate policies and procedures related to providing treatment.

This report on suicides that occurred in CDCR during 2022 would be remiss if it did not discuss the fact that there are significant and persistent staffing shortages that plagued many of the prisons in the CDCR system. While it is difficult to determine a direct nexus between staffing shortages and deaths by suicide in CDCR custody, it is important to recognize the impacts of reduced staffing. Provision of clinical care at levels consistent with the MHSDS Program Guide has been challenging at many institutions. As a result of these difficulties, institutions focus their limited clinical staff on the more acute and emergent needs of their programs.

Progress in implementing each of the Penal Code requirements is discussed at length in this report. The following is a summary of the findings:

***Suicide Risk Evaluations***: In 2022, Department clinicians conducted more than 5,000 suicide risk evaluations per month on average, totaling over 60,000 suicide risk evaluations over the course of the year. The monthly average includes 4,900 evaluations completed in compliance with the Program Guide requirements. An additional 1,200 evaluations were completed by clinicians based on clinical judgment and patient's clinical need. Ninety-eight percent of suicide risk evaluations during the year were required by policy (e.g., admissions and discharges from inpatient psychiatric settings, required follow-up evaluations, and others), and the remainder were completed based on clinicians' judgment of clinical need.

Each risk evaluation is a complex clinical task that requires clinicians to make important clinical decisions. According to CDCR's policy, risk evaluations occur whenever an individual expresses suicidal ideation, makes a statement regarding self-harm, or makes a suicide attempt, at a number of key evaluation points, and during known higher-risk times for the patient. To improve the quality of the risk evaluations, CDCR is revising the Suicide Risk Evaluation Mentoring policy and training and has implemented regional oversight to assist in auditing suicide risk evaluations and to provide direct feedback to clinical teams at the institutions.

***Treatment Plans***: In 2022, clinicians completed initial treatment plans for patients within 72 hours of admission to a Mental Health Crisis Bed (MHCB) unit in 98% of the cases. CDCR continues to improve the quality of these plans by ensuring clinical factors associated with individual suicidal risk are incorporated into each patient's treatment, and when indicated, that treatment goals are specifically targeted towards reducing the patient's suicidal risk. CDCR continues its efforts to ensure that the treatment plans meet quality standards set by the Statewide Mental Health Program (SMHP) through improved training and the use of quality improvement tools and audits. Compliance with the Chart Audit Tool (CAT) pass rate fluctuated between 70% and 83%, which is an improvement from the prior year's range of 66% and 73%.

***Training***: CDCR conducts a broad range of suicide prevention and response trainings. By the end of 2022, 91% of employees had completed their annual training. This average reflects high rates of compliance among custody, health care, and mental health staff.

***Court Recommendations Agreed to and Adopted by the Department***: The OSM's initial suicide audit from 2015 included 32 recommendations, three of which have been withdrawn, and 29 of which have been addressed and implemented or which are the subject of current policy development and physical plant

improvements. The OSM's suicide prevention expert has conducted five subsequent re-audits. Each re-audit has raised issues or concerns that CDCR continues to address, and those are described more fully in this report. In the 5th re-audit, which the Court adopted in full on January 5th, 2023, the OSM's expert conducted visits from May 2021 to April 2022. As of December 3, 2020, the *Coleman* court found CDCR to be in compliance with 13 of the initial 29 recommendations and partial compliance with one recommendation. CDCR is currently working with the OSM and the parties to implement the remaining 15 recommendations.

***Next-of-Kin (NOK) Notification***: During 2020, CDCR and the California Correctional Health Care Services (CCHCS) designed a NOK notification system for inmates who engage in suicide attempts, and the system was implemented in April 2021. In June 2022, the Health Care Department Operations Manual (HCDOM) Section 3.1.19, Next of Kin Notification for Death, Serious Illness, or Serious Injury, was published.

***Departmental Initiatives***: In addition to initiatives developed to address Coleman recommendations, CDCR has undertaken numerous suicide prevention projects. CDCR continues to examine serious suicide attempts to learn new ways to improve prevention. CDCR is considering options for how to collect data in different ways that can help identify global trends related to suicide attempts where statewide initiatives may be able to be developed to improve the safety of patients contemplating self-harm. CDCR recognizes the importance of continuously reviewing this data, as it can provide critical information about vulnerabilities in suicide prevention practices.

Many of CDCR's suicide prevention undertakings continued to see progress in 2022. CDCR continued its construction activities to improve the physical conditions in the housing units by adding more suicide-resistant intake cells in Administrative Segregation Units (ASU); CDCR also continued developing and implementing policies essential to the improvement of CDCR's suicide prevention mission, including the NOK notification plan, and implementing the Transitional Help Rehabilitation in a Violence-Free Environment (THRIVE) program in CDCR's two large reception center institutions, and developing initiatives that began in prior years, such as the replacing the safety planning intervention, and updating local suicide prevention programs.

CDCR continues to focus on improving and expanding its suicide prevention practices, including by assessing the effectiveness of its initiatives and monitoring their quality and sustainability. The lessons learned from the suicides that occurred in 2022 are invaluable, and the analyses of these deaths is an essential part of a robust suicide prevention system.

Previous reports in this series proved helpful to CDCR and the State of California in identifying areas of improvement and areas that require more innovative thinking to address the unique needs of those who are most vulnerable.

## Introduction

In the United States (U.S.), 1.2 million suicide attempts were reported in 2020.[1] The number of adult suicides in the U.S. increased by more than 50% between 2000 and 2019, from fewer than 30,000 per year to over 45,000 per year, while the overall U.S. population grew by only 22%. Prior to 2020, the rate of suicides in the U.S. was the highest rate in the country since the 1930s, during the Great Depression.[2] However, in 2020, there was a slight decrease in all adult suicides in the U.S. In 2022, 19 inmates died by

[1] National Institutes of Mental Health: https//nimh.nih.gov/health/statistics/suicide, accessed on 02/16/2023

[2] Drapeau, C. W., & McIntosh, J. L. (for the American Association of Suicidology). (2020). *U.S.A. suicide: 2018 Official final data.* Washington, DC: American Association of Suicidology, dated February 12, 2020, downloaded from http://www.suicidology.org.

suicide in CDCR. This was an increase from the 15 suicides in 2021. By contrast, in 2020, there were 31 deaths by suicide. During the twenty years spanning 2003 through 2022, CDCR averaged 30 suicides per year. The rate of suicide in CDCR during 2022 was 18.5 suicide deaths per 100,000 incarcerated individuals compared to the 15.2 suicide deaths per 100,000 incarcerated individuals in 2021. The U.S. Bureau of Justice Statistics estimates the suicide rate among state prison inmates nationally was 27 per 100,000 in 2019, the most recent data available.[3]

*Figure 1: Graph of Adult Suicide Rates by Sex, 2002-2020**




Data accessed April 4, 2022 from CDC Web-based Injury Statistics Query and Reporting System (WISQARS), https://www.cdc.gov/injury/wisqars/fatal.html

Suicide prevention is a societal and complex public health problem that has frustrated the efforts of federal, state, and local agencies alike. In the U.S., suicide has long been more prevalent in jails than in prisons, and there have been significant increases in the number of suicides in jails in recent years. Among those detained in U.S. jails, the rate of suicide increased from 39 per 100,000 in 2005 to 42 per 100,000 in 2010. It reached 52 per 100,000 in 2015 before dropping in 2018 to 46 per 100,000 but climbed to 49 per 100,000 in 2019.[4] The rate of suicide for those incarcerated in all state prisons nationwide ranged from 14 per 100,000 to 27 per 100,000 from 2001 to 2019.[5] The rates of suicide among adult males in the U.S. and those in jails and prisons are shown in Figure 2.

*Figure 2: Comparison of Suicide Rates, 2000-2022 (US Jail, US State, CDCR, US Adult Males)*

[3] Carson, E.A. (2020). Mortality in State and Federal Prisons, 2001-2018 – Statistical Tables, Report NCJ 256002. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC.

[4] *Mortality in Local Jails, 2000-2019 – Statistical Tables* (NCJ 256002, Bureau of Justice Statistics, October 2021)

[5] *Mortality in State and Federal Prisons, 2000-2019 – Statistical Tables* (NCJ 255970, Bureau of Justice Statistics, October 2021)




*** Most recent data from Bureau of Justice Statistics, CDCR, and WISQARS.**

In prison systems, suicide deaths have multiple contributing factors that can include longstanding medical and mental health issues, court and sentencing issues, issues involving family, lack of purposeful activity, conditions of the specific prison environment, and the stress of adjusting to incarceration.[6] In 1990, CDCR began tracking the annual suicide frequency and rate. The annual rate of suicide for each year is shown below in Figure 3. The highest rate of suicide occurred in 2019 with a rate of 30.3 per 100,000 and 38 suicides in total. In 2022, CDCR's rate of suicide was 19.6 per 100,000 with 19 suicides total.[6]

*Figure 3: Rate of Suicide in CDCR, 1990-2022*




Over the last thirty years, CDCR has expended significant resources to develop and fully implement policies to improve CDCR's suicide prevention program. Federal court oversight of those efforts continues

[6] https://www.psychiatryadvisor.com/home/topics/suicide-and-self-harm/preventing-suicide-in-prison-inmates/
6 The CDCR suicide rate uses the mid-year June 30 CDCR population.

with the Coleman Special Master's expert conducting six comprehensive audits of the suicide prevention efforts at individual prisons and reporting his findings to the federal court following each audit. The most recent audit was conducted from 2021 into 2022. At the time of the writing of this report, the findings from the fifth re-audit were submitted to the *Coleman* court in October 2022. CDCR has a comprehensive suicide prevention system in place for suicide risk screening, risk evaluation, and treatment planning, and remains committed to continuing to work and improve this system. CDCR has made significant improvements in the development of its Statewide MHSDS. With respect to suicide prevention and response, these improvements include new and enhanced suicide prevention training for all staff, specialized emergency procedures training for all potential first responders to suicide attempts in progress, and training for mental health clinicians on suicide risk assessment, safety planning and treatment planning. Taking a public health approach to suicide prevention, the program targets both those inmates who receive mental health treatment and those who do not. Additionally, CDCR provides patients with a range of mental health services and has created a referral procedure for mental health evaluations, including procedures for protecting individuals during particularly vulnerable periods. CDCR has implemented policies to ensure safety concerns are addressed prior to a patient being discharged from an inpatient setting. The institutions are provided with suicide screening procedures and provides the prison population with suicide prevention information through videos, posters/pamphlets, and institutional suicide prevention events.

***Summary of 2022 Suicides:*** Suicides occurred in 12 CDCR institutions in 2022. Sixteen (84%) suicides occurred among incarcerated persons with violent offense histories. Five (26%) individuals were in segregated housing units,[7] and twelve (63%) suicides occurred in high-custody programs (Level III and Level IV). Thirteen (68%) incarcerated individuals who died by suicide were sentenced to eleven years or more. Seventeen (89%) of the suicides occurred among those participating in mental health treatment, including six (35%) suicides among Enhanced Outpatient Program (EOP) participants, nine (53%) in the Correctional Clinical Case Management System (CCCMS) population, one (6%) receiving Mental Health Crisis Bed (MHCB) care, and one (6%) individual receiving inpatient psychiatric care. Three individuals were housed in inpatient settings during the year prior to their death however only one of these individuals had been psychiatrically hospitalized during the year prior to the death. Eight of the 19 decedents (42%) had at least one prior suicide attempt. Two of those had only one attempt (25%) while six (77%) individuals had more than one suicide attempt during their lives.

***Annual Progress:*** The following sections describe, in detail, the ongoing work to enhance suicide prevention practices within CDCR institutions. CDCR has worked to improve the completion of suicide risk evaluations, 72-hour treatment plans, proper training specific to suicide prevention and response, implementing the recommendations made by the Special Master's expert regarding inmate suicides and attempts, and identifying and implementing initiatives to help reduce risk factors associated with suicide.

## Statistical Summary of 2022 Suicides

### Suicide Definitions and Terms Used

The MHSDS Program Guide, 2021 Revision, provides definitions of suicide and suicide attempts. Several terms used in the last 2009 revision of the PG are now considered obsolete within the field of suicidology and will not be used in this report. Specifically, the terms "self-mutilation" and "suicide gesture" are found

[7] These include Administrative Segregation, Security Housing Units, Short-Term Restricted Housing, Long-Term Restricted Housing, Psychiatric Services Units, and Condemned Housing.

in the MHSDS PG, 2021 Revision; however, a less-pejorative term, "non-suicidal self-injury" or NSSI, is used in this report and refers to self-injury for reasons other than death by suicide.

- Suicide: An intentional self-injurious behavior that causes or leads to death.
- Suicide Attempt: An intentional self-injurious behavior which is apparently designed to deliberately end one's life and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.
- Suicidal Ideation: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing[8] (that is, dying by) suicide or the passive desire to be dead.
- Suicidal Intent: The intention to deliberately end one's own life.
- Self-injurious Behavior: A behavior that causes, or is likely to cause, physical self-injury.

## Review of Findings

The total population in CDCR in 2022 was 97,179. The annual suicide rate in CDCR in 2022 was 19.6 deaths per 100,000 incarcerated individuals, based on 19 suicides. The 2021 rate of 15.2 was a significant decrease from 2020's rate of 27.3. The rate reached 30.3 in 2019, the highest since 1985. Figure 4 shows the annual rate, frequency, and population of CDCR since 2001.[9]

*Figure 4: CDCR Suicide Rate, Frequency, and Population, 2001-2022*




In CDCR, the rate of suicide averaged almost 40 per 100,000 in the 1980s, dropping to an average of 16 per 100,000 in the 1990s as the incarcerated population grew by 72%. In the 2000s, the rate averaged 18 per 100,000 as the population peaked in 2007 and then began to decline. In the 2010s, the rate averaged 23 per 100,000 even though CDCR's incarcerated population fell by 29% due to litigation, decreasing crime rates, criminal justice reform, and the passage of Assembly Bill (AB) 109 (Public Safety Realignment) in

---

[8] The term" 'committing" is not used by current suicidal experts, as the term implies some sort of success in carrying out a pledge or obligation. The favored term is straightforward —" died by suicide."

[9] CDCR population counts are from the Office of Research June 30th Monthly Report of Population. Suicide counts are from the CDCR Statewide Mental Health Program (SMHP).

2011. The average annual number of suicides rose from 16 per year in the 1980s, to 20 in the 1990s, to 33 in the 2000s, and to 31 in the 2010s. The number of suicides was 31 in 2020, 15 in 2021, and 19 in 2022 with an average annual number of 22.

## Sociodemographic Factors

Sociodemographic characteristics do not directly cause suicide but are important risk factors with indirect effects. However, they are important in understanding risk and how risk factors evolve over time. These factors are highlighted in order to examine for potentially emerging trends that would necessitate intervention.

### Gender

Table 1 below presents the male, female, and overall frequency and rates of suicide in CDCR since 2002. In 2022, CDCR suicides were 19 individuals, all males, at a rate of 19.6 per 100,000. The trends for the last five years are consistent with the trends for the last 20 years with the majority being males who died by suicide. Since 2018, CDCR had a total of 133 male suicides and 4 female suicides.

*Table 1: Annual Frequency, Population, and Rate of Suicide by Gender and Total, 2003-2022**

| Year | Male Frequency | Male Pop. | Male Rate | Female Frequency | Female Pop. | Female Rate | Total Frequency | Total Pop. | Total Rate |
|---|---|---|---|---|---|---|---|---|---|
| 2003 | 37 | 150,851 | 24.5 | 0 | 10,080 | 0.0 | 37 | 160,931 | 23.0 |
| 2004 | 23 | 152,859 | 15.0 | 3 | 10,641 | 28.2 | 26 | 163,500 | 15.9 |
| 2005 | 37 | 153,323 | 24.1 | 0 | 10,856 | 0.0 | 37 | 164,179 | 22.5 |
| 2006 | 39 | 160,812 | 24.3 | 4 | 11,749 | 34.0 | 43 | 172,561 | 24.9 |
| 2007 | 33 | 161,424 | 20.4 | 1 | 11,888 | 8.4 | 34 | 173,312 | 19.6 |
| 2008 | 36 | 159,581 | 22.6 | 0 | 11,392 | 0.0 | 36 | 170,973 | 21.1 |
| 2009 | 25 | 156,805 | 15.9 | 0 | 11,027 | 0.0 | 25 | 167,832 | 14.9 |
| 2010 | 34 | 155,721 | 21.8 | 1 | 10,096 | 9.9 | 35 | 165,817 | 21.1 |
| 2011 | 33 | 152,803 | 21.6 | 0 | 9,565 | 0.0 | 33 | 162,368 | 20.3 |
| 2012 | 32 | 128,829 | 24.8 | 1 | 6,409 | 15.6 | 33 | 135,238 | 24.4 |
| 2013 | 29 | 126,992 | 22.8 | 1 | 5,919 | 16.9 | 30 | 132,911 | 22.6 |
| 2014 | 21 | 129,268 | 16.2 | 2 | 6,216 | 32.2 | 23 | 135,484 | 17.0 |
| 2015 | 22 | 123,268 | 17.8 | 2 | 5,632 | 35.5 | 24 | 128,900 | 18.6 |
| 2016 | 24 | 122,874 | 19.5 | 3 | 5,769 | 52.0 | 27 | 128,643 | 21.0 |
| 2017 | 28 | 125,289 | 22.3 | 2 | 5,971 | 33.5 | 30 | 131,260 | 22.9 |
| 2018 | 33 | 123,511 | 26.7 | 1 | 5,906 | 16.9 | 34 | 129,417 | 26.3 |
| 2019 | 37 | 119,781 | 30.9 | 1 | 5,691 | 17.6 | 38 | 125,472 | 30.3 |
| 2020 | 31 | 108,682 | 28.5 | 0 | 4,721 | 0.0 | 31 | 113,403 | 27.3 |
| 2021 | 13 | 94,562 | 13.7 | 2 | 3,910 | 51.2 | 15 | 98,472 | 15.2 |
| 2022 | 19 | 93,510 | 20.3 | 0 | 3,669 | 0.0 | 19 | 97, 179 | 19.6 |

*All populations are mid-year monthly as of June 30th of each year. Total population includes camps, institutions, in-state and out-of-state contract beds.

## Race/Ethnicity

Of the 19 suicide deaths in 2022, eleven were by Hispanic individuals, five were Caucasian individuals and three were African American individuals. This is the second consecutive year where Hispanics represent the highest number of suicides. Table 2 breaks down the last five years of death by suicide based on race as well as provides the overall CDCR Population by racial/ethnic group. The category of Other includes American Indian, Asian, and Pacific Islander.

*Table 2: Frequency and Percent of CDCR Suicide Decedents by Race/Ethnic Group, 2018-2022*

| Racial/Ethnic Group | 2018 | 2019 | 2020 | 2021 | **2022** | **2022 Overall CDCR Population** |
|---|---|---|---|---|---|---|
| African American | 1 (3%) | 8 (21%) | 5 (16%) | 4 (27%) | **3 (16%)** | **27.9%** |
| Hispanic | 17 (50%) | 11 (29%) | 9 (29%) | 6 (40%) | **11 (58%)** | **45.5%** |
| Caucasian | 9 (26%) | 13 (34%) | 12 (39%) | 5 (33%) | **5 (26%)** | **20.1%** |
| Other | 7 (21%) | 6 (16%) | 5 (16%) | 0 (0%) | **0 (0%)** | **6.5%** |

## Age

Table 3 shows annual age group suicides for the five-year period 2018 through 2022 and the percentage of suicides in each group as well as the overall CDCR population for each age group. In 2022, the number of total suicides between the ages of 25 and 34 represented the highest number of suicides. The average age of a suicide decedent in 2022 was 42 years, same as 2021.

*Table 3: Frequency & Percent of CDCR Suicide Decedents by Age Group, 2018-2022*

| Age Group | 2018 | 2019 | 2020 | 2021 | **2022** | **2022 Overall CDCR Population** |
|---|---|---|---|---|---|---|
| 18-24 | 3 (9%) | 1 (3%) | 4 (13%) | 4 (27%) | **1 (5%)** | **5%** |
| 25-34 | 11 (32%) | 10 (26%) | 9 (29%) | 6 (40%) | **7 (37%)** | **29%** |
| 35-44 | 9 (27%) | 15 (40%) | 5 (16%) | 5 (33%) | **3 (16%)** | **28%** |
| 45-54 | 8 (24%) | 9 (24%) | 6 (19%) | 0 (0%) | **3 (16%)** | **19%** |
| 55+ | 3 (9%) | 3 (8%) | 7 (23%) | 2 (13%) | **5 (26%)** | **20%** |

## Marital Status

Of the 19 individuals who died by suicide in CDCR during 2022, four (21%) were married at the time of their death, three (16%) were divorced, twelve (63%) were single, and none were widowed. In 2021, one (7%) was married at the time of their death, three (20%) were divorced, eleven (73%) were single, and none were widowed. The figures between 2021 and 2022 were similar except for married individuals.

## Education, Juvenile Criminal History, and Work History

In 2022, 10 (53%) of the 19 had less than a high school education. Five decedents (26%) finished 12 years of schooling and two (11%) had a GED certificate. One individual is not listed as it was unclear from the records if the decedent received a GED or finished high school. None of the decedents had a college degree. Four individuals were in special education classes although none of the decedents had a DDP designation.

Among the 19 individuals in CDCR custody who died by suicide in 2022, twelve (63%) had a history of crime as juveniles with an average age at first arrest of 14 years. Of these twelve individuals, nine (75%) had some level of gang involvement either inside or outside of prison. This is higher than 2021 where only three individuals had prior or gang involvement at the time of death.

Twelve (61%) of the 2022 suicide decedents had information about employment outside CDCR. The percentage is based on 18 instead of the 19 decedents as there was not information regarding employment for one individual. Of the 12 who had employment histories, seven were skilled workers while five were unskilled workers. Seven (37%) of the decedents had job placements while incarcerated.

## Languages Spoken

For 16 (84%) of 2022's suicide decedents, English was their primary spoken language. An additional six English speaking individuals listed Spanish as their secondary spoken language. For three individuals (16%), Spanish was their primary spoken language.

## Health Factors

Incarcerated populations have higher rates of both chronic medical conditions and infectious diseases than members of the community at large[10], and medical conditions increase the risk of suicide-[11]

Seven (37%) of the 19 individuals who died by suicide in 2022 had both past and current medical conditions at the time of their death. This is significantly lower than the thirteen (87%) of the 15 individuals who died by suicide in 2021. One individual had chronic anemia, degenerative disc disease, diabetes mellitus with neuropathy, hyperlipidemia, hypertension, inguinal hernia, and recurrent skin lesions as well as had a significant apical wall motion abnormality with moderate left ventricle (LV) dysfunction. The second individual had chronic leg pain as a result of a gunshot wound he received while in the community. The third individual reported severe stomach pain that despite medical interventions, did not remit prior to his death. The fourth individual had reported hip pain. The fifth individual had skin cancer and eczema that was reported to be painful. The sixth individual reported shoulder and lower back pain. Lastly, the seventh individual had hypertension, hyperlipidemia, hyperbilirubinemia, and a past COVID-19 diagnosis.

In contrast, for 2021, four individuals had a past COVID-19 diagnosis with one of these individuals being diagnosed with COVID-19 long hauler's syndrome. Other medical conditions present in the decedents included AIDS, kidney disease, type 2 diabetes, degenerative joint disease, hyperlipidemia, hypertension,

---

[10] Maruschak, L.M. & Berzofsky, M. (2016). "Medical Problems of State and Federal Prisoners and Jail Individuals, 2011-12." Report NCJ 251920. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Washington, DC. Available at: https://www.bjs.gov/pub/pdf/mpsfpji1112.pdf.

[11] Ahmedani, B. K., Peterson, E. L., Hu, Y., Rossom, R. C., Lynch, F., Lu, C. Y., et al. (2017). Major Physical Health Conditions and Risk of Suicide. *American Journal of Preventive Medicine*, *53*(3), 308–315. https://doi.org/10.1016/j.amepre.2017.04.001

seizure disorder, heart murmur, scoliosis, asthma, gastroesophageal reflux disease (GERD), and hepatitis C. One individual had a gunshot wound prior to his incarceration however had no medical or health issues due to the wound at the time of death.

## Temporal Factors

Over the years, annual reports have inspected the distribution of suicides by custody watches (1st, 2nd, 3rd), day of week, quarter of year, and month to see if it was more likely that suicide deaths occurred during one temporal domain rather than another.

The distribution of 2022 suicides by day of week, time of day (watch), day of week, month, quarter, and time of year was tested against the hypothesis that all things being equal, suicides would be distributed evenly across these temporal sequences. The analyses found that, in 2022, no day of week, time of day, month, quarter, or holiday season was statistically more likely to have more suicide deaths than any other.

It is commonly believed suicide increases around the winter holidays of Thanksgiving and Christmas, though broader data does not support this.[12] Data from the Centers for Disease Control show that spring and early summer typically have a higher number of suicides, and CDCR's data over the long-term mirror this finding. In 2022, death by suicide was lower than prior years apart from 2021 which saw four fewer suicides. June and July had four suicides, the most of any other months in 2022. Figure 5 shows the 2022 number of suicides by month.

*Figure 5: Monthly Suicides, 2020, 2021, 2022 and 10 Year Average*




In 2022, there were seven suicides on a Saturday, three on a Monday, three on a Tuesday, three on a Wednesday, and one each on a Thursday, Friday, and Sunday. First watch (10 PM to 6 AM) had three

[12] See: Suicide Rate is Lower During Holidays, But Holiday-Suicide Myth Persists | The Annenberg Public Policy Center of the University of Pennsylvania

suicides, 2nd watch (6 AM to 2 PM) had eight suicides, and 3rd watch (2 PM to 10 PM) had eight suicides. In contrast, for 2021, Thursday had five suicides, three on a Monday, two on a Wednesday, two on a Saturday, two on a Sunday, and one on a Tuesday. First watch (10 PM to 6 AM) had five suicides, 2nd watch (6 AM to 2 PM) had two suicides, and 3rd watch (2 PM to 10 PM) had eight suicides.

Rigor mortis[13] is a condition of the body after death that involves stiffening of the musculature due to post-mortem chemical reactions and indicates a person has been deceased for a period ranging from two to six hours. In 2022, three (16%) of the 19 decedents were found in rigor mortis. Two of the three decedents were on Guard 1 checks at the time of death, which resulted in QIPs being assigned to their respective institutions. This was a slight increase compared to 2021 where two (13%) of the 15 decedents were found in rigor mortis. In 2020, two of the 31 decedents (6%) were found in rigor mortis. In 2022, five (26%) of the 19 decedents were under custody discharge checks/guard 1 checks/nursing observations at the time of their death. In 2021, five (33%) of the 15 decedents were under checks at the time of their death. In 2020, one individual (3.2%) included a concern about inadequate custody/welfare checks related to the death by suicide whereas in 2019, there were 5 (13.2%) cases with custody/welfare checks concerns.

The number of rules violation reports (RVRs) received by the 19 decedents ranged from 0 – 36 RVRs with an average of 8.2. The decedents averaged 8.1 years served of their sentence. In 2021, the range of RVRS for the 15 decedents was from 0 – 23 RVRs with an average of 5.5, which is fewer than this year.

In 2022, there was a range of 0 – 42 inter-facility transfers for the 19 decedents with a total average of 9.7 transfers (1.2 transfers per year). One decedent had 0 transfers, 12 decedents had less than 10 transfers, 3 decedents had more than 10 but less than 20 transfers, one decedent had more than 20 but less than 30 transfers, one decedent had more than 30 but less than 40 transfers, and one decedent had 42 transfers, having spent over 33 years in prison at the time of his death. In comparison, in 2021, there was also a range of 0 – 25 inter-facility transfers for the 15 decedents with a total average of 0.9 transfers.

## Custodial and Correctional Factors

The environment of any institution can have an impact on an individual's risk of suicide. Understanding these unique correctional factors is particularly important to determine if intervention is needed to protect individuals during incarceration.

### Institution at Time of Death

In 2022, suicides occurred in 12 CDCR institutions (Table 4). Institutions vary in the number of patients in the mental health program[14], the acuity of the mental health mission, the predominance of violent offenders, and the total number of individuals housed. There are fluctuations in the number of suicides occurring at an institution due to changes in the use or mental health mission of the institution, and other factors. There are also subsets of suicides that occur during, or upon, transfer of an individual from one institution to another, further complicating the interpretation of *why* suicides occur at certain institutions more frequently.

---

[13] Rigor mortis is "the state of postmortem stiffening." It "starts developing within 1 to 2 hours after death," "becomes apparent in the small muscle groups first" including "eyelids, lower jaw, face," "but on an average it may be said to commence 2-4 hours after death..." Kori (2018). Time since death from rigor mortis: Forensic perspective," *Journal of Forensic Sciences and Criminal Investigation, 9 (5), 1-9.*

[14] Levels of care in the Mental Health Services Delivery System (MHSDS): Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Psychiatric Inpatient Program (PIP)

Suicides are more frequent in institutions with intensive mental health programming (e.g., EOP institutions). Suicides are also more frequent in higher security (Level III or Level IV) institutions than in lower security settings. The institutions that have the highest average annual suicides, such as Salinas Valley State Prison (SVSP), are those where high security Level IV incarcerated individuals are housed and being treated for severe and chronic mental health and behavior problems.

*Table 4: 2022 CDCR Suicides by Institution, Security Level and Available Mental Health Programs*[15]

| Institution | Level I and II | Level III | Level IV | Unclassified | Mental Health Programs Available |
|---|---|---|---|---|---|
| California Correctional Institution | 0 | 0 | 1 | 0 | CCCMS |
| California Men's Colony | 2 | 2 | 0 | 0 | CCCMS, EOP, EOP-ASU, MHCB, DDP |
| Kern Valley State Prison | 0 | 0 | 2 | 0 | CCCMS, EOP, MHCB |
| Valley State Prison | 2 | 0 | 0 | 0 | CCCMS, EOP |
| California State Prison-LAC | 1 | 0 | 1 | 0 | CCCMS, EOP, EOP-ASU, MHCB |
| California State Prison-SAC | 0 | 0 | 1 | 0 | CCCMS, EOP, EOP-ASU, MHCB, PSU, DDP |
| Wasco State Prison | 0 | 0 | 0 | 1 | RC, CCCMS, MHCB |
| Richard J. Donovan Correctional Facility | 1 | 0 | 0 | 0 | CCCMS, EOP, EOP-ASU, MHCB, DDP |
| North Kern State Prison | 0 | 0 | 1 | 0 | RC, CCCMS, MHCB |
| Salinas Valley State Prison | 0 | 0 | 2 | 0 | CCCMS, EOP, PIP, MHCB, DDP |
| Substance Abuse Treatment Facility | 0 | 0 | 1 | 0 | CCCMS, EOP, MHCB, DDP |

[15] Levels of mental health care are: Correctional Clinical Case Management System (CCCMS); Enhanced Outpatient Program (EOP); Mental Health Crisis Bed (MHCB); and Psychiatric Inpatient Program (PIP), Developmental Disabilities Program (DDP)

| Institution | Level I and II | Level III | Level IV | Unclassified | Mental Health Programs Available |
|---|---|---|---|---|---|
| California Medical Facility | 0 | 0 | 1 | 0 | CCMCS, EOP, EOP-ASU, MHCB, PIP, DDP |
| Total (percent) | 6 (32%) | 2 (11%) | 10 (53%) | 1 (5%) | |

Table 5 presents the data on suicides in each institution over the ten-year period 2013-2022 along with the 10-year annual average per institution. One institution had, on average, at least two suicides per year while twelve institutions had at least one suicide per year. These twelve institutions represented 170 of the 271 (63%) of all suicides over the 10 years, accounting for an average of 14 per year.

*Table 5: Frequency of Suicide by CDCR Institution, 2013-2022, 10-Year Total, and 10-Year Annual Average*[16]

| Institution | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Annual Average |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CSP Sacramento | 1 | 2 | 3 | 3 | 1 | 2 | 9 | 3 | 0 | 1 | 2.4 |
| Salinas Valley SP | 2 | 2 | 0 | 4 | 2 | 2 | 1 | 1 | 2 | 2 | 1.8 |
| California Correctional Institute | 1 | 3 | 1 | 2 | 0 | 2 | 2 | 4 | 1 | 1 | 1.7 |
| Kern Valley SP | 1 | 1 | 0 | 3 | 1 | 5 | 2 | 2 | 0 | 2 | 1.7 |
| San Quentin SP | 3 | 2 | 3 | 0 | 2 | 2 | 1 | 1 | 1 | 0 | 1.5 |
| CSP LA County | 1 | 0 | 0 | 2 | 4 | 2 | 2 | 2 | 0 | 2 | 1.5 |
| Corcoran SP | 2 | 0 | 2 | 0 | 2 | 3 | 4 | 2 | 0 | 0 | 1.5 |
| Mule Creek SP | 2 | 2 | 0 | 0 | 2 | 2 | 2 | 2 | 2 | 0 | 1.4 |
| RJ Donovan | 3 | 1 | 2 | 0 | 1 | 4 | 0 | 1 | 1 | 1 | 1.4 |
| California Medical Facility | 2 | 1 | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 1 | 1.2 |
| Deuel Vocational Institute* | 0 | 0 | 3 | 0 | 4 | 1 | 3 | 0 | 0 | N/A | 1.2 |
| California Men's Colony | 0 | 0 | 3 | 3 | 0 | 1 | 0 | 0 | 0 | 4 | 1.1 |
| California Institute for Women | 1 | 2 | 2 | 2 | 1 | 0 | 1 | 0 | 1 | 0 | 1.0 |
| High Desert SP | 1 | 1 | 0 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 0.8 |
| Correctional Training Facility | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 3 | 0 | 0 | 0.8 |
| Wasco SP | 1 | 0 | 0 | 0 | 4 | 0 | 0 | 2 | 0 | 1 | 0.8 |
| California Institute for Men | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 3 | 0 | 0.7 |

[16] Chuckawalla Valley SP, Avenal SP, Centinela CP, Sierra Conservation, and California City CF had no suicides during the ten years 2013-2022.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Substance Abuse & Training Facility | 1 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0.6 |
| California Health Care Facility | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 2 | 0 | 0 | 0.5 |
| North Kern SP | 1 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 1 | 0.5 |
| Pleasant Valley SP | 1 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0.4 |
| Folsom SP | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0.4 |
| California Correctional Center | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0.4 |
| Pelican Bay SP | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0.3 |
| Valley SP | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | 0.4 |
| Out-of-State Institutions | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0.3 |
| CSP Solano | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0.3 |
| Central California Women's Facility | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0.3 |
| Calipatria SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0.1 |
| Ironwood SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0.1 |
| Centinela SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Sierra Conservation Center | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Avenal SP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0 |
| Total | 30 | 23 | 25 | 26 | 30 | 34 | 38 | 31 | 15 | 19 | 27.1 |

*Deuel Vocational Institute closed in 2021

## Housing Type

Incarcerated individuals in CDCR are housed in a variety of physical settings, from dormitory settings with up to 200 people, to the most common type, celled housing, which house one or two persons. Table 6 presents the number and percentage of suicides in each type of CDCR housing from 2017 – 2022.

The types of housing where an incarcerated person lives can be associated with prison-related difficulties. For instance, individuals entering CDCR with a new prison term or whose parole has been revoked are initially housed in Reception Center institutions. During 2022, one individual died in a Reception Center institution. During 2021, no one died by suicide in a Reception Center institution which was a decrease from 2020 where one individual died in 2020 in a Reception Center institution. Currently, there are two Reception Center institutions designed to house males (NKSP and WSP) and one designed to house females (CCWF).

*Table 6: Frequency and Percent of Housing Placements of CDCR Suicide Decedents, 2017-2021 and 2022*

| Housing Type | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportion in 2022* |
|---|---|---|---|---|---|---|---|
| Administrative Segregation (including EOP Hub units) | 10(33%) | 4(12%) | 6 (16%) | 3 (10%) | 4(27%) | **5(26%)** | **8%** |

| Housing Type | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportion in 2022* |
|---|---|---|---|---|---|---|---|
| Condemned Housing | 0 (0%) | 2 (6%) | 1 (3%) | 1 (3%) | 1 (7%) | **0 (0%)** | **2%** |
| Psychiatric Services Units | 1 (3%) | 0 (0%) | 5 (13%) | 1 (3%) | 0 (0%) | **1 (5%)** | **0.2%** |
| Short-Term Restricted Housing | 0 (0%) | 2 (6%) | 1 (3%) | 5 (16%) | 2(13%) | **1 (5%)** | **1%** |
| Long-Term Restricted Housing | 0 (0%) | 0 (0%) | 0 (0%) | 1 (3%) | 0 (0%) | **0 (0%)** | **0.1%** |
| Security Housing Units | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | **0 (0%)** | **0.1%** |
| Sensitive Needs Yard | 0 (0%) | 0 (0%) | 0 (0%) | 0 (0%) | 2(13%) | **5(26%)** | **14%** |
| Psychiatric Inpatient Program (PIP) | 0 (0%) | 1 (3%) | 1 (3%) | 2 (6%) | 2(13%) | **1 (5%)** | **0.1%** |
| Reception Centers | 6 (20%) | 2 (6%) | 3 (8%) | 1 (3%) | 0 (0%) | **1 (5%)** | **7%** |
| Outpatient Housing Unit (Medical) | 0 (0%) | 0 (0%) | 0 (0%) | 2 (6%) | 0 (0%) | **1 (5%)** | **1%** |
| Correctional Treatment Center/MHCB | 2 (6%) | 1 (3%) | 0 (0%) | 0 (0%) | 0 (0%) | **1 (5%)** | **1%** |
| General Population | 11 (37%) | 22(65%) | 21(82%) | 15(48%) | 4(27%) | **3(16%)** | **29%** |

*Does not equal 100%. There are other lesser used classifications that comprise the rest of the population

## Segregated Housing

Individuals alleged to be, or found guilty of, committing certain disciplinary infractions are typically placed in segregated housing. If found guilty, sanctions can include loss of time credits, loss of privileges, or other consequences. Incarcerated individuals can also be placed in segregated housing at their own request for protection due to perceived interpersonal safety risk[17]. In 2022, 2,969 individuals, or 3% of the total CDCR population, were housed in segregated housing.

The units and cells in segregated housing are often physically similar to other housing units. But the regulations and routines of segregated housing restrict an individual's movements and privileges, which can affect their mental status and functioning. The conditions of confinement in segregated housing may result in significant distress for some people, and for some, placement in segregated housing increases the risk of self-injury.

Over the last twenty years, CDCR has implemented policies and programs to increase mental health services and to reduce the risk of suicide in segregated housing. In the early 2000s, the department created specialized ASU "Hub" units and Psychiatric Services Units (PSU) for EOP patients. In 2015, CDCR developed the Short-Term and Long-Term Restricted Housing (STRH/LTRH) units for incarcerated persons

[17] For this report, segregated housing includes: Administrative Segregation (ASU), Short-Term Restricted Housing (STRH), Long-Term Restricted Housing (LTRH), ASU-EOP Hubs, Psychiatric Services Units (PSU), Security Housing Units (SHU), and Condemned housing.

at the CCCMS level of care. These units correspond to the ASU and Security Housing Units for the non-MHSDS population, respectively.

During 2022, seven (37%) out of the 19 decedents were housed in CDCR segregated housing units. Of these, five were participants in the MHSDS – two at the CCCMS level of care and three at the EOP level of care. The remaining two individuals were not participants in the MHSDS at the time of their death.

Suicide rates for segregated housing are higher than in the rest of CDCR, 168 per 100,000, in 2022. For reference, the rate of suicide in segregated housing in 2021 was 197 per 100,000, in 2020 was 236 per 100,000 and between 2015 and 2019 the rate was 218 per 100,000. In the past few years, the annual total of suicides and the percentage of total CDCR suicides that occurred in ASU/STRH has trended downward. However, in 2021, while the annual total of suicides in restricted housing units significantly decreased, the percentage increased. This was due to the lower number of deaths by suicide in 2021. Figure 6 shows the number and percentage of total CDCR suicides that occurred in ASU and STRH from 2013 through 2022.

*Figure 6: Percentage of Suicides in Segregated Housing, 2013-2022*




| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| Frequency | 16 | 15 | 8 | 8 | 11 | 10 | 13 | 8 | 6 | 7 |
| Percentage | 43% | 65% | 29% | 30% | 37% | 29% | 34% | 26% | 40% | 37% |

## Time in Segregated Housing

The initial few days in ASU or STRH can be very stressful for some individuals, especially those who are in mental health treatment. Similarly, extended stays (greater than 30 days) can also lead to a deterioration of an individual's mental well-being.[18] In 2007, CDCR began a program to retrofit a number of ASU cells as "intake" cells. These cells have physical modifications which include removing ligature attachment sites to increase the safety of the cells. Incarcerated people who are moved to ASU or STRH are assigned to these intake cells for their initial 72 hours in the unit before transitioning to regular ASU or STRH housing. If an individual is double celled upon placement in ASU, he or she is not required to be placed in an ASU

[18] Haney, C. (2018). Restricting the use of solitary confinement. *Annual Review of Criminology, 1.* 285-310. https://doi.org/10.1146/annurev-criminol-032317-092326

intake cell. In 2022, five individuals were in ASU or STRH at the time of their death. The average time from ASU/STRH entry to death by suicide was 62 days with a range from 6 days to 125 days. In contrast, in 2021, the average time from ASU/STRH entry to death by suicide was 39 days with a range from 7 days to 75 days. Compared to the previous five years (2017-2021), the average time from ASU/STRH entry to suicide was 68 days, similar to 2022.

## Offense Type

A common finding in state prisons is the high proportion of suicides among individuals whose commitment offenses were crimes against persons.[19] Individuals incarcerated for a violent crime have a rate of suicide death more than twice the rate for those committed for non-violent crimes.[20] Table 7 shows the number and proportion types of crimes committed by CDCR suicide decedents in 2017-2021, 2022, and the overall proportion of these crimes of the CDCR population.

*Table 7: Frequency and Percent of Commitment Offenses of Suicide Decedents, 2017-2021, 2022, and CDCR Proportions for 2022*

| Type of Offense | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportions in 2022 |
|---|---|---|---|---|---|---|---|
| Violent Crimes | 23 (77%) | 24 (71%) | 31 (82%) | 24 (77%) | 9 (60%) | **13 (68%)** | 73% |
| Property Crimes | 2 (7%) | 1 (3%) | 3 (8%) | 2 (7%) | 3 (20%) | **4 (21%)** | 3% |
| Sex Crimes | 2 (7%) | 7 (21%) | 3 (8%) | 5 (16%) | 3 (20%) | **2 (11%)** | 21% |
| Other Crimes | 3 (10%) | 2 (6%) | 1 (3%) | 0 (0%) | 0 (0%) | **0 (0%)** | 2% |

## Security Level

In 2022, 10 of 19 suicide decedents had Level IV classification points, the highest security level (Table 8). Two decedents were at Level III. Four decedents were at Level II. Two decedents were at Level I. One decedent was listed as unclassified, as he died by suicide when he was housed in a reception center institution in the first weeks of his incarceration and as a result had not completed processing to determine classification score. As can be seen in Table 8, the pattern of classification levels for the higher levels are similar to that of the prior years.

*Table 8: Frequency and Percent of Security Levels of Suicide Decedents, 2017-2021, 2022, and CDCR Proportions in 2022*

| Security Level | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportions in 2022 |
|---|---|---|---|---|---|---|---|
| Level IV | 16 (53%) | 20 (59%) | 24 (63%) | 18 (58%) | 8 (53%) | **10 (53%)** | 23% |
| Level III | 5 (17%) | 6 (18%) | 5 (13%) | 3 (10%) | 1 (7%) | **2 (11%)** | 15% |

---

[19] Most inmates are charged and found guilty of multiple charges. The charges in Table 7 are the primary charges. The CDCR and the California Department of Justice define crimes against persons as violent offenses and make a distinction between those crimes and property and other crimes. Although sex crimes are considered crimes against persons, they are separated out in this report. See https://openjustice.doj.ca.gov/resources/glossary

[20] Mumola, C. (2005), Bureau of Justice Statistics, located at: http://www.bjs.gov/content/pub/pdf/ardus05.pdf

| Security Level | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** | CDCR Population Proportions in 2022 |
|---|---|---|---|---|---|---|---|
| Level II | 2 (7%) | 5 (15%) | 5 (13%) | 8 (26%) | 5 (33%) | **4 (21%)** | 49% |
| Level I | 2 (7%) | 1 (3%) | 1 (3%) | 2 (7%) | 1 (7%) | **2 (11%)** | 9% |
| Unclassified | 5 (17%) | 2 (6%) | 3 (8%) | 0 (0%) | 0 (0%) | **1 (5%)** | 4% |

## Sentence Length

Another variable that is unique to suicides in correctional settings is sentence length. Specifically, the total length of the sentence; how much time an incarcerated person served prior to the suicide death; and how much time left to serve in prison at time of death. Tables 9, 10, and 11 capture these variables. Length of sentence can have implications for the mental state of incarcerated individuals at the beginning of their prison term. Table 9 presents the sentence lengths of suicide decedents during the 2022 year as well as the past five years. In 2022, 6 (32%) of the 19 decedents were serving a life sentence without the possibility of parole (LWOP) and 4 (21%) of the 19 decedents were sentenced to 21+ years. This is a contrast to 2021, where almost half of the decedents were serving sentences between 11-20 years, three of which were sentenced to over 20 years.

*Table 9: Frequency and Percent of Sentence Length of Suicide Decedents, 2017-2021 and 2022*

| Sentence Length | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** |
|---|---|---|---|---|---|---|
| 1-5 years | 7 (23%) | 4 (12%) | 1 (3%) | 5 (16%) | 2 (13%) | **2 (11%)** |
| 6-10 years | 6 (20%) | 3 (9%) | 5 (13%) | 4 (13%) | 1 (7%) | **3 (16%)** |
| 11-20 years | 3 (10%) | 4 (12%) | 5 (13%) | 1 (3%) | 7 (47%) | **2 (11%)** |
| 21+ years | 9 (30%) | 9 (26%) | 10 (26%) | 6 (19%) | 3 (20%) | **4 (21%)** |
| Life w/ Possible Parole | 5 (17%) | 7 (21%) | 10 (26%) | 12 (39%) | 1 (7%) | **7 (37%)** |
| Life w/out Parole | 0 (0%) | 5 (15%) | 6 (16%) | 2 (7%) | 0 (0%) | **1 (5%)** |
| Condemned | 0 (0%) | 2 (6%) | 1 (3%) | 1 (3%) | 1 (7%) | **0 (0%)** |

Table 10 shows time spent in CDCR during the current admission by individuals who died by suicide from 2017 to 2022. During 2022, the amount of time served at the time of death ranged from just 23 days to over 33 years. In 2022, ten decedents had served more than 6 years in CDCR custody.

*Table 10: Frequency and Percent of Time Served at Time of Death of Suicide Decedents, 2017-2021 and 2022*

| Time Served | 2017 | 2018 | 2019 | 2020 | 2021 | **2022** |
|---|---|---|---|---|---|---|
| 0-1 year | 14 (47%) | 7 (21%) | 5 (13%) | 4 (13%) | 0 (0%) | **5 (23%)** |
| 1-5 years | 9 (30%) | 9 (26%) | 12 (32%) | 8 (19%) | 6 (40%) | **4 (21%)** |
| 6-10 years | 3 (10%) | 6 (18%) | 7 (18%) | 6 (23%) | 4 (27%) | **4 (21%)** |
| 11-20 years | 4 (13%) | 10 (29%) | 11 (29%) | 5 (39%) | 5 (33%) | **5 (23%)** |
| 21+ years | 0 (0%) | 2 (6%) | 3 (8%) | 8 (26%) | 0 (0%) | **1 (5%)** |

Exhibit

Declaration

J. Riggs

RFA No. 6

RFA No. 7

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Defendant objects that the term "in detail" is vague and ambiguous; Plaintiff does not clarify the extent, scope, or specifics of the details in which he seeks an admission. Defendant further objects because the term "Crisis Intervention interview" is vague and ambiguous; Plaintiff does not define the term and does not clarify whether he an interview by the CIT or some other interview.

Subject to the above objections, Defendant responds as follows:

Defendant denies Plaintiff explained a sincere plan to hang himself. Defendant admits Plaintiff made a conditional threat to hang himself by tying a sheet around his neck if he were not sent to a higher level of care.

**REQUEST FOR ADMISSION NO. 6:**

Admit that you, Defendant E. Kranz; were keenly aware that Inmate R. Goins diagnosis included: 'Major Depressive Disorder Severe'; on 3/26/2023.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Defendant denies he was aware that Plaintiff had a diagnosis of severe Major Depressive Disorder at the time the CIT interviewed him on March 26, 2023.

**REQUEST FOR ADMISSION NO. 7:**

Admit that you, Defendant E. Kranz; were keenly aware that Inmate R. Goins diagnosis included: 'Auditory Hallucinations'; n 3/26/2023.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Defendant denies he was aware that Plaintiff had a diagnosis of Auditory Hallucinations at the time the CIT interviewed him on March 26, 2023.

**REQUEST FOR ADMISSION NO. 8:**

Admit that you, Defendant E. Kranz; knew that inmate R. Goins was prescribed medication to help cope with the serious mental health issues he deals with on a daily basis.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

CALIFORNIA MENS COLONY
ROBERT A.GOINS BL-8291
P.O.Box 8101
San Luis Obispo,Ca.93409

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

Case No.:
25-cv-02168-SB-BFM
DECLARATION OF J.RIGGS
IN SUPPORT OF THE
PLAINTIFFS 42 U.S.C.
1983 PRISONERS
COMPLAINT

ROBERT GOINS, )
Plaintiff, )
V. )
E.KRANZ,et.al., )
Defendants. )
----------------

I,INMATE J.RIGGS,DECLARE:

1).During the relavant time of the facts contained within the Plaintiffs 42 U.S.C. Prisoners Complaint;I was housed at the CALIFORNIA MENS COLONY and I have personal knowledge of the facts as I declare in this declaration I am over the age of eighteen,if called to testify,I could do so competently as to these facts

2).On March 26,2023;I was being housed at the "Restrictive Housing Unit" located on B-Facility;at the California Mens Colony

3).Prior to March 26,2023;I complained to the Mental health Supervisor E.Heidler about Psychologist E.Kranzs unprofessional behavior in his interactions with the Enhanced Outpatient Program inmates

4).On one occasion I explained to Supervisor E.Heidler that Psychologist E.Kranz required inmates and/or dared inmates to harm themselves before initiating "Suicidal Prevention Protocols"

I,declare under penalty of perjury under the laws of the State of California and of the United States of America that the forgoing is true and correct.
Executed this 7th day of March 2025

RESPECTFULLY
SUBMITTED,
J.RIGGS ES&##7337
E57337

Exhibit
Request for Admissions No. 13



Admit that you, Defendant Heidler were aware that the Plaintiff R. Goins, suffered from 'Auditory Hallucinations'

**RESPONSE TO REQUEST FOR ADMISSION NO. 12**:

Defendant objects because the request is overly broad, unduly burdensome, and unspecific as to time, without any restriction as to scope. *See* Fed. R. Civ. P. 26(b)(1).

Subject to the above objections, Defendant responds as follows:

Defendant admits she was aware that Plaintiff reported some auditory hallucinations on January 10, 2023.

→ **REQUEST FOR ADMISSION NO. 13**:

Admit that you, Defendant Heidler were aware that the Plaintiff suffered from Major Depressive Disorder.

→ **RESPONSE TO REQUEST FOR ADMISSION NO. 13**:

Defendant objects because the request is overly broad, unduly burdensome, and unspecific as to time, without any restriction as to scope. *See* Fed. R. Civ. P. 26(b)(1).

Subject to the above objections, Defendant responds as follows:

Defendant admits she was aware that Plaintiff had a diagnosis of unspecified depressive disorder on January 10, 2023.

**REQUEST FOR ADMISSION NO. 14**:

Admit that you, Defendant Heidler may have failed to properly train subordinate employee(s) on the proper protocols for Inmate(s) who decompensate while housed at the RHU facility.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14**:

Defendant objects because the term "proper protocols" is vague and ambiguous, which requires Defendant to speculate as to the intended meaning. Defendant further objects because the request is overly broad, unduly burdensome, and unspecific as to time, without any restriction as to scope.

Exhibit

ECF 75
#396

# E

**CMC - California Men's Colony**

Patient: **GOINS, ROBERT ANTHONY**
DOB/Age/Birth Gender: 8/1/1987 / 37 years / Male CDCR: BL8291

## *History and Physical Reports*

-Date of service 1/12/2023

**History of Present Illness**
35 years old male with history of diabetes type 2 was admitted to CTC mental health due to suicidal ideation. TABE Score 4.0. No LTBI. EPRD 9/27/2031.
Walked to the cell side to see the patient. Asked about diabetes and he reported that he has been taking his medication and watching what he is eating. Then after that he asked me to help him "to get the phone" and when I told him I am here for his medical issues, he stopped talking to me and went back to his bed. He stopped answering questions.

**Review of Systems**
Patient refused to answer questions.

**Physical Exam**
Alert and oriented. Good communication and able to answer questions and move without any issues. No distress. Breathing noted to be normal.

**Assessment/Plan**
1. Depression
Admitted to CTC mental health for mental health issues.
2. Diabetes mellitus
- Last A1c 6.0 10/19/2022.
- Continue current dose of glipizide. Counseled patient about compliance and consistent carb diet.

3. Alcohol use disorder, severe, dependence
- Stable on current dose of naltrexone. Continue.

Effective communication:
EEC was attempted via slow, clear, simple speech with repetition of my statements as needed and voiced understanding by IP. IP was facing me to facilitate communication. EEC was achieved to my satisfaction by appropriate responses without delay in a reciprocal dialogue.

Disclaimer:
Note is dictated utilizing voice recognition software. Unfortunately this leads to occasional typographical errors.

Historical
No qualifying data

**Medications**
Inpatient
Abilify, 5 mg, 1 tab, Oral, Daily@12
acetaminophen, 650 mg, 2 tab, Oral, q8hr, PRN
docusate, 100 mg, 1 cap, Oral, BIDAM+PM, PRN
glipiZIDE 2.5 mg oral tablet, extended release, 2.5 mg, 1 tab, Oral, Daily
ibuprofen, 400 mg, 1 tab, Oral, TID, PRN
Milk of Magnesia 8% oral suspension, 30 mL, Oral, q8hr, PRN
naltrexone, 50 mg, 1 tab, Oral, Daily
Remeron, 15 mg, 1 tab, Oral, qPM, PRN
Home
No active home medications

**Allergies**
No Known Medication Allergies

**Social History**
Alcohol
Former, Wine, Liquor, 3-4 times per week, Withdrawal Symptoms Present Yes. Started age 14 Years. Stopped age 33 Years. Previous treatment: Alcoholics Anonymous.
Substance Abuse
Never

**Family History**
Addiction: Father.Negative: Mother.

**Immunizations**

| Event Name | Event Result | Date/Time |
|---|---|---|
| influenza virus vaccine, inactivated | 0.5 mL | 11/28/22 10:35:00 |
| SARS-CoV-2 (COVID-19) mRNA-1273 vaccine | 50 mcg | 12/10/21 09:27:00 |
| SARS-CoV-2 (COVID-19) mRNA-1273 vaccine | 100 mcg | 04/15/21 13:13:00 |
| SARS-CoV-2 (COVID-19) mRNA-1273 vaccine | 100 mcg | 03/18/21 16:20:00 |



**WARNING:** This report contains confidential, proprietary, and/or legally privileged information intended for the recipient only.

Exhibit

AGO 4737 – 4738

# F

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

Date : December 12, 2012

To : Chief Executive Officers
Chiefs of Mental Health

From : K. Allison
Kathleen Allison, Deputy Director
Facility Support, Division of Adult Institutions

T. Belavich PhD
Timothy G. Belavich, Ph.D., MSHCA, CCHP, Deputy Director (A)
Statewide Mental Health Program, Division of Health Care Services

Subject : USE OF OUTPATIENT HOUSING UNITS DIRECTIVE

**This memorandum supersedes the previous *"Use of Outpatient Housing Units"* memorandum dated May 9, 2012 (attached).**

The California Department of Corrections and Rehabilitation currently has a sufficient number of Mental Health Crisis Beds (MHCB). Although inmate-patients may have previously been housed in Outpatient Housing Units (OHU) rather than be referred to MHCB due to an insufficient number of MHCBs, this practice is no longer necessary and is not permitted.

* Placement in an OHU is permitted when a crisis assessment is necessary. A physician, psychiatrist, licensed psychologist, or nurse practitioner may order placement of an inmate-patient into OHU when an assessment is clinically warranted. If an inmate-patient is placed in OHU when a clinician is not available to do a face-to-face evaluation, such as after hours or on weekends, the inmate-patient may be placed on suicide observation until seen by the clinician. The initial intake evaluation shall occur and be documented within 24 hours and a face-to-face evaluation shall occur at the earliest practicable time and within no more than 48 hours of the verbal OHU placement order (*MHSDS Program Guide, 2009*, p. 12-5-30).

Only when circumstances prevent the clinician from making a clinical decision regarding admission to a higher level of care or release from the OHU during the first evaluation (within 24 hours) shall the full 48-hour evaluation period permitted by the MHSDS Program Guide (2009) be used. At any time, "when an inmate-patient in the OHU is [clinically] determined to require MHCB level of care, including Suicide Precaution and/or Watch," he or she shall be immediately referred to a MHCB (*Mental Health Services Delivery System (MHSDS) Program Guide, 2009*, p. 12-10-12). Inmate-patients may not be kept in OHU for higher level of care treatment, including MHCB level of care.

# MEMORANDUM



OHU length of stay shall not exceed 48 hours unless one of the following two conditions is met:

1. *The inmate-patient is referred to the MHCB. Inmate-patients must be transferred to the MHCB within 24 hours of the clinical decision to refer to MHCB. OHU length of stay shall not exceed 72 hours for inmate-patients referred to MHCB.* (MHSDS Program Guide, 2009, p. 12-5-30)

2. *The inmate-patient is awaiting Enhanced Outpatient Program (EOP) level of care placement and an "IDTT determines that the inmate-patient may be at risk if returned to any of the housing units available at that institution while awaiting transfer."* (MHSDS Program Guide, 2009, p. 12-5-31)

Additionally, OHU lengths of stay for EOP inmate-patients meeting Item # 2 of the exceptions above shall not exceed 30 days from endorsement. Clinical staff shall ensure the EOP level of care change is immediately completed upon evaluation and is promptly communicated to the correctional counselor to ensure transfer is initiated.

All mental health inmate-patients housed in OHU for an extended time beyond 72 hours shall receive mental health treatment according to the following guidelines:

| | | |
|---|---|---|
| Inmates transferring from mainline General Population or Correctional Clinical Case Management System | → | Shall receive enhanced mental health treatment as determined by a treatment team. |
| Inmates transferring from Reception Center, mainline, or Administrative Services Unit who were at the EOP level of care upon arrival to the OHU | → | Shall receive Enhanced Outpatient Treatment in accordance with applicable MHSDS Program Guide (2009) requirements. |

If you have questions concerning this memorandum, you may contact Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program, at (916) 691-0308 or via email at Laura.Ceballos@cdcr.ca.gov.

Attachment

cc: Judy Burleson, Associate Director, Program and Clinical Support
Statewide Mental Health Program, Division of Health Care Services
Nathan Stanley, Chief, Coleman Compliance
Statewide Mental Health Program, Division of Health Care Services
Rick Johnson, Chief, Health Care Placement Oversight Program
Statewide Mental Health Program, Division of Health Care Services
Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
Statewide Mental Health Program, Division of Health Care Services
Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
Statewide Mental Health Program, Division of Health Care Services
Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
Statewide Mental Health Program, Division of Health Care Services
Richard Kendall, Ph.D., Southern Mental Health Regional Administrator (A),
Statewide Mental Health Program, Division of Health Care Services

Exhibit
AGO 1926



SUMMARY | DECISION SUPPORT | PATIENT EDUCATION / SELF-MANAGEMENT

## MEDICATION TABLES CONT'D

### Naltrexone

| MEDICATION | DOSING* | ADVERSE EFFECTS* | COMMENTS* |
|---|---|---|---|
| **Naltrexone Oral Tablet**<br><br>**50 mg-100 mg**<br>**$$-$$$** | **Oral dosing:**<br>Usual dose: 50 mg orally once daily.<br>For patients on KOP naltrexone, a dose of 25 mg daily may improve tolerance.<br>May increase dose to 100 mg once daily after 1 month if no benefit from 50 mg/day.<br><br>If using for AUD, consider changing to acamprosate if no benefit from 100 mg/day after 1 month.<br><br>Patients should be opioid free (including tramadol) prior to initiating therapy for at least 7 days (opioid-free duration should be 5-7 half lives of last used opioid).<br><br>Hepatic impairment: Naltrexone undergoes significant liver metabolism. Use with caution due to risk of accumulating higher naltrexone plasma levels.<br><br>Renal impairment:<br>• Do not use if CrCl <30 | Adverse effects (oral and injection):<br>• Major: Eosinophilic pneumonia (injection only)<br>• Common: Nausea, injection site reactions, precipitated withdrawal, abdominal cramps, abdominal pain, arthralgia, myalgia, chills, rash<br>• Other: Headache, anxiety, sedation, dizziness, fatigue, insomnia, vomiting, diarrhea, transient asymptomatic elevated liver enzymes, depression, suicidal ideation, pain, anorexia, cramps, nasopharyngitits<br><br>Drug interactions:<br>• Opioid-containing medications (Contraindicated)<br>• Thioridazine (increased lethargy and somnolence)<br>• Disulfiram—use of two potentially hepatoxic meds is not recommended unless the probable benefits outweigh the known risks | Contraindications:<br>• Receiving opioid agonists<br>• Physiologic opioid dependence<br>• Acute opioid withdrawal<br>• Positive opioid screen<br>• Hypersensitivity to naltrexone or any component of the product including the diluent used in the injection<br>• Acute hepatitis or liver failure<br>• Inadequate muscle mass for injection<br>• Pregnancy<br>• Renal impairment<br><br>Warnings/Precautions:<br>• Vulnerability to opioid overdose due to loss of tolerance<br>• Precipitated opioid withdrawal<br>• Use in patients with evidence of less severe liver disease, or a history of recent liver disease must be carefully considered in light of its hepatotoxic potential<br>• No cases of hepatic failure due to oral naltrexone administration have ever been reported |
| RESTRICTED USE<br><br>**Naltrexone Extended Release Injectable Solution (Vivitrol®)**<br><br>**380 mg/vial**<br>**$$$$$** | RESTRICTED USE<br>**Injectable dosing:**<br>**Usual dose: 380 mg 1x q 28 days by deep intramuscular injection**<br><br>**The patient will be provided a medical alert device (e.g., bracelet/card) upon release**<br><br>**Criteria for Injection:**<br>**1. Willingness to receive injections**<br>**2. Difficulty adhering to an oral regimen**<br>**3. High risk of accidental overdose**<br>**4. Not a candidate for agonist therapy** | Additional considerations on depression, suicidal ideation and liver function abnormalities:<br>• 0-15% of oral naltrexone treated patients and 0-17% of placebo treated patients developed depression. New onset suicide attempt/ideation in 0-1% of oral naltrexone treated patients and 0-3% of placebo treated patients.<br>• Depression related events resulting in discontinuation of medication occurred in 1% of patients treated with injectable naltrexone and 0% of patients treated with placebo.<br>• Suicidal ideation, suicide attempt, suicide occurred in 1% of injectable naltrexone treated patients and 0% of placebo patients.<br>• 7 to 13% of patients treated with injectable naltrexone have increases in LFTs (depending on which LFT you are evaluating) compared to 2-6% of patients treated with placebo.<br>• The evidence that identified oral naltrexone as a hepatotoxin was not obtained in studies involving its use at the doses recommended for opioid blockade, or for treatment of alcohol dependence but at 300 mg/daily. | • A large proportion of patients had abnormal LFTs at baseline, further supporting the conclusion that the abnormalities observed are not attributable to oral naltrexone<br>• The risk of suicide is known to be increased in patients with substance abuse with or without concomitant depression<br>• Women of child bearing age<br>• Excreted in breast milk<br>• Reference: package insert<br>• Caution injection use in patients with thrombocytopenia or coagulopathy |

**Bold = Formulary**

*See prescribing information for complete description of dosing, adverse effects, drug interactions, precautions and contraindications

The cost scale $-$$$$$ represents the relative cost of acquisition of medication only. Frequency and complexity of medication administration (institution workload, effect on adherence) should be considered when determining overall cost-effectiveness of treatment.

Exhibit
MH Document
3/26/2023
20:03 PDT

H

**CMC - California Men's Colony**

(i)

Patient: **GOINS, ROBERT ANTHONY**
DOB/Age/Sex: 8/1/1987 / 35 years / Male CDCR: BL8291

## *Mental Health Documentation*

| | |
|---|---|
| Document Type: | MHPC Consult Emergent Progress Note |
| Document Subject: | Free Text Note |
| Service Date/Time: | 3/26/2023 19:55 PDT |
| Result Status: | Auth (Verified) |
| Perform Information: | Kranz,Eugene Licensed Psychologist (3/26/2023 20:03 PDT) |
| Sign Information: | Kranz,Eugene Licensed Psychologist (3/26/2023 20:03 PDT) |
| Authentication Information: | Kranz,Eugene Licensed Psychologist (3/26/2023 20:03 PDT) |

CIT Consult : Expresses suicidal ideation or recent attempts (Emergency)
CIT Reasons After : Avoidance of SHU/ASU
Kranz, Eugene Licensed Psychologist - 3/26/2023 19:29 PDT
CIT Reason After - Comment : "I heard bad news about my son today (video conference)...but also I've been here for two and half months and I'm mentally exhausted....I'm thinking about wrapping a sheet around my neck." How long have you been feeling this way? "A week." Have you told you PC? "I don't know." Per MH records there was no indication of SI on 3/21/2023 per PC note: IP denied SI and HI; reported "IP stated, "I'm good." I'm super depressed and mentally exhausted. I've been worried and concerned they will transfer me." "I am safe at this prison, I don't do well with people, I don't want to cell with others; I've been dreading it." IP's self report is incogruent with documentation.
IP was vague about "bad news" from son today. IP reports going to groups with full participation per records. IP has no hx of SIB or SA. IP has dx of GAD, ETOH (severe) and Adult anti social personality disorder.
Appearance-neat & clean, wearing eye glasses Behavior- normal psychomotor activity, good eye contact, Attitude-superficial, relatively cooperative until he was told that he wouldn't be going to CTC and that he can program at EOP LOC and work on coping skills to manage his stressors, Level of consciousness-alert, Speech and language-talkative, normal rate and volume, Mood-even, Affect-consistent with mood, Thought process-linear, goal-directed, Thought Content-appropriate to questions asked/discussed Hallucinations-none observed, none mentioned Sleep-reported poor sleep Appetite-reported poor appetite, S/I--see above & H/I-none mentioned

CIT discussed IP's sxs and functioning. Although IP was reporting SI with plan to try to hang self, he self report regarding being suicidal for a week was incongruent with documentation. In addition, it appears IP is wary of a possible transfer and is attempting to use impression management to obtain a LOC change. IP has no hx of SIB or SA; med compliant, attending groups frequently with good participation. Furthermore IP was vage about "stressors" except that he was "mentally exhausted" from being in ASU; couldn't or wouldn't discuss what specifically was exhausting about ASU environment. Documentation suggests that IP is concerned about a possible transfer. Given the totatity of this information it was deemed that IP could continue to program at EOP LOC and work on managing stressors at EOP LOC. This was shared with IP and IP reported "ok, what's your name? Spell it! Ok, after I go back in my cell and do what I got to do I'm going to file paperwork on you for deliberate indifference." IP declined to partipate in safety planning. IP's statement suggests planned calculation to use impression management to reach a HLOC and future orientation regarding planning to "file paperwork" on this writer after he engages in attention seeking, maladaptive bx.

At approx 19:05 a code was called due to IP placing a sheet around his neck with it attached to window. IP was standing on toilette seat with strip of sheet around his neck. Custody ordered IP to take the sheet of his neck and cuff up. IP calmly took the sheet off from around his neck and cuffed up. There were no injuries or marking per SPT. Writer, SPT and SGT went to IP's cell where it food, paperwork, and books were neatly stacked and organized. A very thin strip of sheet material was attached to the IP's window which a thicker piece of sheet material was made for the part that he put around his neck. After hours procedures were in affect after IP was cleared to return to his housing; thus IP was placed in alt housing on 1:1. Writer, or another PC, will evaluate IP tomorrow morning to determine if IP continues to need a HLOC. Initial impressions is that this was not a suicide attempt, but a gesture that is high rescue, low lethality bx in a attempt to affect LOC change and avoid a pending transfer or ASU environment.

**Encounter Info:** Patient Name: ROBERT GOINS,DOB: 08/01/1987,CDCR: BL8291,FIN: 10000000811331083BL8291,Facility: CMC,Encounter Type: Institutional Encounter



**WARNING: This report contains confidential, proprietary, and/or legally privileged information intended for the recipient only.**

## *Mental Health Suicide MPage Forms*

ENCTR Information : Encounter Info: Patient Name: ROBERT GOINS,DOB: 08/01/1987,,FIN: 10000000811331083BL8291,Facility: CMC,Encounter Type: Institutional Encounter

Kranz, Eugene Licensed Psychologist - 3/27/2023 13:13 PDT

**Self-Harm**
self harm date time : 3/26/2023 19:05 PDT
Was this a suicide attempt? : No *
Method Self-Harm : Hanging
Lethality : No
Injury Severity (0-4) : 0 No apparent injury * [redacted]

Kranz, Eugene Licensed Psychologist - 3/27/2023 13:13 PDT

Disposition : Return to previously assigned housing program

Kranz, Eugene Licensed Psychologist - 3/27/2023 13:14 PDT

~~{ [Referral to MHCB] - previously charted by Kranz, Eugene Licensed Psychologist at 3/27/2023 13:13 PDT};~~

**5 Day Follow-up Entered On: 3/29/2023 9:49 PDT**
**Performed On: 3/29/2023 9:47 PDT by McGowan, Phenetre Unlicensed Psychologist**

**Patient Encounter Information**
ENCTR Information : Encounter Info: Patient Name: ROBERT GOINS,DOB: 08/01/1987,,FIN: 10000000811331083BL8291,Facility: CMC,Encounter Type: Institutional Encounter

McGowan, Phenetre Unlicensed Psychologist - 3/29/2023 9:47 PDT

**5 Day Follow-up Continue**
MH Day : 2
5D Staff completing follow up : Mental Health
5D MHCB DC Documentation Option : This form
5D MHCB Admission Reason : IP expressed SI. IP was not admitted

5D Patient's Future Tx Needs : IP was returned to housing w/ 5 day follow-up.

"I heard bad news about my son today (video conference)...but also I've been here for two and half months and I'm mentally exhausted....I'm thinking about wrapping a sheet around my neck." How long have you been feeling this way? "A week." Have you told you PC? "I don't know." Per MH records there was no indication of SI on 3/21/2023 per PC note: IP denied SI and HI; reported "IP stated, "I'm good." I'm super depressed and mentally exhausted. I've been worried and concerned they will transfer me." "I am safe at this prison, I don't do well with people, I don't want to cell with others; I've been dreading it." IP's self report is incogruent with documentation.
IP was vague about "bad news" from son today. IP reports going to groups with full participation per records. IP has no hx of SIB or SA. IP has dx of GAD, ETOH (severe) and Adult anti social personality disorder.
Appearance-neat & clean, wearing eye glasses Behavior- normal psychomotor activity, good eye contact, Attitude-superficial, relatively cooperative until he was told that he wouldn't be going to CTC and that he can program at EOP LOC and work on coping skills to manage his stressors, Level of consciousness-alert, Speech and language-talkative, normal rate and volume, Mood-even, Affect-consistent with mood, Thought process-linear, goal-directed, Thought Content-appropriate to questions



**WARNING: This report contains confidential, proprietary, and/or legally privileged information intended for the recipient only.**

Exhibit
AGO 3538



*Table 14: Frequency of Mental Health Diagnoses of Suicide Decedents, 2020-2022*

| Diagnosis | 2020 | 2021 | 2022 |
|---|---|---|---|
| Major Depressive Disorder | 7 | 2 | 6 |
| Unspecified Depressive Disorder | 4 | 0 | 4 |
| Bipolar Disorder | 1 | 2 | 1 |
| Schizophrenia and Schizoaffective Disorder | 2 | 5 | 2 |
| Psychotic Disorder Not-Otherwise-Specified | 2 | 0 | 4 |
| Delusional Disorder | 1 | 0 | 0 |
| Anxiety Disorder | 4 | 3 | 3 |
| Adjustment Disorder | 4 | 1 | 2 |
| Post-Traumatic Stress Disorder | 2 | 2 | 3 |
| Personality Disorders | 7 | 4 | 2 |
| Alcohol Abuse or Dependence | 1 | 0 | 0 |
| Any Substance Use-related Disorder | 5 | 3 | 4 |
| Other Diagnoses | 4 | 1 | 0 |

## Suicide Attempt History

In 2022, 47% (N=9) of suicide decedents had a history of suicide attempts in the community and/or while in CDCR custody. Of these, five (56%) had documented reports of community suicide attempts but no attempts in CDCR custody. There was evidence by self-report or documentation that seven (78%) had multiple suicide attempts in the past. The overall percentage of 2022 suicide decedents with a history of suicide attempts were lower than the five previous years (2017-2021), when, on average, 63% of suicide decedents had a history of CDCR or community suicide attempts.

## Suicide Precipitants and Behavior

When an individual dies by suicide, oftentimes there are stressful life events in the weeks or months prior to death that can play a role in triggering an individual's decision to make a suicide attempt[26]. These events are often identified as "precipitating" events. In many cases, the precipitants or drivers were not entirely clear or definitively established. Rather, those identified by suicide case reviewers should be considered clinically presumptive about each individual's specific reasons for ending their life, based on available records and information reviewed posthumously.

Rarely can one precipitant or driver be identified as the sole reason someone made the decision to end their life. More often, there are multiple precursors that accumulate on top of pre-existing vulnerabilities. Reviewers identified 17 separate precipitants and drivers among the 19 suicides, many of which similar precipitants were experienced from several individuals totaling 40 precipitants. The frequency of

[26] Buchman-Schmitt, J. M., Chu, C., Michaels, M. S., Hames, J. L., Silva, C., Hagan, C. R., Ribeiro, J. D., Selby, E. A., & Joiner, T. E. (2017). The role of stressful life events preceding death by suicide: Evidence from two samples of suicide decedents. *Psychiatry Research, 256*, 345-352. https://doi.org/10.1016/j.psychres.2017.06.078

Exhibit

AGO 84
AGO 86
Speciality
Physical
Therapy
Documents
*Progress Notes
3/28/2024

# J

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE**
**CDCR 602 HC (Rev. 10/18)**

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

**STAFF USE ONLY** Expedited? ☐ Yes ☐ No Tracking #: CMC HC 26000250

Staff Name and Title (Print) Signature Date

**If you think you have a medical, mental health or dental emergency, notify staff immediately.** If additional space is needed, use Section A of the CDCR 602 HC A Health Care Grievance Attachment. Only one CDCR 602 HC A will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to California Code of Regulations (CCR), Title 15, Chapter 2, Subchapter 2, Article 5 for further guidance with the health care grievance process.

**Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First, MI): | CDCR #: | Unit/Cell #: |
|---|---|---|
| Goins, Robert | BL-8291 | D8-8353 |

**SECTION A:** Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy:

On April 14,2026;I was able to determine that 'Licensed Psychologist
Eugene Kranz' falsified a report surrounding an injury I sustained on
3/26/2023;while housed at the Restrictive Housing Unit at C.M.C.
Psychologist Eugene Kranz failed to interview me before submitting an
inherently false account of the events surrounding my suicide attempt after
I was arbritrarily denied 'Crisis Intervention Treatment'.It appears as if
staff other than a qualified/trained mental health care employees account
was adopted by Psychologist Eugene Kranz in order to minimize the seriousness
of the attempted suicide.During the current litigation of this issue
Psychologist Kranz admits that information he received after the incident
caused the report to contain false facts.Title 15 sec.3999.330(e) violated

**Supporting Documents Attached. Refer to CCR 3999.227** ☐ Yes ☒ No (will provide at a later date)

**Grievant Signature:** R. [signature] **Date Submitted:** April 15,2026

**BY PLACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL.** R.G.

**SECTION B: HEALTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only** Is a CDCR 602 HC A attached? ☒ Yes ☐ No

This grievance has been:

☐ Rejected (See attached letter for instruction): Date: ______ Date: ______

☐ Withdrawn (see section E)

☐ Accepted Assigned To: ______ Title: ______ Date Assigned: ______ Date Due: ______

Interview Conducted? ☐ Yes ☐ No Date of Interview: ______ Interview Location: ______

Interviewer Name and Title (print): ______ Signature: ______ Date: ______

Reviewing Authority Name and Title (print): ______ Signature: ______ Date: ______

**Disposition: See attached letter** ☐ Intervention ☐ No Intervention

**HCGO Use Only:** Date closed and mailed/delivered to grievant:

1. Disability Code: ☐ TABE score ≤ 4.0 ☐ DPH ☐ DPV ☐ LD ☐ DPS ☐ DNH ☐ DDP ☐ Not Applicable

2. Accommodation: ☐ Additional time ☐ Equipment ☐ SLI ☐ Louder ☐ Slower ☐ Basic ☐ Transcribe ☐ Other*

3. Effective Communication: ☐ Patient asked questions ☐ Patient summed information. Please check one: ☐ Not reached* ☐ Reached *See chrono/notes

4. Comments:

RECEIVED CMC APR 21 2026 HCGO

STAFF USE ONLY

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE ATTACHMENT**
**CDCR 602 HC A (10/18)**

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

**STAFF USE ONLY**

Tracking #: CMC HC 26000250

Attach this form to the CDCR 602 HC, Health Care Grievance, only if more space is needed. Only one CDCR 602 HC A may be used.
**Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First, MI): | CDCR Number: | Unit/Cell Number: |
|---|---|---|
| Goins,Robert | BL-8291 | D8-8353 |

**SECTION A:** Continuation of CDCR 602 HC, Health Care Grievance, Section A only (Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy):

Psychologist Kranz's conduct denotes a lack of training for mental health care personnel here at the California Mens Colony.Evenmore,a lack of supervision is highlighted by the misconduct complained about here.
I'm entitled to adequate mental health care while under the jurisdiction of the Department of Corrections;this basic an necessary right was denied to me on more than one occasion while housed at this facility.
The conclusions arrived at by Psychologist Kranz were primarily motivated at least in part by a deep racially bias against African -American inmates.
Inmates not of African-American decent are not treated with the same or similar discourtesy as I/M Goins after an attempted suicide.
I suffer from auditory hallucinations on a daily basis;I've been diagnosed as 'Major Dispressive Disorder Severe';and Adult ~~Anti-Social~~ Disorder.
I'm currently housed at the Enhanced Out Patient level of care.
Corrective action should ensue following the events complained about in this appeal in the very least on the job training as well as proper supervision for subordinate employees. Finally I'm asking for monetary damages for the Constitutional violations outlined in this appeal.

Grievant Signature: R. G[signature] Date Submitted: April 15,2026

**SECTION B:** Staff Use Only: Grievants do not write in this area. Grievance Interview Clarification. Document issue(s) clarified during interview.

Name and Title: ______ Signature: ______ Date : ______

RECEIVED
CMC
APR 21 2026
HCGO

**STAFF USE ONLY**

**CMC - California Men's Colony**

Patient: **GOINS, ROBERT ANTHONY**
DOB/Age/Birth Gender: 8/1/1987 / 37 years / Male CDCR: BL8291

***Consultation Notes***

| | |
|---|---|
| Document Type: | Physical Therapy Consultation |
| Document Subject: | Cervical pain |
| Service Date/Time: | 5/26/2023 07:11 PDT |
| Result Status: | Auth (Verified) |
| Perform Information: | Hall,Leonard PT (5/26/2023 07:12 PDT) |
| Sign Information: | Hall,Leonard PT (5/26/2023 08:57 PDT) |
| Authentication Information: | [Hall,Leonard PT; Hall,Leonard PT (5/26/2023 08:57 PDT)]; Hall,Leonard PT (5/26/2023 08:52 PDT); Hall,Leonard PT (5/26/2023 07:34 PDT); Hall,Leonard PT (5/26/2023 07:32 PDT); Hall,Leonard PT (5/26/2023 07:21 PDT); Hall,Leonard PT (5/26/2023 07:18 PDT); Hall,Leonard PT (5/26/2023 07:16 PDT); Hall,Leonard PT (5/26/2023 07:14 PDT) |

**Encounter Info: Patient Name: ROBERT GOINS,DOB: 08/01/1987,CDCR: BL8291,FIN: 10000000811331083BL8291,Facility: CMC,Encounter Type: Institutional Encounter**

**SPECIALTY CONSULT PHYSICAL THERPY INITIAL EVALUATION**

Reason for Consult: Cervical pain

History: 35 year old I/P presents with the chief complaint of cervical pain. I/P attempted suicide on 3/26/2023 by hanging. Subsequently I/P has had numbness with pins-and-needles in the posterior neck area as well as some weakness in the left upper extremity.

ROM: Cervical ROM is restricted in rotation and side bending to the right

Other Musculoskeletal History: Seen in physical therapy for left shoulder pain in 2021.

Work Duties: Education

Current Housing Restrictions/Accomodations: None currently listed in the EUHR

**Diagnostic Studies:**



**WARNING:** **This report contains confidential, proprietary, and/or legally privileged information intended for the recipient only.**